**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,** | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   **Civil Action No. 11-6533** |
| **CITY OF PHILADELPHIA,** | ) ) ) |
| Defendant. | ) ) |

**PLAINTIFF NAACP'S OPPOSITION TO**
**DEFENDANT CITY OF PHILADELPHIA'S MOTION TO DISMISS**

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

I.     BACKGROUND ............................................................................................................... 1

II.    THE CITY'S MOTION TO DISMISS ............................................................................. 3

III.   SUMMARY OF THE NAACP'S ARGUMENT IN OPPOSITION TO THE CITY'S MOTION .......................................................................................................... 3

IV.   ARGUMENT .................................................................................................................... 4

       A.    The Court Should Not Decide This Case Without A Full Factual Record ............ 4

       B.    If The Court Is Inclined To Classify The Forum At This Stage Of The Case, It Should Decide That The Airport Advertising Space Is A Designated Public Forum, And That The City's Advertising Policy Does Not Pass Strict Scrutiny ................................................................................... 7

            1.    The Airport Advertising Space Is A Designated Public Forum ................. 7

            2.    The City's Prohibition Of All Non-Commercial Speech Cannot Withstand Strict Scrutiny ............................................................................ 8

       C.    Even If The Airport Advertising Space Were A Non-Public Forum, The City's Policy Is Neither Reasonable Nor Viewpoint Neutral .............................. 11

       D.    The Regulation Is Unconstitutionally Vague ....................................................... 12

       E.    The Court Should Not Dismiss The NAACP's Claim Under The Pennsylvania Constitution ..................................................................................... 14

V.    CONCLUSION ............................................................................................................... 15

**TABLE OF AUTHORITIES**

**CASES**

*AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*,
   42 F.3d 1 (1st Cir. 1994) ............................................................................................. 6, 12

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of the City of Chicago*,
   45 F.3d 1144 (7th Cir. 1995) ............................................................................................ 6

*Am. Freedom Defense Initiative v. Wash. Metro. Area Transit Auth.*
   --- F. Supp. 2d --- No. 12-1564, 2012 WL 4845643 (D.D.C. Oct. 12, 2012) ............................ 9

*Bistrian v. Levi*,
   696 F.3d 352 (3d Cir. 2012) ....................................................................................... 3, 10

*Children of the Rosary v. City of Phoenix*,
   154 F.3d 972 (9th Cir. 1998) ............................................................................................ 6

*Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*,
   148 F.3d 242 (3d Cir. 1998) ...................................................................................... passim

*City of Lakewood v. Plain Dealer Publ'g Co.*,
   486 U.S. 750 (1988) ....................................................................................................... 13

*Cornelius v. NAACP Legal Def. and Educ. Fund*,
   473 U.S. 788 (1985) ......................................................................................................... 6

*Delano Farms Co. v. Calif. Table Grape Comm'n*,
   586 F.3d 1219 (9th Cir. 2009) .......................................................................................... 8

*Gregoire v. Centennial Sch. Dist.*,
   907 F.2d 1366 (3d Cir. 1990) ........................................................................................... 5

*Hastings Christian Fellowship v. Martinez*,
   130 S.Ct. 2971 (2010) ...................................................................................................... 6

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*,
   505 U.S. 672 (1992) ......................................................................................................... 6

*Johanns v. Livestock Mktg. Ass'n*,
   544 U.S. 550 (2005) ......................................................................................................... 8

*Lebron v. Nat'l Passenger Corp. (Amtrak)*,
   69 F.3d 650 (2d Cir. 1995) ............................................................................................... 6

*Lebron v. Wash. Metro. Area Transit Auth.*,
    749 F.2d 893 (D.C. Cir. 1984) ........................................................................................... 7

*Lehman v. City of Shaker Heights*,
    418 U.S. 298 (1974) ........................................................................................................... 6

*McTernan v. City of York*,
    577 F.3d 521 (3d Cir. 2009) ............................................................................................... 6

*Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ......................................................................................................... 11

*Pap's A.M. v. City of Erie*,
    812 A.2d 591 (Pa. 2002) .................................................................................................. 14

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
    653 F.3d 290 (3d Cir. 2011) ..................................................................................... passim

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ........................................................................................................... 8

*Rosenberger v. Rector and Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ......................................................................................................... 11

