**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR | : | CIVIL ACTION |
| THE ADVANCEMENT OF COLORED | : | |
| PEOPLE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | NO. 11-cv-6533 |
| Defendant. | : | |

**DEFENDANT CITY OF PHILADELPHIA'S BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF NAACP'S
MOTION FOR SUMMARY JUDGMENT**

This case is a challenge to the Philadelphia Airport's Advertising Policy.  The Airport has decided to create a forum for only commercial advertising and the City's own speech on certain topics in its advertising spaces.

Contrary to the NAACP's assertions, and in line with Third Circuit precedent, *see Pittsburgh League of Young Voters v. Port Authority*, 653 F.3d 290, 299 (3d Cir. 2011), the Airport Advertising Policy is well within the bounds of the First Amendment.  This is so because the Airport, including its advertising space, is not a place for the public to express its views.  *See ISKCON v. Lee*, 505 U.S. 672, 682 (1992).  The Airport's purposes are to provide safe travel as well as airline and other commercial services to travelers.

In *ISKCON*, the Supreme Court recognized that airports "are commercial establishments funded by users fees and designed to make a regulated profit . . . and where nearly all who visit do so for some travel related purpose."  *See id.* at 682.  The Supreme Court also recognized that airports are different from other travel centers, such as rail and bus stations, due to security requirements and the restricted access to airport terminals.  *See id.*; *see also Christ's Bride v. SEPTA*, 148 F.3d 242, 250 (3d Cir. 1998) (same).  That is still the case at the Airport today, if not more so.

The policy to limit Airport advertising space to commercial messages and to the City's own mainly Airport and tourism-related speech has reasonable roots in this concept of airports versus public fora.  Airport officials put this policy in place to earn money for the Airport from the sale of its advertising spaces, to avoid controversy, and to cater to the travelers going through the Airport.  Given that this policy does not discriminate with respect to viewpoint – it does not facilitate one side of a debate and squelch the other – and given that the Airport actually does provide designated free speech zones where people can express themselves, this Court must reach the conclusion that the Airport Advertising Policy is reasonable and constitutional.

I.      **Facts.**

   **A.  The NAACP's Initial Complaint.**

In 2011, the Airport ran an advertising program to display paid advertising in display cases and other sites at the Airport.  Tyrell Dep., Exhibit I, at 8.  The Airport's contract with its concessionaire, Clear Channel, "pretty much" set forth the terms of what advertisements would be posted.  Exhibit I at 7-8.  The Airport also used unwritten "general guidelines" to limit advertising at the Airport to commercial advertising.  Exhibit I at 9-10.  The Airport had no written policy governing advertising at the Airport.  Exhibit E, Stipulated Facts ("SF") 2.

At the time, proposed advertisements would be sent to Clear Channel, and Clear Channel would send the proposal to Jim Tyrrell, Deputy Director of Aviation.  Exhibit I at 10-11.  Tyrell would review the proposal, and if he approved it, the ad would be sent to the Airport CEO for final approval prior to posting.  Exhibit I at 10.  During this time, Clear Channel and the Airport posted free "filler" advertisements in empty display cases "when we needed to fill them with something," and some of those "filler" advertisements were non-commercial advertisements.  Exhibit I at 14.

On January 2011, the NAACP submitted an advertisement to Clear Channel for display at the Airport that stated:  "Welcome to America, home to 5 % of the world's people & 25% of the

world's prisoners." ("Misplaced Priorities Advertisement").  Exh. E at SF 3, 4.  The Airport rejected the Misplaced Priorities Advertisement.  Exh. E at SF 5.

The NAACP's only contact with the Airport was its submission of the proposed Misplaced Priorities Advertisement.  Kasravi Dep, Exhibit Q, at 22-23.  The NAACP did not make any effort or attempt to picket, leaflet, or distribute material at the Airport.  Wingerter Dep., Exh. P, at 58.

The NAACP did not submit the Misplaced Priorities Advertisement to other media in the City, nor was it posted anywhere else in the City.  Exh. P at 53, Exh Q at 22.  The sum total of the NAACP's efforts in the City was:  1) to hold a press conference; and 2) to put the advertisement on a "rolling billboard" that went through City streets for one day.  Exh. P at 37, 53, 73-74; Exh. Q at 32-33.

On October 19, 2011, the NAACP filed its initial complaint with this Court, naming the City and Clear Channel as defendants.  Complaint, Exh. D, Exh. E at SF 6.  The NAACP's initial complaint alleged that the rejection of the Misplaced Priorities Advertisement violated the First Amendment; alleged that the Airport had previously displayed advocacy and issue advertising similar in nature to the Misplaced Priorities Advertisement; and alleged that whatever policies and standards that resulted in the rejection of the Misplaced Priorities advertisement violated the First Amendment.  Exh. D at 1-2, 6-8.

### B.  The NAACP and the City Settle the Initial Complaint.

On June 21, 2012, the NAACP and the City filed a stipulation to "settle claims relating to the City's rejection of the Misplaced Priorities Advertisement."  Exh. E at SF 10.[1]  That settlement included an agreement by the City to place the Misplaced Priorities Advertisement for a period of three months at two locations at the Airport and to pay the NAACP $8,800 in attorney's fees.  Exh. E at SF 10.

---

[1]Clear Channel was dismissed as a defendant on June 6, 2012.  Exh. E at SF 9.

The parties also agreed that the NAACP would file an amended complaint "to challenge the *current* advertising policy at the Philadelphia International Airport."  Exh E at SF 10 (emphasis added).

On August 2, 2012, the NAACP filed its amended complaint to challenge the current advertising policy at the Airport.  Exh. E at SF 12.

### C.   The Current Advertising Policy at the Airport.

### 1.   March 2012:  Airport Regulations Are Issued.

In March of 2012, the City's Division of Aviation issued a comprehensive set of changes to Airport regulations ("Regulations").  Exh. E at SF 7.  The Regulations address, among other things, operations, airfield vehicle operations, fire safety, security, tenants, and picketing, leaflet distribution, solicitation, and advertising at the Airport.  Regulations, Exhibit A; Exh. E at SF 7.

Under the Regulations, the Airport is divided into a series of areas, each with different security levels and security compliance requirements.  Exh. A at 1-12, 7-1.  The "public areas" are the areas that are accessible to the general public, such as the public portions of all terminal buildings, the Airport parking lots, and Airport roadways.  Exh. A at 1-12, 7-1(C).