*U.S. Sw. Africa/Namibia Trade & Cultural Council v. United States*,
    708 F.2d 760 (D.C. Cir. 1983) ......................................................................................... 10

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit
    Auth.*,
    163 F.3d 341 (6th Cir. 1988) ....................................................................................... 7, 13

*United States v. Macarvage*,
    609 F.3d 264 (3d Cir. 2010) ............................................................................................... 6

*W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*,
    515 A.2d 1331 (Pa. 1986) ................................................................................................ 14

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ........................................................................................................... 6

I.      BACKGROUND

In 2011, the National Association for the Advancement of Colored People submitted a billboard advertisement to be displayed on one of the interior wall spaces at the Philadelphia International Airport that the City of Philadelphia has set aside for advertising:

> Welcome to America, home to
> 5% of the world's people &
> 25% of the world's prisoners.
>
> Let's build a better America together.  NAACP.org/smartandsafe

The City rejected the advertisement.  The NAACP sued the City.  The City relented and agreed to post the NAACP ad for a limited time.

The City then issued a new regulation for Airport advertisements.[1]  The regulation prohibits advertisements that "do not propose a commercial transaction," *i.e.*, the only

---

[1]     The new regulation reads as follows:

**ADVERTISEMENTS**

1.  No person shall post, distribute, or display any Advertisement at the Airport without the express written consent of the CEO and in such manner as may be prescribed by the CEO.
2.  The CEO will not accept or approve any of the following Advertisements:
    a)  Advertisements that **do not** propose a commercial transaction;
    b)  Advertisements relating to the sale or use of alcohol or tobacco products;
    c)  Advertisements that contain sexually explicit representations and/or relate to sexually oriented businesses or products; and/or
    d)  Advertisements relating to political campaigns.
3.  The City shall have the right to post or cause to be posted its own advertising promoting:
    a)  Air Service;
    b)  The use of Airport related services;
    c)  The greater Philadelphia area and economy;
    d)  Philadelphia tourism initiatives; and

1

advertisements that the City will now allow are (1) those that do propose a commercial transaction and (2) the City's own advertisements.

In response to the City's new regulation, the NAACP filed an Amended Complaint asking this Court to permanently enjoin enforcement of the City's regulation, and alleging that:

- Before adopting its new advertising policy, the City had accepted a wide variety of advertising, including many "non-commercial" advertisements that could be considered controversial. ¶¶ 17, 21 (detailing numerous examples of non-commercial advertisements).

- None of the non-commercial advertising that the City previously permitted caused any harm to the City, the Airport, or the passengers who use the Airport. ¶ 22.

- Until March 2012, when it issued its new regulation, the City had never had a written regulation concerning advertisements at the Airport. ¶ 18.

- The display of the NAACP Advertisement and non-commercial advertisements will cause no harm to the City, the Airport, the airline passengers, or others who use the Airport, as demonstrated by the City's previous acceptance of non-commercial, issue-oriented, educational, and advocacy advertisements. ¶¶ 16, 20, 23.

- Under the new policy, the City is permitted to display City advertisements that do not propose a commercial transaction. Advertisements honoring the Red Cross and other non-profit groups have been placed at the Airport. ¶ 29.

- The new policy does not define "commercial transaction," ¶ 19, such that it is unclear if the NAACP's advertisement would be permitted under the policy if it merely added the words, "Donate money to the NAACP," or "Buy a t-shirt to support the NAACP."

- The City has stated that it previously permitted the display of non-commercial advertisements because it could not fill the airport advertising spaces with advertisements from paying customers. Accordingly, permitting the display of non-commercial advertisements will not cause the City to lose any revenue. ¶ 27.

- The City's policy contrasts with its policy on leafleting at the Airport, which permits non-commercial leafleting. ¶ 24.

- The City does not have a legitimate reason, let alone a compelling governmental interest, in prohibiting all non-commercial advertisements at the Airport. ¶ 3.

---

e)   Other City initiatives or purposes.

- The City rejected the NAACP's advertisement because of the advertisement's content and/or viewpoint. ¶ 13.