The Regulations provide that the Airport is a "security sensitive environment, designed and utilized as an air transportation facility" and that the Airport "is neither designed not intended as a public forum for First Amendment activities."  Exh. A at Appendix A 1-1. Towards that end, the Regulations distinguish between "commercial" and "non-commercial" activity at the Airport:

> **Commercial Activity**: a) The exchange, trading, buying, hiring or selling of commodities, goods, services or property of any kind in the Airport; b) engaging in any conduct in the Airport for revenue producing purposes, whether or not revenues ultimately are exchanged, obtained, or transferred in the Airport; c) the offering or exchange of any service in the Airport as a part of, or condition to, other revenue producing activities or service in or outside of the Airport.

4

**Non-Commercial Activity**; Any act or speech not related to the commercial promotion of a for-profit or other business enterprise, whether by individuals or organizations, and not pursuant to contract with the City of Philadelphia, its advertising contractor, or its master retail concessionaire, nor subject to the payment of regulation fees for the use of Airport space.  Non-Commercial activity shall include, without limitations, the distribution of literature, picketing, seeking signatures for petitions or conducting surveys.

Exh. A at 1-4, 1-10.

Leafleting, picketing, and other forms of non-commercial activity can only occur in designated public areas of the Airport.  Exh. A at Appendix A 1-14 (picketing and leafleting zones); Appendix B (non-commercial activity).

**2.  The Airport Advertising Policy**.

The March 2012 Regulations include the Airport Advertising Policy:

**Advertisements.**

1. No person shall post, distribute, or display any Advertisement at the Airport without the express written consent of the CEO and in such manner as may be prescribed by the CEO.

2. The CEO will not accept or approve any of the following Advertisements:
    a) Advertisements that **do not** propose a commercial transaction;
    b) Advertisements relating to the sale or use of alcohol or tobacco products;
    c) Advertisements that contain sexually explicit representations and/or relate to sexually oriented businesses or products; and/or
    d) Advertisements relating to political campaigns.

3. The City shall have the right to post or cause to be posted its own
    advertising promoting:
    a) Air Service;
    b) The use of Airport related services;
    c) The greater Philadelphia area and economy;
    d) Philadelphia tourism initiatives; and
    e) Other City initiatives or purposes.

**Advertisement**:  Sign, display, or other notice designed to attract public attention or patronage.

Exh. E at SF 8; Exh. A at 1-2.

5

3.   **The Clear Channel Advertising Concession and the Review Process for Advertisements Submitted to Clear Channel for the Airport Advertising Spaces.**

Since March 2012, Clear Channel has been the concessionaire for the paid advertising at the Airport.  Clear Channel Contract, Exhibit B, at 3, ¶ E.  These advertisements are posted on a set number of display cases, fixtures, and screens throughout the Airport (the "Airport's advertising spaces").  Exh. B. at 3, ¶ E, Contract Attachment A at 158-85 (setting forth locations for advertisements; Contract Attachment D (same).  The contract with Clear Channel provides that all advertising will be submitted to the Airport for review and approval, and that Clear Channel cannot display "filler" advertisements at the Airport.  Exh. B at 2.

Since March 2012, when a private entity has wanted to submit an advertisement for display at the Airport, it has been required to submit the advertisement to Clear Channel.  Exh. E at SF 13.  Clear Channel submits those proposed advertisements to the Airport.  Exh. E at SF 13.

The Airport submits the proposed advertisement to the Law Department to determine whether the proposed advertisement fits within Section 2 of the Airport Advertising Regulation. Tyrrell Dep., Exh. H at 32-36.  If the Law Department approves the proposed advertisement, that advertisement is submitted to Jim Tyrrell and his staff, who put together a package to send to the CEO, Mark Gale, for final approval prior to posting in the Airport's advertising spaces.  Exh. H at 36-37; Gale Dep., Exh. J, at 12-13.

Since March 2012, the Airport has rejected two proposed advertisements because the advertisements did not propose a commercial transaction, and the Airport rejected one advertisement because it was presented in an overly large "wall-wrap" format.  Exh. H at 36, 41-42.

The Airport's Advertising Regulation is designed and intended to do the following:  1) make money for the Airport; 2) avoid controversy at the Airport; and 3) cater to the passengers going through the Airport.  Exh. H. at 82, 85, 92, 109, 110; Exh. J at 14, 23; Exh. O at 5.

**4.   City Advertisements and the Review Process for City Advertisements.**

The Airport has a Marketing and Public Affairs Department that reports to the Airport Chief of Staff, Christine Derenick-Lopez.  Lopez Dep., Exh. K at 12.  The Marketing and Public Affairs Department works on promoting the Airport and the City.  Exh. K at 15-16.  Since March 2012, the Marketing and Public Affairs Department has posted advertisements at the Airport ("City advertisements").  Exh. K. at 21, 31-32.  City advertisements are posted on about one hundred monitors throughout the Airport; these monitors are separate from the Airport advertising spaces used for paid advertising through Clear Channel.  Exh. K. at 20-21.

Some of the City advertisements promote the Airport as a good place to choose for air travel.  Exh. K at 15-16 (Derenick-Lopez:  "[P]eople have choices. . . . Obviously, we want you to fly out of Philadelphia International Airport.")  Other City advertisements describe Airport programs and initiatives like "Art at the Airport."  Exh. K at 16, 18-19, 31-32; City Advertisements, Exh. R .

City advertisements also promote the City and the surrounding area as a tourist destination and as a good place to live.  Exh. K at 8, 12, 16, 20, 42-43.  City advertisements and videos promoting local tourist attractions and famous Philadelphians are posted on the monitors as well.  Exh. K at 21, 33; Exh. R.

The Airport has entered into Memoranda of Understanding ("MOUs") with three nonprofit tourism agencies:  1) the Philadelphia Convention and Visitors Bureau; 2) Select Greater Philadelphia; and 3) the Greater Philadelphia Tourism Marketing Corporation, to supply tourism advertisements for display on the City advertisement monitors.  Exh. K at 6-7, 18-19; MOUs, Exhibits L, M, and N.  The Airport determines which advertisements will be displayed, and when posted, the advertisements include the Airport logo or state that the advertisement is being made by the Airport.  Exh. K at 43-44, Exh. R.

City advertisements also go through a review process under Section 3 of the Airport Advertising Regulation.  Exh. K at 18, 45-46.  City advertisements are sent by the Airport to the Law Department for review.  Exh. K at 19-21, 42.  After Law Department approval, the

advertisements are sent to the Chief of Staff, Christine Derenick-Lopez, and the Airport CEO, Mark Gale, for final approval prior to posting on the City advertisement monitors.  Exh. K at 19-21, 42.