## II.   THE CITY'S MOTION TO DISMISS

The City has moved to dismiss the NAACP's amended complaint.  Of course, in deciding a Rule 12(b)(6) motion to dismiss, the Court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff."  *Bistrian v. Levi*, 696 F.3d 352, 358 n.1 (3d Cir. 2012).  In essence, then, by moving to dismiss, the City is arguing that this Court now can rule *as a matter of law* that the space in the Airport that the City makes available for advertising is a "non-public forum" for which the City can impose reasonable and viewpoint neutral restrictions on the content of advertisements, and further arguing that the Court, at this early stage, can rule *as a matter of law* that it is both reasonable and viewpoint neutral to ban all non-commercial advertisements.

## III.   SUMMARY OF THE NAACP'S ARGUMENT IN OPPOSITION TO THE CITY'S MOTION

The NAACP opposes the City's motion.  First, the Court cannot properly decide the issues in this case without the development of a factual record; for that reason alone, the Court should deny the City's motion to dismiss.  Second, if the Court is inclined to go further at this point, the Court should find that:  (a) the Airport advertising space is properly classified as a "designated public forum," rather than a "non-public forum"; (b) any restrictions on the content of advertisements are therefore subject to strict scrutiny and must be narrowly tailored to serve a compelling governmental interest; and (c) the City's restrictions cannot withstand such scrutiny.  Third, even if the Court were to conclude somehow that the Airport advertising space is indeed,

as the City contends, a "non-public forum," the ban on non-commercial speech is neither reasonable nor viewpoint neutral. Fourth, the distinction between advertisements that "propose a commercial transaction" and those that do not is unconstitutionally vague. Finally, even if the Court were to dismiss the NAACP's First Amendment claims, the City is wrong in its contention that the NAACP's claims under the Pennsylvania Constitution would therefore also have to be dismissed.

## IV. ARGUMENT

### A. The Court Should Not Decide This Case Without A Full Factual Record

The first step in deciding whether a governmental entity can restrict speech is to determine whether the government-owned property at issue is properly classified as a "public," "limited [or designated] public" or "non-public" forum. The classification of the forum determines the level of scrutiny to be applied, and the level of scrutiny is crucial to evaluating the restrictions at issue. *See Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290 (3d Cir. 2011), for a thorough explanation of the jurisprudence on this issue.[2]

---

[2] In *Pittsburgh League of Young Voters*, the Third Circuit stated:

> The Supreme Court has developed a forum analysis to determine when the government's interest in limiting the use of its property outweighs the interest of those wishing to use the property as a place for expressive activity. There are three types of fora. On one end of the spectrum lie traditional public fora. These fora, of which public streets and parks are examples, "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In traditional public fora, content-based restrictions on speech are subject to strict scrutiny (*i.e.*, the restrictions must be narrowly tailored to serve a compelling governmental interest). Next are designated public fora. These fora consist of public property that has not traditionally been regarded as a public forum but that the government has

The question of how to classify a forum is a quintessential mixed question of law and fact, and it can only be decided on a factual record.  Because it hinges on the intent of the government in creating the forum, *see Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 248-49 (3d Cir. 1998), the Court must examine the government's "policies and practices in using the space and also the nature of the property and its compatibility with expressive activity."  *Id.* at 249.  "[A]ny forum classification must be rooted in the facts of the particular case" and "should be triggered by what [the government] does, not what it says."  *Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) (quoting *Bd. of Educ. v. Mergens*, 496 U.S. 226, 244 (1984)).  Importantly, the government's "own statement of its intent . . . does *not* resolve the public forum question."  *Christ's Bride Ministries*, 148 F.3d at 251 (emphasis added) (citing *Gregoire*).  "To allow . . . the government's statements of intent to end rather than to begin the inquiry into the character of the forum would effectively eviscerate the public forum doctrine; the scope of first amendment rights would be determined by the government rather than by the Constitution."  *Gregoire*, 907 F.2d at 1374.  Furthermore, "[t]his factual inquiry into consistent policy and practice is necessary . . . [because it] guards against the dangers of post-hoc policy formulation or the discretionary enforcement of an effectively inoperative policy.  The government may not 'create' a policy to implement its newly-discovered

---

> intentionally opened up for use by the public as a place for expressive activity.  As is the case in traditional public fora, content-based restrictions are subject to strict scrutiny in designated public fora.  Finally, public property that is not by tradition or designation a forum for public communication constitutes a nonpublic forum.  Access to a nonpublic forum can be restricted so long as the restrictions are reasonable and viewpoint neutral.