     **5.   The CNN Airport Network.**

     The Airport also has a network program for broadcasting news and entertainment on about fifty screens in the Airport gates.  Exh. I at 18.  Two corporations submitted proposals for the network program, Clear Channel and CNN Airport Network.  Exh. B, Attachment A at 186-296; CNN Concession Agreement, Exhibit C, Attachment E.  CNN Airport Network was selected to be the network broadcast service at the Airport.  Exh. I at 19, 2-18.  CNN puts together and presents the programming for the CNN Airport Network.  Exh. I. at 18, Exh. C at 8, ¶ A.

     In its agreement with the Airport, CNN states that "all programming, advertising, and promotional material" will comply with "highest industry standards"; will not be sexually explicit; and will not include graphic descriptions of violence.  Exh. C at 8.  CNN also agrees that "all advertisements" broadcast on the CNN Airport Network will comply with CNN's advertising standards and the City's regulations.  Exh. C at 26, ¶ H, Attachment B (CNN Advertising Policies and Practices).

     The agreement with CNN Airport Network also allows the City to have six minutes of advertising time each hour, or "Local Spots."  Exh. C at 8.B.  The City has not sold Local Spots for paid advertising.  Exh. I at 27-28.  Instead, the Airport has broadcast City advertisements promoting food concessions at the Airport or the City as a tourist destination.  Exh. I. at 28-30, Exh. L, M., N.

**D.  This Court's May 30, 2013, Opinion.**

On May 30, 2013, this Court denied the City's Motion to Dismiss.  In its opinion, this Court ruled:

> • The "forum at issue" for purposes of the NAACP's First Amendment and Article I, § 7 challenge to Section 2 of the Airport Advertising Policy was the Airport's advertising spaces.  Opinion at 6.
>
> • That "forum" was defined in terms of the access sought by the NAACP with its Misplaced Priorities Advertisement.  Opinion at 6.
>
> • This Court was not able to classify the forum as a nonpublic forum or a designated public forum without a more developed factual record, so any ruling on the First Amendment and Art. I, § 7 claims was premature.  Opinion at 8-9.
>
> • The First Amendment vagueness claim also required a more developed factual record.  Opinion at 9 n.29.
>
> • Any facial challenge to Section 3 of the Airport Advertising Policy "would necessarily fail" because Section 3 applies to City advertisements, which are government speech.  Opinion at 9, n.29.  This Court did not read the Amended Complaint to bring a facial challenge to Section 3, and the NAACP had stated that it was not its intent to bring such a challenge.  Opinion at 9, n.29.
>
> • It was not "clear" whether the June 20, 2012, stipulation operated "as a release of claims regarding the initial denial of the NAACP's request to advertise[]" and the Court required additional information to determine what claims were barred by that stipulation.  Opinion at 9-10, n. 29.

## II.    Summary Judgment Standard.

Summary judgment must be granted when the pleadings, affidavits and discovery materials produce no "genuine issue as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Lawrence v. National Westminster Bank*, 98 F.3d 61, 65 (3d Cir. 1996).  The non-moving party must point to specific evidence of record that demonstrates a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Although the Court must resolve all doubts and consider the evidence in the light most favorable to the opposing party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), it is well settled that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *See Robertson v. Allied Signal*, 914 F.2d 360, 382 n.12 (3d Cir. 1990); *see also Lexington Insurance Co. v. Western Pennsylvania Hospital*, 423 F.3d 318, 333 (3d Cir. 2005) (same).

## III.   Argument.

### A.  The NAACP's First Amendment Facial Challenges to Section 2 of the Airport Advertising Policy Are the Only Claims Before this Court.

To evaluate the motions for summary judgment, this Court must make some initial determinations regarding what First Amendment claims are before this Court, such as:

   • Whether the NAACP has brought facial challenges or an as-applied challenge to the Airport Advertising Policy;

   • What burdens of proof apply to the NAACP's First Amendment claims;

   • What section or sections of the Airport Advertising Policy can be challenged by the NAACP; and

   • What claims the City and the NAACP settled.

Doing so requires some discussion that is, admittedly, a little dry and detailed, but this initial set of determinations is important because of what the NAACP is asking this Court to do.  The NAACP is asking this Court to invalidate a City policy.

Any such demand places a set of requirements on both the NAACP and this Court.  Therefore, the City needs to make sure that this Court has a sense of what First Amendment claims are, or are not, before this Court, before addressing the merits of any such claims.

To summarize, this Court's initial review will point toward the following set of conclusions:

• The NAACP has brought First Amendment facial challenges to the Airport Advertising Policy;

• Because the NAACP has brought First Amendment facial challenges, the NAACP must meet stringent burdens of proof;

• The NAACP's First Amendment facial challenges place certain requirements on this Court as well;

• The NAACP can only challenge Section 2 of the Airport Advertising Policy; and

• The City and the NAACP settled the claims alleged in the NAACP's initial complaint, so there is no as-applied claim before this Court and no challenge to the Airport's pre-March 2012 practices before this Court.

1. **NAACP Has Brought First Amendment Facial Challenges to the Airport Advertising Policy.**

As a general matter, a plaintiff can bring two kinds of constitutional claims:

• a **facial** challenge; and
• an **as-applied** challenge.

A **facial** challenge asks a court to rule that a policy is unconstitutional and to order the defendant not to use the policy any more. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009). Also, if a plaintiff alleges that it might want to take some action in the future, and uses any future action as the basis for its constitutional challenge, that constitutional challenge is a facial challenge. *See id.* at 270.

By contrast, an **as-applied** challenge does not challenge the constitutionality of a policy. *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). Rather, an as-applied challenge addresses the application of a policy to a plaintiff under a particular set of facts. *See id.* In this context, an as-applied challenge would allege that the Airport's denial of a particular

advertisement violated the First Amendment.  *See, e.g.*, *Pittsburgh League of Young Voters v. Port Authority*, 653 F.3d 290, 292 (3d Cir. 2011).

In its amended complaint, the NAACP:

• Asks this Court to issue a ruling declaring that Airport Advertising Policy is unconstitutional under the First Amendment and Article I, § 7 of the Pennsylvania Constitution; and

• Asks this Court to enter a permanent injunction barring any future use of the Airport Advertising Policy by the Airport.

In its amended complaint, the NAACP also alleges:

• its basis for its First Amendment claims is its allegation that the NAACP or other organizations might want to submit advertisements to the Airport in the future and might not be able to do so.

Amended Complaint at 11-12.

Therefore, the claims before this Court are facial challenges to the Airport Advertising Policy.

### 2.   Because the NAACP Has Brought Facial Challenges to the Airport Advertising Policy, the NAACP Must Meet Stringent Burdens of Proof.

In its motion for summary judgment, the NAACP claims that the Airport Advertising Policy violates the First Amendment and that the Airport Advertising Policy is unconstitutionally vague.  *See* Motion at 1-2.  In that motion, the NAACP also asserts – for the first time in the course of this litigation – that the Airport Advertising Regulation is overbroad.  *See* Motion at 1-2.