653 F.3d at 295-96 (quotation marks and citations omitted); *see also Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 247 (3d Cir. 1998).

desire to suppress a particular message." *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of the City of Chicago*, 45 F.3d 1144, 1153 (7th Cir. 1995).

This Court would be ill-advised to decide now, on a motion to dismiss, an issue that other courts consistently have decided only later, with the benefit of a factual record. Indeed, although the City has cited several cases upholding governmental regulations, not even one is a case in which a district court decided the forum classification issue simply by granting the government's motion to dismiss. To the contrary, the courts in all those cases ruled only after a factual record had been developed either at a trial or hearing, or through discovery in advance of summary judgment motion practice.[3] And this is so not only in the cases the City has cited: **The NAACP has not found any Supreme Court or Third Circuit case in which the district court decided the forum-classification issue without benefit of a factual record.**[4]

---

[3] *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008) (district court decided forum issue at summary judgment); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) (district court decided forum issue at summary judgment); *Cornelius v. NAACP Legal Def. and Educ. Fund*, 473 U.S. 788 (1985) (district court decided forum issue at summary judgment); *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (appeal after trial); *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290 (3d Cir. 2011) (district court decided forum issue after trial); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir. 1998) (district court decided forum issue after hearing on application for preliminary injunction); *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242 (3d Cir. 1998) (district court decided forum issue after trial); *Lebron v. Nat'l Passenger Corp. (Amtrak)*, 69 F.3d 650 (2d Cir. 1995) (district court decided forum issue after trial).

[4] *See, e.g.*, *Hastings Christian Fellowship v. Martinez*, 130 S.Ct. 2971, 2981 (2010) (district court decided forum issue at summary judgment); *United States v. Macarvage*, 609 F.3d 264, 269, 274 (3d Cir. 2010) (magistrate judge decided forum classification issue after bench trial, district court agreed); *McTernan v. City of York*, 577 F.3d 521 (3d Cir. 2009) (district court decided forum classification issue after evidentiary hearing on preliminary injunction); *see also Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of the City of Chicago*, 45 F.3d 1144, 1152 (7th Cir. 1995) (reversing district court's grant of motion to dismiss and stating that "[d]etermining the government's intent is an inherently factual inquiry that should not be resolved without due attention to an underlying record"); *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 9 (1st Cir. 1994) (because of an "underdeveloped" record that contained "precious little evidence of the [defendant's] practice in accepting or rejecting ads over the past few years," court declined "to anchor an important First Amendment ruling on so fragile a foundation").

The NAACP urges the Court to deny the City's motion to dismiss and to allow the parties to develop a factual record.

**B.     If The Court Is Inclined To Classify The Forum At This Stage Of The Case, It Should Decide That The Airport Advertising Space Is A Designated Public Forum, And That The City's Advertising Policy Does Not Pass Strict Scrutiny**

**1.     The Airport Advertising Space Is A Designated Public Forum.**

If the Court is inclined to classify the forum now, without the benefit of a factual record, it should decide that the Airport advertising space is a "designated" public forum, rather than a non-public forum.

A designated public forum "consist[s] of public property that has not traditionally been regarded as a public forum but that the government has intentionally opened up for use by the public as a place for expressive activity." *Pittsburgh League of Young Voters*, 653 F.2d at 296 (citation and quotation marks omitted). In *Christ's Bride Ministries*, for instance, the government set aside certain spaces on its mass transit vehicles and in its mass transit stations for advertising. 148 F.3d at 244-45. Based on the government's (1) written policies, which specifically provided for the exclusion of only a very narrow category of ads, (2) goal of generating revenues through the sale of ad space, and (3) past practice of permitting virtually unlimited access to the forum, the Third Circuit held that the government had had created a designated public forum that was suitable for the speech in question – posters which presented messages concerning abortion and health issues. *Id.* at 252; *see also United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Auth.*, 163 F.3d 341, 355 (6th Cir. 1988) (defendant transit authority, "through its policies and actions, demonstrated an intent to designate its advertising space a public forum"); *Lebron v. Wash. Metro. Area Transit Auth.*, 749

-7-

F.2d 893, 896 n.6 (D.C. Cir. 1984) (concluding that defendant transit authority, by accepting political advertising, had made its subway stations into public fora).