All of these facial challenges must meet stringent burdens of proof.

**Claim #1 (First Amendment Facial Challenge)**:  To prove its First Amendment facial challenge to the Airport Advertising Policy, the NAACP must demonstrate that the regulation is unconstitutional in all of its applications.  *See Washington State Grange v. Washington State*

*Republican* Party, 552 U.S. 442, 449-50 (2008); *Brown v. City of Pittsburgh*, 586 F.3d 263, 270 (3d Cir. 2009).

 **Claim #2 (Vagueness)**:  To prove its vagueness challenge, the NAACP must demonstrate that the Airport Advertising Policy is vague in all of its applications.  *See Village of Hoffman v. Flipside*, 455 U.S. 489, 296-97 (1982).

 **Claim #3 (Overbreadth)**:  To prove an overbreadth claim, the NAACP must show that the Airport Advertising Policy prohibits a substantial amount of protected expression.  *See Brown*, 586 F.3d at 270.  A policy is overbroad when it penalizes a "substantial amount" of protected activity in relation to its plainly legitimate sweep, such that the regulation's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *See Hill v. Colorado*, 530 U.S. 730, 732 (2000); *McCauley v. University of the Virgin Islands*, 618 F.3d 232, 241-42 (3d Cir. 2010).

 To prove its facial challenges, the NAACP must stay with the terms and requirements of the Airport Advertising Policy and cannot prove its case with "hypothetical" or "imaginary" cases.  *See Washington State Grange v. Washington State Republican Party*, 552 U.S 442, 450-51 (2008).

  **3.   The Law Applicable to Facial Challenges Also Requires this Court to Use, or Refrain from Using, Certain Interpretations of the Airport Advertising Policy.**

 Facial challenges also place requirements on this Court.  To evaluate the NAACP's facial challenges, this Court must consider any authoritative or limiting construction offered by the City.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1974); *see also Village of Hoffman*, 455 U.S. at 494-95.  If the NAACP's construction of the Airport Advertising Policy could raise serious constitutional problems and the City's interpretation is "fairly possible," this Court is obligated to use the City's interpretation and rule that the Airport Advertising Policy is constitutional.  *See Broadrick*, 413 U.S. at 613.

Put another way, evaluation of evidence outside of the Airport Advertising Policy can only be considered to save the policy from a ruling of unconstitutionality, not invalidate it.  *See McCauley v. University of Virgin Islands*, 618 F.3d 232, 242 (3d Cir. 2010); *see also Hoye v. City of Oakland*, 653 F.3d 835, 947-49 (9th Cir. 2011).  A plaintiff such as the NAACP cannot rely on extrinsic evidence of policy, practice, or interpretation to re-cast the plain meaning of an otherwise facially valid regulation, and this Court should not allow the NAACP to do so.  *See McCauley*, 618 F.3d at 242; *Hoye*, 653 F.3d at 947-49.

### 4.   The NAACP Can Only Bring Facial Challenges to Section 2 of the Airport Advertising Policy.

The NAACP can only bring facial challenges to Section 2 of the Airport Advertising Policy.  Section 2 of the Airport Advertising Policy limits private Airport advertising to commercial advertising.  Exh. E at SF 8.  This is so because this Court has already ruled that the NAACP cannot bring a facial challenge to section 3 of the Airport Advertising Policy, because section 3 applies to City advertisements, which are government speech, and because the NAACP has alleged that it does not wish to bring such a claim.  May 30, 2013, Opinion at n.29.

### 5.   The NAACP and the City Settled the Claims in the NAACP's Initial Complaint.

When ruling on the Motion to Dismiss, this Court stated that it could not rule on the effect of the June 21, 2012, stipulation because it was not "clear" what that stipulation settled.  May 30, 2013, Opinion at 9 n.29.  Now it is clear.  On June 21, 2012, the City and the NAACP's settled the claims set forth in the NAACP's initial complaint.

The NAACP's initial complaint alleged that the rejection of the Misplaced Priorities Advertisement violated the First Amendment; alleged that the Airport had previously displayed advocacy and issue advertising similar in nature to the Misplaced Priorities Advertisement; and alleged that whatever policies and standards that resulted in the rejection of the Misplaced Priorities advertisement violated the First Amendment.  Exh. D at 1-2, 6-8.

14

It is undisputed that on June 21, 2012, the NAACP and the City settled the NAACP's claims "relating to the rejection of the Misplaced Priorities Advertisement." Exh. E at SF 10. Therefore, the claims alleged in the initial complaint have been settled and resolved, and those claims are not before this Court. Exh. E at SF 10.

The City and the NAACP's settlement of the initial complaint narrows the kinds of First Amendment claims that are before this Court.

First, there is *no* as-applied claim before this Court. *See Mitchell*, 652 F.3d at 405. The only advertisement submitted by the NAACP to the Airport was the Misplaced Priorities Advertisement. Exh. E at 3, 4. That claim has settled, and that settlement moots the NAACP's as-applied claim. *See Genesis Health Care Corp. v. Symczyk*, 133 S. Ct. 1523, 1528-29 (2013); *Phillips v. Cheltenham Township*, 575 F.3d 72, 73-74 (3d Cir. 1978) (settlement rendered case and attendant issues moot).

Second, having settled its claims relating to the denial of the Misplaced Priorities Advertisement, the NAACP does not have standing to challenge the Airport's pre-March 2012 practices or policies. *See Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009) (where plaintiff has settled a suit, that plaintiff does not retain standing to challenge the basis for that action).

Third, the NAACP cannot point to pre-March 2012 practices at the Airport to challenge Section 2 of the current Airport Advertising Policy. The NAACP cannot do so because the settled any claims regarding the Airport's pre-March 2012 practices, and therefore has no standing to challenge those practices, but beyond that lack of standing, the NAACP cannot do so because any such efforts would be incorrect as a matter of law.

The City is allowed to open, or close, a forum, rather than have a forum's status fixed by past practices, or a plaintiff's allegations regarding those past practices. *See, e.g.*, *Pittsburgh League of Young Voters*, 653 F.3d at 298; *Ridley v. Change the Climate, Inc.*, 390 F.3d 65, 77 (1st Cir. 2004).

Further, the City's motive in closing a forum does not matter, because officials "may choose to close a designated public forum at any time" and for any reason. *See United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *see also Sons of Confederate Veterans v. City of Lexington*, 722 F.3d 224, 232 (4th Cir. 2013) (analysis of "motive" does not apply to closure of forum by municipality).