Here, the City's use of the Airport advertising space to generate revenue through expressive activity demonstrates that the City "has dedicated the space to expression in the form of paid advertisements." *Christ's Bride Ministries*, 148 F.3d at 250. Its past practice of permitting non-commercial advertisements demonstrates that the Airport advertising spaces are compatible with that category of expression. Accordingly, the Airport advertising space is a designated public forum.[5]

### 2. The City's Prohibition Of All Non-Commercial Speech Cannot Withstand Strict Scrutiny.

Any content-based restrictions on speech within a designated public forum "must pass strict scrutiny to comport with the First Amendment," *Christ's Bride Ministries*, 148 F.3d at 255 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)), and must be

---

[5] The City misunderstands why the Amended Complaint discusses the fact that the regulation allows the City to post the City's own non-commercial advertising. Def. Mot. at 12-13. The City's practice of posting its own non-commercial advertising is relevant when determining the nature of the forum and its compatibility with expressive activity at issue, and more specifically, whether any harm might be caused by the display of non-commercial advertising. Furthermore, discovery may show that the City is favoring some viewpoints over others, using the designation of its "own" advertising to provide cover for the City's viewpoint discrimination.

The cases cited by the City regarding "government speech" are irrelevant here. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 464 (2009) ("[T]he display of a permanent monument in a public park is not a form of expression to which forum analysis applies. Instead, the placement of a permanent monument in a public park is best viewed as a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause."); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 562 (2005) ("Citizens may challenge compelled support of private speech, but have no First Amendment right not to fund government speech."); *Delano Farms Co. v. Calif. Table Grape Comm'n,* 586 F.3d 1219, 1220 (9th Cir. 2009) (holding that a state statutory scheme requiring growers to fund generic advertising for promotion of an agricultural product does not violate the First Amendment).

narrowly tailored to achieve a compelling governmental interest, *Pittsburgh League of Young Voters*, 653 F.3d at 295.

Few speech restrictions can survive strict scrutiny. For example, in *Am. Freedom Defense Initiative v. Wash. Metro. Area Transit Auth.*, the plaintiffs had submitted a pro-Israel anti-jihad advertisement for display on subway platforms. --- F. Supp. 2d ---, No. 12-1564, 2012 WL 4845643, at *1 (D.D.C. Oct. 12, 2012). Before the ads were displayed, however, a movie trailer that disgraced the Prophet Mohammad caused large and dangerous anti-American demonstrations. *Id.* Wary of a risk of violence or a terrorist attack, the defendant transit authority told the plaintiffs that it would postpone display of the ad. *Id.* Although the defendant's concern for the safety of its passengers and employees constituted a compelling interest, the court concluded that this content-based discrimination violated the First Amendment because it was not narrowly tailored to achieve that interest. *Id.* at *6-8. The court reasoned that if the defendant was concerned that inter-passenger disputes could cause passengers to fall down onto the tracks, the defendant could have placed the ads away from the subway platform. *Id.* at *7. Furthermore, the defendant's arbitrary timeline for the delay of the ad, not tied to any objective evaluation of necessity, was not the least restrictive means of serving the defendant's safety interest. *Id.* at *7-8.

In this case, the City states in its motion that its purpose in restricting the content of advertising at the Airport is to "maintain the commercial environment created at and by the Airport, and in so doing to 'minimize chances of abuse, the appearance of favoritism, and the risk of imposing on a captive audience.'" Def. Mot. at 10. Maintaining a commercial environment hardly seems to be a compelling governmental interest, but in any event, the City

seems to have invented this purpose out of whole cloth solely for the purpose of this litigation. Nothing in the regulation itself supports the City's self-serving statement of purpose, and more importantly, the City's *post hoc* justification is at odds with the City's prior practice of allowing non-commercial advertising at the Airport. Indeed, in deciding this Rule 12(b)(6) motion, the Court must assume the truth of the NAACP's allegations, *see Bistrian*, 696 F.3d at 358 n.1, above, that non-commercial advocacy ads at the Airport have caused and will cause no harm of any kind.