The Third Circuit so recognized in *Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny County*, 653 F.3d 290, 298 (3d Cir. 2011). In *Pittsburgh League of Young Voters*, the Third Circuit determined that the Port Authority had engaged in viewpoint discrimination because it had rejected a proposed noncommercial advertisement encouraging ex-prisoners to vote when the Port Authority had accepted prior non-commercial advertisements: an as-applied challenge. *See id*. at 297-98. The Third Circuit emphasized that its ruling on the as-applied challenge did not mean that the Port Authority was required to accept all non-commercial advertisements going forward. *See id*. Rather, the Port Authority could develop a new policy to address its aims, and under that new policy, reject non-commercial advertising. *See id.*; *see also Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 974 (9th Cir. 1998) (prior advertising policy struck down as improperly discriminatory, city enacted new policy limiting advertisements to those that "propose a commercial transaction," the terms of which were constitutional under the First Amendment).

Similarly here, even if the City's policy prior to March 2012 was ambiguous, the City settled the NAACP's claims concerning the prior policy. *Port Authority* allows a city to move forward from a prior policy and change it, definitively closing the forum if there was any question as to whether a prior policy prevented the posting of non-commercial advertisements. *See* 653 F.2d at 298. The new policy clearly does so. Therefore, this Court should follow *Port Authority* and grant summary judgment to the City.

**B. This Court Should Grant Summary Judgment to the City on the NAACP's First Amendment Facial Challenge, Because the Airport Advertising Policy is a Viewpoint Neutral, Reasonable Regulation of Speech in a Nonpublic Forum.**

Having walked this Court through what First Amendment claims are actually before this Court, the City now turns to the Airport Advertising Policy, and how this Court should address the NAACP's attempts to bring a First Amendment facial challenge to Section 2 of that policy.

In its motion for summary judgment, the NAACP avers that the Airport Advertising Policy does not meet "strict scrutiny" because the Airport Advertising Policy restricts expression in a "designated public forum." Motion at 1. The NAACP also avers that the Airport Advertising Policy is unconstitutional because even if strict scrutiny does not apply, the Airport Advertising Policy is not viewpoint neutral or reasonable. Motion at 102.

The NAACP is wrong. At the outset, the NAACP is wrong because the Airport advertising spaces – the forum at issue here – are a nonpublic forum, not a designated public forum, so strict scrutiny does not apply. The NAACP is also wrong because section 2 of the Airport Advertising Policy is a viewpoint neutral, reasonable speech regulation.

**1. The Airport's Advertising Spaces Are a Non-Public Forum.**

This Court has already ruled that the forum at issue is the Airport advertising spaces to which the NAACP initially sought access. May 20, 2013, Opinion at 6; *see Christ's Bride*, 148 F.3d at 248. Therefore, the forum this Court must use in ruling on the motions for summary judgment is the Airport advertising spaces set forth in the contract with Clear Channel. Exh. E, SF 3, 4; Exh. F at ¶ 35.

To determine the nature of that forum, this Court must look to the current policy and practice at the Airport regarding advertising, as well as any restrictions on expressive activity in and around that forum, to determine whether the City intended to have the Airport's advertising spaces be a designated public forum or a nonpublic forum. *See Cornelius v. NAACP Legal Defense Fund*, 473 U.S. 788, 802-04 (1985); *Christ's Bride v. SEPTA*, 148 F.3d 242, 248-49 (3d Cir. 1998).

The Airport does not create a public forum by permitting limited discourse, but only by clearly and deliberately opening a nontraditional forum, such as the Airport advertising spaces, for unlimited public expression. *See ISKCON*, 505 U.S. at 679-81; *Christ's Bride*, 148 F.3d at 148. As a result, even if the Airport has opened up the Airport advertising spaces to some speech, the Airport advertising spaces do not become a designated public forum if the Airport did not intend to open the forum without limitation. *See ISKCON*, 505 U.S. at 679-81.

Here, on its face, Section 2, the Airport Advertising Policy limits advertising by private entities to advertisements that propose a commercial transaction, and excludes other kinds of advertising as well, such as advertising for alcohol or political campaigns. *See* Exh. E at SF 8. When a transportation agency, such as the Airport, allows only commercial advertising to be posted in its advertising spaces, those advertising spaces are a nonpublic forum. *See Children of the Rosary*, 154 F.3d 972, 977-78 (9th Cir. 1998) (limitation of advertising on bus panels to advertising that "proposes a commercial transaction" meant that panels were a non-public forum).

In addition, the Airport's practices direct that the Airport's advertising spaces are a nonpublic forum. Since March 2012, the City has controlled those spaces and limited what can and cannot be posted in accordance with the Airport Advertising Policy. *See ISKCON*, 505 U.S. at 679-81. Clear Channel does not post any advertisements at the Airport without Airport review and approval. Exh. H at 36-37, Gale Dep., Exh. J, at 12-13. Further, since March 2012, both the Law Department and Airport officials review all advertising submitted to Clear Channel to determine whether the advertisements fall within the terms of the Airport Advertising Policy. Exh. H at 36-37, Gale Dep., Exh. J, at 12-13.

Finally, this control and review occurs and these advertisements are posted at the Airport. The Airport is a secured, restricted environment, a place for traveling and buying – not expression. Exh. A at Appendix A 1-1; Exh. E at SF 7; Exh. J at 10.

This combination of: 1) the explicit written limitations on advertising set forth in the Airport Advertising Policy; 2) the Airport's practice of reviewing all advertising submitted to

Clear Channel for prior to posting at the Airport; 3) the Airport's practice of accepting or denying that advertising based on the Airport Advertising Policy; 4) the context in which this review occurs – an Airport – demonstrates that the Airport's advertising spaces are a nonpublic forum, rather than a designated public forum.  *See Lebron v. Amtrak*, 69 F.3d 650, 656 (2d Cir. 1995) (advertising space only used for commercial advertising was nonpublic forum); *see also Christ's Bride*, 148 F.3d at 251-52 (SEPTA's advertising spaces were a designated public forum because SEPTA had no policy in place and had an ongoing practice of accepting both commercial and non-commercial advertisements without limitation).

Alternatively, the Airport's policy and practice can be deemed a limited public forum, because the Airport has only allowed commercial speech to occur in the Airport advertising spaces, or has only allowed discussion of "certain subjects" in the Airport advertising spaces.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).  In such a situation, the Airport has created a limited public forum.  *See id.*; *see also Lebron*, 69 F.3d at 656.

### 2.   The Airport Advertising Policy Is Viewpoint-Neutral and Reasonable.

Regardless whether this Court determines that the Airport's advertising spaces are a nonpublic forum or a limited public forum, the test is the same.  The Airport Advertising Policy is viewpoint neutral and reasonable and therefore constitutional.