Furthermore, even if the Court were to credit the City's litigation-driven statement of the purpose and were to conclude that "maintain[ing] a commercial environment" is indeed a compelling governmental interest, the City's regulation is not narrowly tailored, nor is it the least restrictive means available, to achieve that interest. First, the professed goal of "minimiz[ing] chances of abuse" is nonsensical. What "abuse" is the City concerned about? Second, even if the passengers at the Airport could be considered a "captive audience" – and the NAACP does not concede that they are[6] – surely the City could permit non-commercial advertising in certain advertising spaces at the Airport to avoid any risk of "imposing" on them. Finally, it is unclear what the City means by "avoiding the appearance of favoritism," but if it means that the City does not want to appear to be endorsing any particular non-commercial advertisement, the City simply could place a placard next to the advertisement stating that it did not endorse the advertisement, rather than banning all non-commercial advertisements from the Airport.

---

[6] *See U.S. Sw. Africa/Namibia Trade & Cultural Council v. United States*, 708 F.2d 760, 767 (D.C. Cir. 1983) ("A person in the airports' concourses or walkways who considers an advertisement – commercial or noncommercial – to be objectionable enjoys the freedom simply to walk away . . . .").

This Court could not now properly rule, without any factual record, that the City's regulation does indeed serve a compelling governmental interest and that the regulation is the least restrictive means available to serve that interest.

### C. Even If The Airport Advertising Space Were A Non-Public Forum, The City's Policy Is Neither Reasonable Nor Viewpoint Neutral

Even if the Court determined that the Airport's advertising space is a non-public forum, that would not end the case.  Even in a non-public forum, the First Amendment allows only those speech restrictions that are both reasonable and viewpoint neutral.  *Pittsburgh League of Young Voters*, 653 F.2d at 296; *see also Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."); *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.").

The City's regulation is hardly reasonable, given the allegations of the Amended Complaint that non-commercial advertisements pose no risk of harm or problem for the Airport, the City, or the passengers or others who use the Airport, and that the City's prior acceptance of these advertisements caused no without incident of any kind.  Am. Compl. at ¶¶ 20-23.

Furthermore, it is preposterous to label a regulation as viewpoint neutral when it creates this kind of a dichotomy:

| Proposes a Commercial Transaction, so ALLOWED | Does Not Propose a Commercial Transaction, so PROHIBITED |
|---|---|
| An ad for an abortion clinic | An ad posted by a "pro-life" organization |

|  | opposing all abortions |
| --- | --- |
| An ad urging people to buy BP gasoline | An ad posted by an environmental organization urging people not to buy BP gasoline because of BP's environmental record |
| An ad urging people to buy Pepsi soda | An ad by a diabetes organization urging people to avoid highly sugared drinks |

This is flagrant viewpoint discrimination. *See Pittsburgh League of Young Voters*, 653 F.3d at 297-98 (defendant's acceptance of several noncommercial ads for placement in its buses, and rejection of plaintiff's ad for the stated reason that it was noncommercial, "was evidence that the District Court could properly consider as strongly suggesting viewpoint discrimination"); *AIDS Action Comm. of Mass., Inc. v. Mass. Bay Transp. Auth.*, 42 F.3d 1, 11-12 (1st Cir. 1994) (affirming injunction of transportation authority's advertising policy because uneven application of policy gave rise to appearance of viewpoint discrimination).

### D.     The Regulation Is Unconstitutionally Vague

There is yet another problem with the City's regulation. It is unconstitutionally vague. The distinction between those advertisements that "propose a commercial transaction" and those that do not may seem at first blush to be clear, but it is actually highly ambiguous. For example, who can say whether these hypothetical ads do or do not "propose a commercial transaction":

- An advertisement by Exxon that describes only Exxon's efforts to preserve the environment but does not explicitly urge anyone to buy Exxon gasoline.

- An ad by Pepsi that has pictures of happy members of the Pepsi generation but shows no actual Pepsi cans or bottle.

- An ad by Macy's:  "Macy's wishes everyone a joyous holiday season."

- An ad by Planned Parenthood:  "Providing care to women for 50 years."

-12-

And if the City were to say that Macy's could post an ad "wishing everyone a joyous holiday season" because Macy's is implicitly "proposing a commercial transaction, what would the City say about a Sierra Club ad that also "wishes everyone a joyous holiday season", or would the Sierra Club advertisement have to include the words, "Buy a Sierra Club t-shirt" in order for the City to permit it?