First, the distinction drawn between commercial and non-commercial speech in Section two of the Airport Advertising Policy is viewpoint neutral.  *See Pittsburgh League of Young Voters v. Port Authority*, 653 F.3d 290, 295 (3d Cir. 2011) (distinction between commercial and non-commercial speech is viewpoint neutral).

Second, the limitation of private advertising to commercial advertisements is designed and intended to generate revenue for the Airport, avoid controversy, and cater to the passengers traveling through the Airport.  Exh. H. at 82, 85, 92, 109, 110; Exh. J at 14, 23, Exh. O at 5.  These are all reasonable goals for a policy in a nonpublic forum or limited public forum.  *See Cornelius*, 473 U.S. at 809.

The Regulations provide that the Airport is a "security sensitive environment, designed and utilized as an air transportation facility" and that the Airport "is neither designed not intended as a public forum for First Amendment activities." *See* Exh. A at Appendix A 1-1. Towards this end, the Regulations set forth how and where commercial and non-commercial activities occur at the Airport. Exh. A at Appendix A, B.

Non-commercial activity, such as picketing and leafleting, can only occur in designated public areas outside of the Airport terminals. Exh A at Appendix A, B, Exh. H at 131. All other areas of the Airport are limited to commercial activity and commercial speech, in keeping with what the Airport does and the atmosphere that the Airport wants to maintain. Exh. H. at 82, 85, 92, 109, 110; Exh. J at 14, 23, Exh. O at 5. That effort is a reasonable one. *See ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1290 (11th Cir 1998) (affirming policy of designating First Amendment activity to "zones" on sidewalks outside of an airport).

The NAACP may try to argue that the Airport Advertising Policy is not reasonable because the City must demonstrate "harm" from non-commercial advertisements before excluding those advertisements from a nonpublic forum. Amended Complaint at ¶ 22, 23, 28. Any such argument would be incorrect: the Airport does not have to show "harm" for its policy to be reasonable. *See* Cornelius, 473 U.S. at 809.

Indeed, if this Court were to impose a "harm" requirement on the City, this Court would be in error. In *Cornelius*, the Supreme Court ruled that a lower court had erred by requiring a defendant to prove that a particular kind of expression had an "actual effect" on a nonpublic forum prior to excluding that expression from the nonpublic forum. *See* 473 U.S. at 809. The Supreme Court cautioned that any such requirement would ignore the "teachings of this Court" that a government entity does not have to wait until "havoc" or harm occurs to restrict access to a nonpublic forum to avoid controversy. *See id.*

The NAACP may also try to argue that trying to avoid controversy by limiting advertising to commercial advertising is not reasonable. Any such assertion is also incorrect. Drawing a viewpoint neutral distinction to avoid controversy is a reasonable decision in a non-

public forum.  *See Cornelius*, 473 U.S. at 811; *see also  Brody by and through Sygnzdinis v. Spang*, 857 F.2d 1108, 1122 (3d Cir. 1992) (desire to avoid controversy is a reasonable justification for exclusion in a nonpublic forum); *Student Coalition for Peace v. Lower Merion Dist. Bd. of School Directors*, 776 F.2d 431, 438 (3d Cir. 1985) (even if desire to avoid controversy is "unfounded" on the record, that decision is nevertheless reasonable).

Such a decision is reasonable in the context of advertising as well.  Both the Supreme Court and Courts of Appeal have held that a decision to avoid controversy by precluding the display of noncommercial advertising is a reasonable decision to make.  *See Lehman*, 418 U.S. at 304 (allowing only commercial advertising and banning political advertising was reasonable because commercial advertising is generally "innocuous and less controversial"); *American Freedom Defense Initiative*, 698 F.3d at 997 (ruling that it was reasonable for bus transit to allow commercial advertising to boost revenue, rather than accept noncommercial advertisements that "might alienate riders"); *Lebron*, 69 F.3d at 558, 660 (ban on "political" advertising on Penn Station billboard, which resulted in rejection of artist's left-wing mural, was reasonable, because Penn Station sought to derive revenue from advertising while "minimizing interference with or disruption of the station's commercial function.")

Furthermore, the Airport's decision only to allow commercial advertising is reasonable regardless whether another airport might make a different decision regarding what kind of advertising to display.  *See, e.g., American Freedom Defense Initiative*, 698 F.3d 885 (bus system's prohibition of political advertisements was reasonable and constitutional on its face, and "though some municipal bus systems permit wide-ranging political advertisements, other bus systems need not" do so in a nonpublic forum).  A restriction on Airport advertising "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *See ISKCON*, 505 U.S. at 683 (emphasis in original).

Finally, the NAACP cannot argue that the Airport Advertising Policy is not reasonable because it might want to reach a target audience in the Airport and cannot do so under the terms of the Airport Advertising Policy.  A decision to regulate speech in a nonpublic forum is

reasonable if a speaker who cannot express himself in that nonpublic forum has access to other channels of communication.  *See Cornelius*, 473 U.S. at 809.  Here, it is undisputed that there are fora in the public areas of every Airport terminal where the NAACP, or other members of the public, can communicate non-commercial messages.  Exh. A at Appendix A, B, Exh. H. at 131.  It is also undisputed that there are other advertising options or options for expression in the City.  Exh. P at 37, 53, 73-74; Exh. Q at 32-33.

he NAACP cannot claim that alternative channels are not sufficient because it might want a "target audience" or a preferred location and might not get it.  *See Interstate Outdoor Advertising, L.P., v. Zoning Board of the Township of Mount Laurel*, 706 F.3d 527, 529 (3d Cir. 2013) (rejecting billboard company's claim that alternative channels were inadequate because it could not reach a "distinct audience of travelers" on an interstate highway).

In sum, the Airport Advertising Policy is a viewpoint neutral and reasonable regulation of speech in a nonpublic forum.  This Court should reject any attempts by the NAACP to argue otherwise.

**C. This Court Should Reject Any Attempts by the NAACP to Try to Prove Its Case By Pointing to Hypotheticals, Government Speech, or the CNN Airport Network.**

It is somewhat difficult to argue in a vacuum.  Even so, drawing upon the allegations in the NAACP's amended complaint, the NAACP's arguments in response to the motion to dismiss, and the course of discovery in this matter, the City wants to address any attempts by NAACP to cite to the following to try to prove its First Amendment facial challenge:  1) hypothetical advertisements; 2) City advertisements; and 3) the CNN Airport Network.  If the NAACP does so, none of these efforts will serve to prove the NAACP's First Amendment facial challenge or avoid a grant of summary judgment to the City.