"'[S]tandards for inclusion and exclusion' in a limited public forum 'must be unambiguous and definite' if the 'concept of a designated open forum is to retain any vitality whatever.'"  *Christ's Bride Ministries*, 148 F.3d at 251 (quoting *Gregoire*, 907 F.2d at 1375). Ambiguous and indefinite standards for inclusion and exclusion are problematic because they allow governmental officials to use "*post hoc* rationalizations" and "shifting or illegitimate criteria" to justify their behavior, "making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988); *see also United Food & Commercial Workers Union*, 163 F.3d at 352 ("[W]e will hold that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum's designated purpose.").

Because the City's new regulation does not define the terms "commercial" or "transaction," or the phrases "commercial transaction" or "propose a commercial transaction," it fails to enable a reasonable member of the public to know which advertisements are permitted or not permitted under the policy, and it vests City officials with unfettered discretion to decide which advertisements to permit or reject.  Am. Compl. at ¶ 19.

### E. The Court Should Not Dismiss The NAACP's Claim Under The Pennsylvania Constitution

In a throwaway argument at the end of its Motion, the City says that because the NAACP's First Amendment claim must be dismissed, it follows that the NAACP's Pennsylvania constitution claim must also fail.

Not so. Even if the Court were to dismiss the First Amendment claim, it would need to analyze the Pennsylvania constitution claim separately. *See Pap's A.M. v. City of Erie*, 812 A.2d 591, 609 (Pa. 2002) (when faced with claims sounding under both the United States and Pennsylvania Constitutions, a court should conduct an independent analysis under Pennsylvania law).

Pennsylvania courts have made clear that the Pennsylvania constitution provides a "more expansive protection than the First Amendment." *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1338 (Pa. 1986); *see also id.* at 1333 ("In our federal system, the Constitution of United States provides a minimum level of protection for individual rights. A state constitution may [ ] provide greater protection for those rights."); *Pap's A.M.*, 812 A.2d at 603 ("Article I, §7 is broader than the First Amendment"). The difference is rooted in Pennsylvania's unique history regarding the freedom of expression. *Pap's A.M.*, 812 A.2d at 605. Thus, while the Pennsylvania Supreme Court has often "followed the lead of the Supreme Court in matters of expression under Article I, §7," the Court has noted that there is "an entirely different jurisprudential and constitutional imperative at work when the [Pennsylvania Supreme Court], which has the final word on the meaning of [its] own Charter . . . is charged with the duty to render a judgment." *Id.* at 611. In sum, claims under Article I, §7 cannot be governed solely

-14-

by First Amendment jurisprudence because Article I, §7 affords "broader protections than are afforded by its federal counterpart." *Id.*

Having filed a motion to dismiss, the City bears the burden of persuading this Court that the City's regulation is permissible under the Pennsylvania constitution. The City has provided no analysis whatsoever, however. Hence, even if the Court were to dismiss the First Amendment claim, it should not dismiss the NAACP's claim based on the Pennsylvania constitution.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the City's motion to dismiss.

Dated: November 19, 2012

Respectfully,

s/ Fred. T. Magaziner
Fred T. Magaziner
Alexander R. Bilus
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Phone: (215) 994-4000
Fax: (215) 994-2222

Aden J. Fine
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2583

Mary Catherine Roper
American Civil Liberties Foundation of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106
Phone: (215) 592-1513 ext. 116
Fax: (215) 592-1343

Witold J. Walczak
American Civil Liberties Foundation of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
Phone: (412) 681-7736
Fax: (412) 681-8707

Seth F. Kreimer
3400 Chestnut St.
Philadelphia, PA 19104
Phone: (215) 898-7447
Fax: (215) 573-2025

*Counsel for Plaintiff National Association for the Advancement of Colored People*

## CERTIFICATE OF SERVICE

I, Alexander R. Bilus, hereby certify that on November 19, 2012, I electronically filed the foregoing Plaintiff's Opposition to the City of Philadelphia's Motion to Dismiss via the Court's CM/ECF system and electronically served it upon all counsel of record.

Dated: November 19, 2012                                  s/ Alexander R. Bilus
                                                          Alexander R. Bilus