**1.   The NAACP Cannot Prove Its Case by Posing Hypotheticals.**

The NAACP has indicated that it will try to respond to the City's summary judgment motion, or prove its own motion, by pointing to a series of advertisements that either: 1) never existed; or 2) have never been submitted to the Airport for review. Exh. H at 146-93.  The NAACP cannot cite to hypotheticals to prove its case, and this Court should not allow the NAACP to do so.

First, a First Amendment facial challenge cannot be proven by hypotheticals.  The Supreme Court has directed that in ruling on a facial challenge, a court must stay with the requirements of the regulation and not speculate about "hypothetical" or "imaginary" cases.  *See Washington State Grange v. Washington State Republican Party*, 552 U.S 442, 450-51 (2008).

Second, a plaintiff cannot avoid a grant of summary judgment or prove its own motion by posing hypotheticals.  *See, e.g.*, *Wall v. Rexnord, Inc.*. 624 F.3d 1168, 1181-82 (3d Cir. 1980) (plaintiff's "ability to posit" hypotheticals "does not defeat summary judgment"); *Grossman v. Berman*, 241 F.3d 65, 68 (1st Cir. 2001) (summary judgment cannot be granted on "hypothetical scenarios" as they are "guesswork").

Third, any such effort fails because what the record actually demonstrates is that the Airport uses a review process where all private advertising is submitted to the Law Department for review, and then submitted to Airport officials for compliance with the Airport Advertising Policy prior to posting at the Airport.  Exh. H at 32-37.  It is that review process that matters, not hypotheticals.

**2.   The NAACP Cannot Prove Its Case By Pointing to Government Speech.**

The Court has ruled that Section 3 of the Airport Advertising Regulation relates to government speech, so the NAACP cannot bring a First Amendment challenge to that portion of the Airport Advertising Regulation.  May 23, 2013, Opinion at 9 & n.23.  Nevertheless, the NAACP has indicated that it still wants to point to City advertisements to prove its First

Amendment facial challenge to Section 2 of the Airport Advertising Policy.  This Court should reject any such efforts.

The First Amendment "restricts government regulation of private speech; it does *not* regulate government speech."  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2008) (emphasis added).  This Court should reject any effort by the NAACP to rely on the City's advertisements for this reason alone.

Nor can the NAACP cite to City advertisements that have been ordered through the MOU's to try to create a fact question.  The Supreme Court also explained in *Summum* that the government can also use private sources to deliver a government-controlled message, and that such speech is government speech.  *See Summum*, 555 U.S. at 468-69; *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (year) (the government "may exercise this same freedom to express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message").  Here, these advertisements that have been ordered and supplied to the Airport through the MOU's are reviewed by the Law Department and the Airport prior to posting, and these advertisements state that they are City advertisements or prominently display the Airport logo.  Exh. K at 43-44, Exh. R.  Therefore, these advertisements are government speech and cannot be used by the NAACP to try to attack a facially valid policy.

Put another way, the NAACP cannot use the City's own advertising to force the inclusion of noncommercial advertisements into the Airport advertising spaces, or to claim that the City's *not* doing so amounts to viewpoint discrimination.  The Supreme Court rejected just such arguments in *Summum*, and so have other courts.  *See Summum*, 555 U.S. at 468 (government not required to include contrary messages when it had adopted certain messages as its own, nor was such a decision viewpoint discrimination); *Freedom from Religion Foundation v. City of Warren*, 707 F.3d 686, 696-97 (6th Cir. 2013) (city not required to include message from private group in city holiday display, display was government speech); *Wells v. City & County of Denver*, 275 F.3d 1132, 1134 (10th Cir. 2001) (same); *see also Downs v. Los Angeles Unified*

*School Dist.*, 228 F.3d 1003, 1014-15 (9th Cir. 2003) (teacher could not "compel" inclusion of antigay viewpoint for school bulletin boards promoting gay & lesbian awareness month).  This Court should reject any such efforts along these lines as well.

### 3. The NAACP Also Cannot Prove Its Case by Pointing to the CNN Airport Network.

The NAACP has also indicated that it will point to the CNN Airport Network to try to create a fact question.  Any such attempt will also fall short because the broadcasting and programming decisions of a network (here CNN) are that network's own, and the First Amendment does not compel a broadcaster to allow third parties access to their programming.  *See Arkansas Education Television Commission v. Forbes*, 523 U.S. 666, 674 (1998).

This principle does not change because the Airport entered into a contract with CNN to broadcast news and entertainment programming at the Airport.  *See Wisconsin Interscholastic Athletic Association v. Gannett Co.*, 658 F.3d 614, 622-23 (7th Cir. 2011) (rejecting First Amendment viewpoint discrimination challenge to a broadcast agreement, ruling that "decisions about who gets air-time or what to broadcast are left to the journalistic and editorial judgment of the broadcaster, unconstrained by a viewpoint-neutrality requirement").

Regardless, the record demonstrates that there is no deviation from the Airport Advertising Policy on the CNN Airport Network.  CNN has agreed to comply with the Airport's advertising policies in addition to its own.  Exh. C at 26, ¶ H, Attachment B.  As for the "Local Spots," the City has displayed its own advertising on the CNN Airport Network rather than selling advertising through Clear Channel.  Exh. I. at 27-30, Exh. L, M., N.

In sum, the NAACP cannot demonstrate that the Airport Advertising Policy is unconstitutional in *all* of its applications, or that "no set of circumstances exists" under which Airport Advertising Policy would be valid.  *See Washington State Grange v. Washington State Republican* Party, 552 U.S. 442, 449-50 (2008); *Brown v. City of Pittsburgh*, 586 F.3d 263, 270

(3d Cir. 2009).  Therefore, this Court should grant the City's motion for summary judgment on the NAACP's First Amendment facial challenge, and deny the NAACP's motion.

### D.  This Court Should Grant Summary Judgment to the City on the NAACP's Vagueness Challenge.

The NAACP has also asserted that the standard set forth in Section 2 of the Airport Advertising Policy is unconstitutionally vague.  Motion at 2; Exh. F at ¶ 39.  This Court should grant summary judgment to the City on this claim as well.

First, the Supreme Court has stated that there are "commonsense differences between speech that does no more than propose a commercial transaction and other varieties" of speech. *See Virginia Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 749, 771 n.24 (1976).  The NAACP cannot overrule the Supreme Court, so the NAACP's First Amendment vagueness claim must be rejected.

Second, the Regulations set forth the difference between "commercial" and "non-commercial" activity at the Airport.  Exh. A at 1-4, 1-10.  Therefore, beyond what the Supreme Court says, there is further guidance in the Regulations as to what is "commercial" or "non-commercial" at the Airport, and this aspect of the Regulations also bars the NAACP's vagueness claim.

Finally, the NAACP cannot create a First Amendment vagueness challenge by pointing to hypothetical advertisements that have never been submitted to the Airport, or by pointing to advertisements that have never existed at all.  Possible or hypothetical difficulties in interpreting a standard, or an "occasional marginal case" that "might arise," do not make a standard unconstitutionally vague.  *See Hill*, 530 U.S. at 733 (rejecting "hypertechnical theories" as to what a statute might or might not cover, as "there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question"); *Children of the Rosary*, 154 F.3d at 983 (rejecting a First Amendment vagueness challenge to a "proposes a commercial transaction" standard for transit advertising); *see also Ridley v. Change the Climate*

*Inc.*, 390 F.3d 65, 95 (1ˢᵗ Cir. 2004) (rejecting a First Amendment vagueness challenge to "prevailing community standards" guideline in transit advertising policy, guideline was not unconstitutionally vague because "some kinds of advertisements" might be difficult to "pinpoint with exact precision).

Therefore, this Court should grant the City summary judgment on the NAACP's vagueness challenge.

### E. This Court Should Grant Summary Judgment to the City on the NAACP's New "Overbreadth" Challenge.

In its summary judgment motion, for the first time, the NAACP asserts that the Airport Advertising Policy is "overbroad." Motion at 2. Other than that assertion, NAACP has not indicated how or why the Airport Advertising Policy might somehow be "overbroad."

In the interest of completeness, however, the City will explain why, as a general matter, the Airport Advertising Regulation is not "overbroad."

First, as set forth *supra*, the Airport Advertising Regulation is viewpoint neutral and reasonable. Therefore, it is not overbroad. *See Broadrick*, 613 U.S. at 616.

Second, it is undisputed that there are a number of fora at the Airport where any member of the public may engage in non-commercial activity, if they ever elect to do so, so the Airport Advertising Regulation is not overbroad. *See Cornelius*, 473 U.S. at 809; *Broadrick*, 413 U.S. at 616; *see also Hill v. Colorado*, 530 U.S. 703, 731-32 (2000).

Third, to the extent the NAACP might want to claim that the Airport Advertising Regulation is an "overbroad" commercial speech regulation, the overbreadth doctrine does not apply to commercial speech. *See Village of Hoffman v. Flipside*, 455 U.S. 489, 496-97 (1982).

Hence, this Court should grant summary judgment to the City on the NAACP's claim that the Airport Advertising Regulation is "overbroad."

**F. The NAACP's State Law Claims Fail for the Same Reasons Plaintiff's First Amendment Claims Fail.**

The NAACP's Art. I, § 7 claims fail for the same reasons that the NAACP's First Amendment claims fail.

The Pennsylvania Supreme Court has applied First Amendment forum analysis to claims under Art. I, § 7 of the Pennsylvania Constitution. *See, e.g.*, *Western Pennsylvania Socialist Workers 1982 Campaign v. Connecticut General Life Ins. Co.*, 512 Pa. 23, 32-33, 515 A.2d 1331, 1335 (1986). The Pennsylvania Supreme Court has also applied First Amendment analysis to Art. I., § 7 vagueness and overbreadth claims. *See, e.g.*, *Commonwealth v. Davidson*, 595 Pa. 1, 15-20, 938 A.2d 198, 207-15 (2007)

If the Pennsylvania Supreme Court applies a First Amendment standard to such claims under Art. I, § 7 of the Pennsylvania Constitution, this Court should do so as well. *See id.*; *see Norton*, 580 Pa. at 338-39, 860 A.2d at 57-59 (looking to prior case law to reject efforts of parties to claim broader Article I, § 7 protections for media); *see also Busch v. Marple Newtown School District*, 567 F.3d 89, 94 n.6 (3d Cir. 2009) (observing that where Pennsylvania state courts have followed "federal constitutional principles" when considering a First Amendment claim, its analysis of plaintiff's free speech claims under the First Amendment was dispositive of her claims under Article I). Therefore, this Court should grant summary judgment to the City on the NAACP's Art. I, § 7 claims.

**G. Attorney General Holder's Support of Alternatives to Incarceration Does Not Affect the Outcome of this Case.**

In an October 18, 2013, phone conference, this Court asked the parties to address whether Attorney General Holder's recent statement of support of alternatives to incarceration, and Philadelphia District Attorney Seth Williams' endorsement of those views, signals a change in City policy that affects this litigation. It does not.

First, Seth Williams has made public statements supporting alternatives to incarceration since he was first elected District Attorney. *See* Craig R. McCoy & Troy Graham, "Next Phila.

28

D.A. looks back and ahead" Philadelphia Inquirer, December 27, 2009 (supporting diversion programs and a "holistic approach" to addressing crime); Erik Eckholm, "'Smart on Crime'" Mantra of Philadelphia Prosecutor", New York Times, June 19, 2010 (supporting community courts and drug treatment).  Therefore, the District Attorney's support of Attorney General Holder does not demonstrate a change in City practice or policy.

Second, the City has a number of departments and functions.  First Amendment case law reflects this range of functions:  the expression that occurs outside of City Hall (a public forum) does not dictate the expression that occurs in the Airport's Advertising spaces (a nonpublic forum).  *See, e.g.*, *Cornelius*, 473 U.S. at 809.  Further, in determining the nature of a forum, or the rationale of that forum, a particular agency such as the Airport is "not bound by decisions of . . . agencies made in other contexts" at the City, such as the District Attorney's Office.  *See id*.  It would be error for this Court to rule otherwise.  *See id*.

**WHEREFORE**, defendant City of Philadelphia respectfully requests that this Court grant the City's motion for summary judgment, deny the NAACP's motion for summary judgment, and dismiss the NAACP's Amended Complaint with prejudice.

Respectfully submitted,

City of Philadelphia Law Department
Shelley R. Smith, City Solicitor

/s Elise Bruhl
_____

By:  Craig Straw
Chief Deputy, Civil Rights Unit
Amanda Shoffel, Assistant City Solicitor, Civil Rights Unit
Elise Bruhl, Deputy City Solicitor, Appeals
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
215-683-5448
Attorneys for Defendant,
City of Philadelphia

Date:  December 13, 2013

## <u>CERTIFICATE OF SERVICE</u>

I, Elise Bruhl, certify that on December 13, 2013, the City's Motion for Summary Judgment was filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System.  The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service:

Alexander Bilus
Fred T. Magaziner
Dechert LLP
Cira Centre
2929 Arch St
Philadelphia, Pa 19104
215-994-2608
sandy.bilus@dechert.com
fred.magaziner@dechert.com

Mary Catherine Roper
ACLU of PA
PO Box 40008
Philadelphia, Pa 19106
215-592-1513
mroper@aclupa.org

By:     /s Elise Bruhl

_____

Elise Bruhl

Date:  December 13, 2013