IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 11-6533 |
| CITY OF PHILADELPHIA, | ) ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFF'S INITIAL BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

DECHERT LLP
Fred T. Magaziner
Alexander R. Bilus
Catherine V. Wigglesworth
Laura M. Kessler
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Phone:  (215) 994-4000
Fax:  (215) 994-2222

AMERICAN CIVIL
   LIBERTIES FOUNDATION
   OF PENNSYLVANIA
Mary Catherine Roper
P.O. Box 40008
Philadelphia, PA 19106
Phone:  (215) 592-1513
ext. 116
Fax:  (215) 592-1343

Seth F. Kreimer
3400 Chestnut St.
Philadelphia, PA 19104
Phone:  (215) 898-7447
Fax:  (215) 573-2025

*Attorneys for Plaintiff National Association for the Advancement of Colored People*

December 13, 2013

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 3

    A.   The Airport's Public Areas ................................................................................ 3

    B.   Subject Matter of Airport Communication ..................................................... 5

    C.   The City's Practices Before March 2012 ........................................................ 7

    D.   Pre-March 2012 Public Interest Advertisements ............................................ 8

    E.   The NAACP's "Misplaced Priorities" Public Awareness Campaign ............... 8

    F.   The City's Rejection of the NAACP's Advertisement; the NAACP's Lawsuit ............. 11

    G.   The City's 2012 Prohibition of Non-Commercial Advertisements .................. 11

    H.   Purpose of Banning Non-Commercial Advertisements .................................... 13

    I.   Interim Partial Settlement of the NAACP's Claim ......................................... 13

    J.   The Display of the Misplaced Priorities Ad ................................................... 14

    K.   The City's Current Practices ............................................................................ 14

    L.   The City's Own Advertisements ...................................................................... 16

    M.   Lack of Harm to the City ................................................................................. 16

ARGUMENT ................................................................................................................. 17

I.     THE AIRPORT ADVERTISING POLICY IS UNCONSTITUTIONAL BECAUSE IT FAILS UNDER STRICT SCRUTINY. ........................................... 17

    A.   The Airport's Public Areas Constitute the Relevant "Forum" ........................ 17

    B.   The Airport's Public Areas are a "Designated Public Forum" ........................ 19

    C.   The Public Areas of the Airport Do Not Constitute a Nonpublic Forum ......... 24

    D.   The Official Airport Advertising Policy Cannot Survive Strict Scrutiny. ........ 26

    E.   The City's Unwritten No-Inappropriate-Ads Policy Cannot Survive Strict Scrutiny. ..... 29

II.    BOTH THE OFFICIAL AIRPORT ADVERTISING POLICY AND THE UNWRITTEN NO-INAPPROPRIATE-ADS POLICY ARE UNCONSTITUTIONAL BECAUSE THEY ARE SO VAGUE AND SUBJECTIVE THAT CITY OFFICIALS CAN USE THEM TO ARBITRARILY REJECT ADVERTISEMENTS. ......................................... 30

III.   EVEN IF THE FORUM WERE NONPUBLIC, THE AIRPORT ADVERTISING POLICY WOULD FAIL BECAUSE IT IS UNREASONABLE. ................................... 33

IV.   THE AIRPORT ADVERTISING POLICY ALSO VIOLATES THE PENNSYLVANIA CONSTITUTION. ............................................................................ 34

CONCLUSION .............................................................................................................. 35

## **TABLE OF AUTHORITIES**

**CASES**

*Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*,
　905 F. Supp. 2d 317 (D.D.C. 2012) ................................................................. 27-28

*Airline Pilots Ass'n, Int'l, v. Dep't of Aviation of the City of Chicago*,
　45 F.3d 1144 (7th Cir. 1995) .......................................................................... 21

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
　898 F. Supp. 2d 73 (D.D.C. 2012) ................................................................... 29

*Arkansas Writers' Project, Inc. v. Ragland*,
　481 U.S. 221 (1987) ....................................................................................... 26

*Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*,
　233 F. Supp. 2d 647 (D.N.J. 2002), *aff'd*, 386 F.3d 514 (3d Cir. 2004) ................ 30

*Christ's Bride Ministries, Inc. v. SEPTA*,
　148 F. 3d 242 (3d Cir. 1998) ................................................................. 20, 21, 22, 25

*Circle Sch. v. Pappert*,
　381 F.3d 172 (3d Cir. 2004) ........................................................................... 26

*City of Lakewood v. Plain Dealer Publ'g Co.*,
　486 U.S. 750 (1988) ....................................................................................... 30

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
　473 U.S. 788 (1985) ................................................................................. 17, 20

*Dills v. Cobb Cnty.*,
　755 F.2d 1473 (11th Cir. 1985) (per curiam) .................................................. 26

*First National Bank of Boston v. Bellotti*,
　435 U.S. 765 (1978) ....................................................................................... 26

*Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*,
　457 U.S. 596 (1982) ....................................................................................... 26

*Greer v. Spock*,
　424 U.S. 828 (1976) ................................................................................. 20, 24

*Gregoire v. Centennial Sch. Dist.*,
　907 F.2d 1366 (3d Cir. 1990) ..................................................................... 20, 33

*Hawkins v. City & Cnty. of Denver*,
  170 F.3d 1281 (10th Cir. 1999) ................................................................26

*Hopper v. City of Pasco*
  241 F.3d 1067 (9th Cir. 2001) ................................................................20, 22, 23

*International Society for Krishna Consciousness, Inc. v. Lee*,
  505 U.S. 672 (1992) ................................................................24, 25

*McTernan v. City of York*,
  577 F.3d 521 (3d Cir. 2009) ................................................................20, 24

*N.Y. Magazine v. Metro. Transp. Auth.*,
  136 F.3d 123 (2d Cir. 1998) ................................................................25, 32

*Naser Jewelers, Inc. v. City Of Concord*,
  513 F.3d 27 (1st Cir. 2008) ................................................................26

*Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002) ........................................34

*Penthouse Int'l, Ltd. v. Koch*,
  599 F. Supp. 1338 (S.D.N.Y. 1984) ................................................................19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ................................................................20

*Perry v. McDonald*,
  280 F.3d 159 (2d Cir. 2001) ................................................................20, 24

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
  653 F.3d 290 (3d Cir. 2011) ................................................................17, 20, 26

*Planned Parenthood Ass'n v. Chicago Trans. Auth.*,
  767 F.2d 1225 (7th Cir. 1985) ................................................................21

*Prime Media, Inc. v. City of Brentwood*,
  398 F.3d 814 (6th Cir. 2005) ................................................................26

*Regan v. Time, Inc.*,
  468 U.S. 641 (1984) ................................................................26

*Sable Communications v. FCC*,
  492 U.S. 115 (1989) ................................................................27

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) ................................................................30

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ................................................................29

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) ......................................................................................... *passim*

*United States v. Marcavage*,
609 F.3d 264 (3d Cir. 2010)..........................................................................................29

*U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States*,
708 F.2d 760 (D.C. Cir. 1983) ...................................................................................19, 32

*W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*,
515 A.2d 1331 (Pa. 1986) ............................................................................................34

*Widmar v. Vincent*,
454 U.S. 263 (1981).....................................................................................................26

## OTHER AUTHORITIES

CBS NEWS, *Almanac*: *America's Jailed Population* (Oct. 27, 2013, 9:21 AM),
http://www.cbsnews.com/news/almanac-americas-jailed-population/....................................9

CBS NEWS, *The Cost of a Nation of Incarceration* (April 23, 2012, 5:15 PM),
http://www.cbsnews.com/news/the-cost-of-a-nation-of-incarceration/.................................9

EDITORIAL, *Falling Crime, Teeming Prisons*, NEW YORK TIMES (Oct. 29, 2011),
http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming-
prisons.html.................................................................................................................9

EDITORIAL, *Justice Kennedy on Prisons*, NEW YORK TIMES (Feb. 16, 2010),
http://www.nytimes.com/2010/02/16/opinion/16tue3.html ..............................................9

EDITORIAL, *School Districts Right to Divert Kids from Life of Crime* (Nov. 1, 2013),
http://www.miamiherald.com/2013/11/14/3753815/school-districts-right-to-
divert.html...................................................................................................................9

*Enplanements at All Commercial Service Airports (by Rank),* Federal Aviation
Administration (Oct. 30, 2013),
http://www.faa.gov/airports/planning_capacity/passenger_allcargo_stats/passenger/in
dex.cfm?year=2012........................................................................................................4

*Frequently Asked Questions*, FIGHT CRIME: INVEST IN KIDS,
http://www.fightcrime.org/state/usa/frequently-asked-questions ........................................9

*I'm the Guy You Pay Later: Sheriffs, Chiefs, and Prosecutors Urge America to Cut
Crime by Investing Now in High-Quality Early Education and Care*, FIGHT CRIME:
INVEST IN KIDS (2013), *available at* http://fightcrime.s3.amazonaws.com/wp-
content/uploads/PA-Im-the-Guy-Report.pdf. ................................................................. 9-10

*Members of the Board of Directors*, FIGHT CRIME:  INVEST IN KIDS,
    http://www.fightcrime.org/state/usa/board-directors ................................................9

PENNSYLVANIA CONSTITUTION, ART. I, § 7 ...............................................................34

*PHL Facts*, PHILADELPHIA INT'L AIRPORT,
    http://www.phl.org/AboutPHL/Pages/facts.aspx (last visited Dec. 13, 2013) ........................4

Remarks by United States Attorney General Eric Holder at the Annual Meeting of the
    American Bar Association's House of Delegates (Aug. 12, 2013), *available at*
    http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. ...........................9

*Southeast PA Prosecutors:  "I'm the Guy You Pay Later"*, FIGHT CRIME:  INVEST IN KIDS
    PENNSYLVANIA (Oct. 16, 2013), www.fightcrime.org/southeast-pa-prosecutors-im-
    the-guy-you-pay-later/ .........................................................................................9

John Tierney, *Prison Population Can Shrink When Police Crowd Streets*, NEW YORK
    TIMES (Jan. 25, 2013) ..........................................................................................9

George F. Will, *When Solitude is Torture*, WASHINGTON POST (Feb. 20, 2013),
    http://articles.washingtonpost.com/2013-02-20/opinions/37198669_1_solitary-
    confinement-supermax-prison-suicides ...................................................................9

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
|         |             |

**DEPOSITIONS – DEFENDANT'S WITNESSES**

| | |
|---|---|
| A | Deposition of Christine Derenick-Lopez (excerpts) |
| B | Deposition of Mark Gale (excerpts) |
| C | Deposition of James Tyrrell |
| D | Deposition of James Tyrrell II (excerpts) |

**DEPOSITIONS – PLAINTIFF'S WITNESSES**

| | |
|---|---|
| E | Deposition of Niaz Kasravi (excerpts) |
| F | Deposition of Eric Wingerter (excerpts) |

**AFFIDAVITS**

| | |
|---|---|
| G | Affidavit of Laura M. Kessler and supporting exhibits G01-G74 |
| H | Affidavit of Witold J. Walczak and supporting exhibits H01-H25 |

**OTHER EXHIBITS**

| | |
|---|---|
| I | Joint Stipulation of Material Facts (Docket Number 82) |
| J | Airport Rules and Regulations (excerpts) |
| K | CNN Network Agreement (excerpts) |
| L | NAACP Misplaced Priorities Advertisement |
| M | Art at the Airport Brochure |
| N | 30(b)(6) Deposition Notice |

## INTRODUCTION

The First Amendment is one of the foundations of our democracy.  At its core is the principle that citizens must be allowed to state their opinions on significant matters of public importance and especially to raise questions about government policies and practices.  The issue in this case is whether the City of Philadelphia can lawfully keep the NAACP from buying advertising space at the Philadelphia International Airport to raise important questions about government priorities.

The "Public Areas" of Philadelphia International Airport are a highly desirable forum for anyone who wants to communicate with tens of thousands of people every day.  The City has opened the Public Areas of the Airport to many modes of communication that provide information on every imaginable subject, *e.g*., television screens show news stories about violent crime, natural disasters, and political campaigns focused on abortion; retail stores advertise liquor; newsstands display magazines with guns or scantily clad women on their covers; display cases tout the brewing of beer; billboards celebrate Lesbian Gay Bi-Sexual Transgender history.  Freedom of speech is alive and well in the Airport.

But there has long been one glaring exception:  if a City official deems a wall-mounted advertisement inappropriate, the City refuses to display it.

That is what happened when the NAACP sought to display an advertisement that a City official deemed inappropriate.  The City refused to display it.  Then, to make sure that neither the NAACP nor anyone else would again seek to display an advertisement that City officials thought inappropriate, the City adopted a policy (hereafter "the Airport Advertising Policy" or "the Policy") banning all advertising that did not "propose a commercial transaction."  The City apparently believed that by banning ads that do not "propose a commercial transaction," it was

effectively banning ads that raised troubling questions about important social issues.  Even after adopting the official Airport Advertising Policy, however, City officials continued also to apply an unwritten policy of rejecting ads that the officials deemed in any way inappropriate, potentially offensive, or inconsistent with the "Airport's Mission."

Both the official Airport Advertising Policy and the unwritten No-Inappropriate-Ads policy violate the First Amendment and the Pennsylvania Constitution.

First, neither the City's official Policy nor its unwritten policy can survive the strict scrutiny that applies to a "designated public forum" like the Airport's "Public Areas."[1]  Such policies can be upheld only if they are narrowly tailored to serve a compelling government interest.[2]  And they are not.

Indeed, even if the relevant forum were more narrowly defined as the advertising space on the Airport's walls (as the City will argue), that wall space would still constitute a "designated public forum," and the City's policies would still violate the First Amendment.

Second, both the official Airport Advertising Policy and the unwritten policy are impermissibly vague, allowing City officials to reject advertisements for arbitrary and viewpoint-discriminatory reasons.  The "commercial/noncommercial" distinction in the official Airport Advertising Policy is ill-defined – so much so that the City official in charge of applying the Policy cannot say whether various ads do or do not "propose a commercial transaction" – and the

---

[1]      As explained in Part I.A below, the NAACP submits that the "forum" should be defined as the Public Areas of the Airport.  The NAACP apologizes to the Court for mistakenly agreeing in its brief in opposition to the City's Motion to Dismiss that the forum should be more narrowly defined as the wall space used for advertising in the Airport.  Discovery has revealed how widely the City has opened the Airport to multiple modes of free expression, and defining the forum to encompass advertising space alone would be unduly narrow.

[2]      *See* Parts I.B & I.D, below.

unwritten policy's "appropriate/inappropriate" standard is, of course, completely subjective and arbitrary.

The City may try to avoid the scrutiny that the law demands by claiming that the Public Areas, or the advertising wall space within those Public Areas, constitute a "nonpublic" forum. But if that were so, both the City's official Policy and its unwritten policy would still offend the First Amendment.  Even in a nonpublic forum, restrictions on speech can be upheld only if they are both reasonable and viewpoint neutral.  The City's policies are neither.

Accordingly, the Court should enter judgment in favor of the NAACP and should deny the City's motion for summary judgment.  Alternatively, the Court should schedule the case for a non-jury trial on the merits.

## STATEMENT OF FACTS

> **These facts are grouped by subject matter, rather than chronologically.  Every material fact is established by the Joint Statement of Stipulated Undisputed Material Facts ("JS") (Doc. No. 82, attached as Ex. I), the City's own documents, the Airport photographs attached to the Kessler Affidavit and Walczak Affidavit (Exs. G-H), or the deposition testimony of City officials.**

### A.    The Airport's Public Areas

1.      Philadelphia International Airport (the "Airport") is owned and operated by Defendant City of Philadelphia (the "City").  JS at ¶ 1.

2.      The City has issued a 239-page set of regulations for the Airport.  *See* Amendment to Rules and Regulations for Philadelphia International Airport, revised as of March 8, 2012 ("Regulations").  The title pages and other relevant pages are attached as Ex. J.  The stated purpose of the Regulations is to "promote the safe and efficient use of the Airport facilities."  Regulations at 1-1.

3.      The Regulations divide the Airport into three parts.  The parts not open to the public are denominated as the "Restricted Area" and the "Secured Area" and include such things as tarmacs, runways and control towers.  *See* Regulations at 1-12—1-13.  The areas of the Airport that are open to the public are called the "Public Areas," which the Regulations define as "[a]reas normally accessible to the General Public, including the public portion of all Terminal Buildings, parking lots, and Airport roadways."  *Id*. at 1-12.  (Because of TSA security, some of the Public Areas can be accessed only by ticketed passengers, of course, rather than by the general public).

4.      The Airport is one of the twenty busiest airports in the United States.[3] Over thirty million people pass through the Public Areas of the Airport every year, *i.e*., almost 83,000 people per day.[4]

5.      The City has opened the Airport's Public Areas, particularly the terminals and concourses, to many kinds of communication media, including, for example, (a) more than 100 wall-mounted "flat-screen monitors" that can be used to display advertisements, *see* Deposition of Christine Derenick-Lopez, Aug. 27, 2013, at 31:15-32:9; 33:10-15, attached as Ex. A,[5] (b) printed advertisements in and adjacent to the stores and kiosks that the City leases to

---

[3]      *See Enplanements at All Commercial Service Airports (by Rank),* Federal Aviation Administration (Oct. 30, 2013), http://www.faa.gov/airports/planning_capacity/passenger_ allcargo_stats/passenger/index.cfm?year=2012.

[4]      *PHL Facts,* Philadelphia Int'l Airport http://www.phl.org/AboutPHL/Pages/facts.aspx (last visited Dec. 13, 2013) ("PHL Facts") (showing that 30.2 million passengers used the Airport in 2012; 30.2M passengers per year ÷ 365 days = 82,739 passengers per day).

[5]      Examples of advertisements on flat-screen monitors can be seen in G-01; G-02; G-03; to Kessler Affidavit (Ex. G).

retailers and that are positioned to be seen by the thousands of passengers who are passing by,[6] (c) displays of merchandise, positioned to be seen by those who are passing by, to advertise the merchandise that retailers are offering for sale,[7] (d) televisions located within restaurants and bars, positioned to be seen by passengers who are passing by,[8] and (e) televisions located in the waiting areas next to the Airport's 130 gates.[9] In addition, the Airport is "one of the few airports in the world with a rotating Exhibitions Program and a Performing Arts Program" through which the City provides space in the Public Areas for displays of artwork and performances.   PHL Facts; *see* Ex. M (brochure advertising art at the Airport).

6.       The City's chief purpose in opening the Public Areas of the Airport to such a robust array of communication media is to raise revenue for the operation of the Airport. *See* Deposition of Mark Gale (Sept. 18, 2013) ("Gale Dep.") at 23:14-17, attached as Ex. B ("the purpose of the advertising at the Airport for us is we raise revenue for the operation of the Airport through the sale of that advertising"); Rule 30(b)(6) Deposition of James Tyrrell (March 22, 2013) ("Tyrrell Dep.") at 92:20-23, attached as Ex. C.

**B.       Subject Matter of Airport Communication**

7.       The communication media in the Public Areas of the Airport are used to address a wide range of topics.

8.       The televisions at the Airport's 130 gates are tuned to the CNN Airport Network ("CNN"),  Continuation of Rule 30(b)(6) Deposition of James Tyrrell (July 22, 2013)

---

[6]       *See* G-04, G-05, G-06.

[7]       *See* G-07, G-08, G-09, G-10, G-11.

[8]       *See* G-12, G-13, G-14, G-15.

[9]       *See* G-16, G-17.

("Tyrrell Dep. II") at 18:1-15, attached as Ex. D, under a contract that allows CNN to display

any and all kinds of programming and advertisements except graphic video coverage of airline

crashes, misleading or untruthful materials, sexually explicit materials, or abnormally graphic

violence.  *See* CNN Network Agreement at 8 (also allowing CNN to "interrupt the Services to go

'live' to any significant breaking news or special event"), attached as Ex. K; Tyrrell Dep. at

20:5-26:2.

   9. The televisions in bars and restaurants can be tuned to any channel that the

lessee chooses.  *See, e.g.*, Kessler Affidavit, attached as Ex. G, at G-18, G-19, G-20.

   10. Someone passing through the Public Areas of the Airport in November,

2013, could have seen information on (a) the risks of nuclear power, (b) election battles, (c) the

Affordable Care Act, (d) abortion, (e) "marijuana-related police efforts," (f) celebrity

pregnancies, (g) gunfire at a shopping mall, (h) rifles in a middle school, (i) the Confederate flag,

(j) drug abuse, (k) politicians, (l) a trucker's use of Facebook, (m) "The Real Housewives of

Atlanta," (n) gay rights, (o) a movie about an attack on the White House, (p) the need to better

fund public education, (q) a rapper arrested at an airport, (r) a murder trial, (s) a man with a mask

brandishing a samurai sword and a gun, (t) whether a woman's success will damage the ego of

her male partner, (u) the high cost of child care, (v) an airport rampage in which a TSA agent

was killed, (w) scantily clad models, (x) guns, (y) wine drinking, (z) oversize soft drinks and

junk food, (aa) liquor, (bb) sexual intimacy, (cc) drinking of alcohol, (dd) Native American

heritage, (ee) military families, (ff) a free app, (gg) sultry women, (hh) support for our troops

(ii) cigarettes, (jj) an 1899 book called "The Philadelphia Negro" and a 1925 book called "The New Negro," (kk) a movie called "Jesus' Son," and (ll) an airplane take off that went wrong.[10]

C.    **The City's Practices Before March 2012**

11.    Until March 2012, the City had no written policy governing Airport advertising.  JS at ¶ 2.  Rather, City officials including Mark Gale, the Airport's Chief Executive Officer, and James Tyrrell, the Airport's Deputy Director for Property and Business Development, allowed some advertisements while rejecting others, based on their view of what was appropriate for the Airport.  *See, e.g.*, Gale Dep. at 36:6-17; Tyrrell Dep. II at 11:19-13:5, 13:22-14:6.

12.    The high-ranking City officials who decided whether or not to approve an advertisement applied highly subjective standards, refusing to display advertisements (a) that were controversial or potentially offensive to some members of the traveling public, Tyrrell Dep. II at 11:22-14:6; Gale Dep. at 21:14-22:3, 41:7-16, (b) that they deemed inconsistent with the Airport's  "mission," Tyrrell Dep. at 77:10-18, 169:1-24, 179:1-18, or (c) that they viewed as failing to promote the City and region in a positive fashion, Gale Dep. at 37:21-38:3.

13.    Among the advertisements that Tyrrell rejected were an ad by an organization that objected to the TSA, Tyrrell Dep. II at 11:19-13:1, an ad for Penthouse Magazine, *id.* at 13:2-5, and an ad for an exhibit at the Art Museum.  *Id.* at 13:12-14:6. *See also* Gale Dep. 35:12-19.

---

[10]    Attached as Exhibit G is the Affidavit of Laura Kessler, to which are attached in turn 73 photographs.  The image numbers corresponding to the subjects listed in the text above are as follows:  (a) G-21,  (b) G-22, (c) G-23, G-24, (d) G-25, (e) G-26, (f) G-27, (g) G-28, G-29, G-30, (h) G-31, (i) G-32, G-33, (j) G-34, (k) G-35, (l) G-36, (m) G-37, (n) G-38, (o) G-39, (p) G-40, (q) G-41, (r) G-42, (s) G-43, (t) G-44, (u) G-45, (v) G-46, (w) G-47, (x) G-48, (y) G-49, G-50, (z) G-51, (aa) G-04, G-08, G-52, G-53, G-54, G-55, G-56, G-57, (bb) G-58, (cc) G-59, (dd) G-60, (ee) G-61, (ff) G-62, (gg) G-63, (hh) G-06, (ii) G-64, (jj) G-65, G-66, (kk) G-67, and (ll) G-68.

**D.      Pre-March 2012 Public Interest Advertisements**

14.     Before March 2012, when it had advertising space in the Public Areas that it was unable to sell, the City would from time to time make the unsold space available without charge to organizations that wished to communicate with the traveling public about issues of public interest ("Public Interest Advertisements").  *See* Tyrrell Dep. II at 14:7-19; *see also* Walczak Affidavit, Ex. H.  Among the topics addressed were funding for cancer research, ADHD, inspirational messages about character, love, and ambition, Shriner's Hospital asking "If You Could Improve a Life Would You?," the USO, the World Wildlife Foundation, the American Red Cross, PTA.org asking "Do you know where your kid's desk is?," the Make-A-Wish Foundation, the National Committee for Employer Support of the National Guard and Reserve, the National Center for  Missing and Exploited Children, and the importance of saving for education.  *Id.* at H-01, H-03, H-04, H-07, H-08, H-10, H-11, H-12, H-13, H-14, H-15, H-16, H-17, H-19, H-23, and H-24.

15.     The City never received any complaints about such Public Interest Advertisements, Tyrrell Dep. II at 15:19-24, nor did such Public Interest Advertisements ever cause any harm to the City, to the Airport, or the Airport's mission.  *See* Tyrrell Dep, at 121:4-13.

**E.      The NAACP's "Misplaced Priorities" Public Awareness Campaign**

16.     In 2011, the NAACP launched its national "Misplaced Priorities" campaign to draw public attention to the high rate of incarceration within the United States and to point out how much our nation spends on incarceration and how little on education.  Rule 30(b)(6) Dep. of Niaz Kasravi, Aug. 12, 2013 ("Kasravi Dep.") at 27:22-28:3, attached as Ex. E; *see also* http://www.naacp.org/pages/misplaced-priorities (last visited Dec. 13, 2013); Rule 30(b)(6) Dep. of Deposition of Eric Wingerter, Sept. 11, 2013 ("Wingerter Dep.") at 68:19-69:4,

attached as Ex. F. ("The action that [the NAACP] wanted to inspire was to change the funding dynamic of schools versus prisons").

      17.    The issue of incarceration versus education is an important one for our society. *See* Remarks by United States Attorney General Eric Holder at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.[11]  Indeed, Seth Williams, the Philadelphia District Attorney, is a member of the Board of Directors of "Fight Crime:  Invest in Kids," an organization of law enforcement leaders and crime victims that contends that "the best way to prevent crime and violence is through investments in quality early childhood education, voluntary in-home parent coaching, after-school programs, and interventions for troubled youth."[12]  Mr. Williams's organization recently released a report titled "I'm The Guy You Pay Later" that shows "further state and federal funding for early childhood education could boost high school graduation rates, reduce the number of people who are

---

[11]    *See also* John Tierney, *Prison Population Can Shrink When Police Crowd Streets*, NEW YORK TIMES, (Jan. 25, 2013), http://www.nytimes.com/2013/01/26/nyregion/police-have-done-more-than-prisons-to-cut-crime-in-new-york.html?_r=0.; George F. Will, *When Solitude is Torture*, WASHINGTON Post, (Feb. 20, 2013), http://articles.washingtonpost.com/2013-02-20/opinions/37198669_1_solitary-confinement-supermax-prison-suicides; MIAMI HERALD EDITORIAL, *School Districts Right to Divert Kids from Life of Crime* (Nov. 1, 2013), http://www.miamiherald.com/2013/11/14/3753815/school-districts-right-to-divert.html; CBS NEWS, *Almanac*: *America's Jailed Population* (October 27, 2013, 9:21 AM), http://www.cbsnews.com/news/almanac-americas-jailed-population/; CBS NEWS, *The Cost of a Nation of Incarceration*, (April 23, 2012, 5:15 PM), http://www.cbsnews.com/news/the-cost-of-a-nation-of-incarceration/; EDITORIAL, *Falling Crime, Teeming Prisons*, NEW YORK TIMES (Oct. 29, 2011), http://www.nytimes.com/2011/10/30/opinion/sunday/falling-crime-teeming-prisons.html; EDITORIAL, *Justice Kennedy on Prisons*, NEW YORK TIMES (Feb. 16, 2010), http://www.nytimes.com/2010/02/16/opinion/16tue3.html.

[12]    *See Members of the Board of Directors*, FIGHT CRIME:  INVEST IN KIDS, http://www.fightcrime.org/state/usa/board-directors; *Frequently Asked Questions*, FIGHT CRIME: INVEST IN KIDS, http://www.fightcrime.org/state/usa/frequently-asked-questions.

incarcerated in Pennsylvania, and eventually lead to $195 million in Corrections cost savings for the Commonwealth every year."[13]

18.     In January 2011, as part of the "Misplaced Priorities" campaign, the NAACP submitted an advertisement to the City for display at the Airport:



JS at ¶ 3-4; *see also* Ex. L. The website that is referenced in the advertisement includes a button that says "donate."  Users who click on that button are directed to a website through which they can make a donation to the NAACP.

19.     The NAACP submitted its advertisement with the intention of paying market rate for the advertising space, just as Accenture, St. Joseph's University, Merck, and other "commercial" Airport advertisers pay for advertising space in the Public Areas of the Airport.  *See* Tyrrell Dep. at 114:8-14.

20.     The NAACP sought to advertise at the Airport so that it could communicate every day with tens of thousands of people who would have time to think about the

---

[13]     *See Southeast PA Prosecutors:  "I'm the Guy You Pay Later"*, FIGHT CRIME:  INVEST IN KIDS PENNSYLVANIA (Oct. 16, 2013), www.fightcrime.org/southeast-pa-prosecutors-im-the-guy-you-pay-later/; *I'm the Guy You Pay Later:  Sheriffs, Chiefs, and Prosecutors Urge America to Cut Crime by Investing Now in High-Quality Early Education and Care*, FIGHT CRIME:  INVEST IN KIDS (2013), *available at* http://fightcrime.s3.amazonaws.com/wp-content/uploads/PA-Im-the-Guy-Report.pdf.

issues and to visit the NAACP's website to learn more about the "Misplaced Priorities" campaign.  *See* Wingerter Dep. at 18:13-20:2, Kasravi Dep. at 27:22-28:3.

>    **F.      The City's Rejection of the NAACP's Advertisement; the NAACP's Lawsuit**

21.     The City rejected the NAACP's advertisement, JS at ¶ 5, because a City official deemed it inappropriate, "not in keeping with promoting the city and the region in a positive fashion," Gale Dep. at 37:21-38:3, and not "consistent with what I believed the airport's mission is. " Tyrrell Dep. at 51:23-24.  Tyrrell further testified that "I don't believe the ad is consistent with the message that the airport wants to deliver in terms of promoting tourism, promoting the region and making it a very hospitable place." *Id.* at 114:15-24.

22.     The NAACP then sued the City for rejecting the ad.

>    **G.      The City's 2012 Prohibition of Non-Commercial Advertisements**

23.     In March 2012, five months after the NAACP sued, the City adopted the Airport Advertising Policy:

**Advertisements.**

    (1)    No person shall post, distribute, or display any Advertisement at the Airport without the express written consent of the CEO and in such manner as may be prescribed by the CEO.

    (2)    The CEO will not accept or approve any of the following Advertisements:

        1.    Advertisements that **do not** propose a commercial transaction;

        2.    Advertisements relating to the sale or use of alcohol or tobacco products;

        3.    Advertisements that contain sexually explicit representations and/or relate to sexually oriented businesses or products; and/or

        4.    Advertisements relating to political campaigns.

    (3)    The City shall have the right to post or cause to be posted its own advertising promoting:

        1.    Air Service;

        2.    The use of Airport related services;

        3.    The greater Philadelphia area and economy;

        4.    Philadelphia tourism initiatives; and

        5.    Other City initiatives or purposes.

JS at ¶ 7, 8; *see also* Regulations at 2-4.

        24.    Neither the phrase "propose a commercial transaction" nor the term "commercial" is defined in the Airport Advertising Policy or in any other document published by or available from the City.  Tyrrell Dep. at 149:24-150:4.  *Although the term "commercial" is vague, as discussed at Part II, below, this Brief will use the word "commercial" as shorthand for "propose a commercial transaction," and the word "non-commercial" as shorthand for "do not propose a commercial transaction."*

### H.      Purpose of Banning Non-Commercial Advertisements

25.      The City designated James Tyrrell as its Rule 30(b)(6) witness to testify about the City's purpose in banning non-commercial advertising.  *See* Ex. N, Rule 30(b)(6) Deposition Notice.  Tyrrell testified, however, that he did not in fact know the reason for the ban. Indeed, Tyrrell said that if it were up to him, he would accept any advertisement that someone would pay to display.  *See* Tyrrell Dep. at 138:23-140:22; 141:10-142:4.

26.      Tyrrell did seek to explain the non-commercial ban, however, by saying that "commercial ads are less likely to offend than non-commercial ads."  *Id.* at 146:4-23.

27.      Mark Gale, the Airport's Chief Executive Officer, also testified about the reason for the ban on non-commercial advertisements.  Gale testified that it was the controversy about the NAACP advertisement that prompted the City for the first time to distinguish between commercial and non-commercial advertisements.  Gale Dep. at 42:7-43:7; *see also* Tyrrell Dep. at 26:22-27:7.

### I.      Interim Partial Settlement of the NAACP's Claim

28.      On June 21, 2012, the NAACP and the City settled the NAACP's claim that the City had wrongfully rejected the NAACP advertisement.  JS at ¶ 10.  The City agreed to display the advertisement for three months at two Airport locations and to pay the NAACP $8,800 in attorney's fees.  *Id.*  The parties also agreed that the NAACP would file an amended complaint challenging the terms and implementation of the then newly-adopted Airport Advertising Policy.  *Id.*

29.      This Court entered an order confirming the stipulation on July 23, 2012, JS at ¶ 11, and a week later, the NAACP filed its Amended Complaint.  JS at ¶ 12.

13

### J.      The Display of the Misplaced Priorities Ad

30.      Pursuant to the settlement agreement, the City displayed the NAACP's "Misplaced Priorities" advertisement from July 27, 2013 to October 27, 2013 in two locations within the Public Areas of the Airport.  *See* E-mail from Jayne Risk to Alexander Bilus (Sept. 19, 2013), Kessler Affidavit at G-74; *see also* Ex. L.

### K.      The City's Current Practices

31.      Anyone who wants to display an advertisement at the Airport is required to submit it to Clear Channel.  JS at ¶ 13.[14]  If Clear Channel approves an advertisement as allowed under the Airport Advertising Policy, one or more City officials then review the ad to confirm that it is, in their view, appropriate for display at the airport:

> Clear Channel submits the proposed advertising package which includes the terms, the creative, to a member of my staff.  They then submit that package, primarily the creative, to the law department to ensure that it meets the commercial viability test. When it's either given an approval or a rejection by the law department, it comes to me for a further review.  And **if I deem it appropriate**, I forward it to the CEO for his ultimate approval.

Tyrrell Dep. at 32:7-21 (emphasis added); *see also id.* at 33:19-21.  When asked whether "commercial viability" is something different than "propos[ing] a commercial transaction," Tyrrell stated that "[i]t's probably part of it.  I'm not sure it's entirely that."  *Id.* at 33:22-34:3. He also said that he is "not positive" whether there is "some part of [the commercial viability test] that goes beyond determining whether the ad proposes a commercial transaction."  *Id.* at 34:4-7.

---

[14]      Clear Channel acts as the City's agent when Clear Channel accepts and/or rejects advertisements submitted for display at the Airport.  JS at ¶ 14.  For purposes of this lawsuit, any acceptance and/or rejection of an advertisement by Clear Channel pursuant to the terms of the Airport Advertising Policy is deemed to have been done by the City.  *Id.*

32.     Even though the City has adopted the official Airport Advertising Policy,
City officials have continued at the same time to apply their unwritten No-Inappropriate-Ads
policy.  Tyrrell Dep. at 32:7-21.  When asked whether he would allow to be displayed every ad
that complied with the Policy (an ad that clearly proposed a commercial transaction not related to
politics, sex, alcohol, or tobacco), Tyrrell responded:  "Typically . . . .  [but] [r]ecall my ability to
disapprove any ad in our sole discretion."  *Id*. at 100:1-101:5, and that even with respect to
Policy-compliant ads: " There's always an exception.  . . .  Everything is looked at on a case-by-
case basis."  *Id*. at 104:5-20.

33.     When asked whether he cared about whether ads were "commercial or
non-commercial," Tyrrell testified:

> A. Well, I can tell you as a business person at the airport tasked
> with generating non-airline revenue, I would sell just about
> anything that wasn't totally offensive to the traveling public and
> put it anywhere at the airport.
>
> Q. So I infer from that answer, sir, that you don't, yourself, as the
> Deputy Director of Aviation, care one way or the other whether the
> ads are commercial or not, if they generate revenue, you're happy?
>
> A. I would be, yes.
>
> **Q. And the only test that you would want to be able to apply if
> it were up to you is whether they're offensive or not; correct?**
>
> **A. Yes.**

*Id.* at 141:10-142:4 (emphasis added).

34.     As he so candidly admitted, Tyrrell's standard for whether or not to
approve an ad seems to be whether the ad might be viewed as "offensive."  For instance, when
shown a provocative advertisement for Bentley automobiles (Ex. P-21 to Tyrrell Dep.), Tyrrell
testified that the City likely would reject the ad because "it would probably be deemed
offensive**.**"  Tyrrell Dep. at 167:6-20 (emphasis added).  Similarly, Tyrrell testified that although

an ad for a Mattel toy gun did in fact "propose a commercial transaction," the decision whether to approve it for display "would require a discussion."  *Id.* at 173:10-19.  He further testified:

> Q. And if the airport rejected it, it would be because it involved a gun?
>
> A. That would be my understanding, yes.
>
> Q. Is there any place in this policy where it says we don't allow ads for guns, even toy guns, that is expressed in writing?
>
> A. No, I don't believe so.
>
> **Q. That just falls under the general rubric of what's appropriate and not appropriate at the airport consistent with the airport's mission?**
>
> **A. I would think so, yes.**

*Id.* at 173:20-174:10 (emphasis added).

L.     **The City's Own Advertisements**

35.     The Airport Advertising Policy permits the City to post its own advertisements on potentially controversial topics.  Regulations at 2-4, Section J, Paragraph 3. The City has displayed advertisements promoting "LGBT (Lesbian · Gay · Bisexual · Transgender) History Month," *see* Tyrrell Dep. at 164:23-165:7; Ex. P-18 to Tyrrell Dep, as well as celebrating beer brewing, *see* Kessler Affidavit [G-69, G-70], and beer-drinking, [G-71], (b) honoring an artist who is "reminding us to be less wasteful and more respectful of our natural environment" [G-72], and ads about (c) cocktails [G-04, G-09, G-59], and (d) dumpster divers [G-73].

M.     **Lack of Harm to the City**

36.     The display of the NAACP's "Misplaced Priorities" advertisement at the Airport did not cause any harm to the City, the Airport, or the Airport's mission.  *See, e.g.*, Gale Dep. at 46:18-22, Tyrrell Dep. II at 25:16-23.  When asked whether he believed that the display

16

of the NAACP ad would cause any problem, Tyrrell stated "I do not believe it will create a physical problem, if that's what you're describing, or a problem with safety or anything else." Tyrrell Dep. at 121:4-7.

37.     The City received no complaints about the NAACP advertisement.  Gale Dep. at 46:18-22, Tyrrell Dep. II at 25:16-23.

38.     The City also has never received a complaint about the programming or advertisements that CNN has displayed on Airport television screens. Tyrrell Dep. II at 25:16-19. The City never received a complaint about the many public interest advertisements (*see* Fact ¶ 15) that it allowed to be displayed before March 2012.  Tyrrell Dep. II at 15:19-24.

## ARGUMENT

### I.     THE AIRPORT ADVERTISING POLICY IS UNCONSTITUTIONAL BECAUSE IT FAILS UNDER STRICT SCRUTINY.

#### A.     The Airport's Public Areas Constitute the Relevant "Forum."

The First Amendment provides that the government "shall make no law . . . abridging the freedom of speech."  U.S Const. amend. I.  To decide whether the government's restriction of speech violates the First Amendment, the Court first must determine what property is at issue, *i.e.*, define the relevant "forum."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 800 (1985).  The Court must then determine whether the forum is a "public," "designated public," or "nonpublic" forum.  *See id.*  The forum's classification determines the degree of scrutiny to be applied to the speech restriction.  *See Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty*., 653 F.3d 290, 295-96 (3d Cir. 2011) (listing varying degrees of scrutiny to be applied to restrictions in different fora).

To define the relevant forum, a court is to focus on "the access sought by the speaker." *Cornelius*, 473 U.S. at 789.  Here, the NAACP seeks to "speak" by placing advertisements in the

Public Areas of the Airport, *i.e.*, "Areas normally accessible to the General Public, including public portions of all Terminal Buildings, parking lots, and Airport roadways."  Regulations at 1-12.  The NAACP is not seeking access to the nonpublic areas of the Airport, such as the airplane hangars or the runways.

The City likely will argue that the forum should be narrowly defined as the wall spaces in the Public Areas of the Airport on which advertisements can be displayed on billboards or on flat screen monitors.  In its brief opposing the City's motion to dismiss, the NAACP mistakenly agreed with the City that the forum should be so defined, and in denying the City's motion, the Court noted that agreement.  With apologies to the Court for having briefed the motion to dismiss on that basis, the NAACP now submits, for three reasons, that the forum must be defined more expansively as the Public Areas of the Airport.

First, discovery has shown that the billboards and flat screen monitors are just two of many modes of communication under the City's control within the Airport's Public Areas.  *See* Facts ¶¶ 5-10.  The many diverse media inject a great deal of expressive activity into the Public Areas of the Airport for viewing by the 83,000 people who pass through the Airport every day. It makes no more sense to define the wall-mounted billboards and flat screen monitors as a distinct forum in and of themselves than to define each gate-located television screen as a separate forum.  Rather, the Airport's Public Areas constitute one large forum.

Second, the City's Airport Advertising Policy is not by its terms limited to the wall spaces.  To the contrary, the Policy applies on its face to *all* advertisements that anyone wishes to "post, *distribute* or display" (emphasis added) in the Public Areas of the Airport.  The inclusion in the Policy of advertisements that are "distributed" shows conclusively that the Policy is not limited to wall space.

Third, the City's proposed narrow definition of the forum is a completely artificial construct, at odds with the way in which Airport passengers are simultaneously exposed to many kinds of communication media.  The City's argument is analogous to defining as the forum the particular soapbox on which someone was trying to give a speech in a park, rather than considering the park itself as the relevant forum.   Other courts have rejected such contrived and cramped forum definitions.  In *U.S. Southwest Africa/Namibia Trade & Cultural Council v. United States*, for instance, the D.C. Circuit stated:

> [T]he district court was wrong to consider the advertising display cases [at the airport] as discrete self-contained forums – apart from the airport terminals in which they are located.  . . .  [W]e note that these facilities are for the most part physically 'separated' from the terminals only by glass panes or translucent plexiglass whose sole purpose is to frame or project messages of outside organizations to the terminals' public users.  Given the peculiar role of these facilities as the self-described premiere communications medium at National and Dulles, any restrictions placed on the subject matter of the airport advertisements are also placed on one of the dominant forms of speech – if not *the* dominant medium of 'outside' communication – within the airport themselves.  Accordingly, to appraise accurately the public forum/nonforum nature of the public properties at issue in this case, we must evaluate the nature of the airport terminals of which the display advertisement areas are an organic part.

708 F.2d 760, 764 (D.C. Cir. 1983) (citation omitted); *see also Penthouse Int'l, Ltd. v. Koch*, 599 F. Supp. 1338, 1346 (S.D.N.Y. 1984) (defining forum as entire New York City subway system).

For all these reasons, the Court should define the relevant forum as the Public Areas of the Airport.

## B.     The Airport's Public Areas are a "Designated Public Forum."

The Public Areas of the Airport constitute a "designated public forum."

A traditional "public forum" is government-owned property that has "immemorially been held in trust for the use of the public, and, time out of mind, [has] been used for purposes of

assembly, communicating thoughts between citizens, and discussing public questions."
*Pittsburgh League of Young Voters Educ. Fund,* 653 F.3d at 295-96 (quotation omitted).  City
streets and parks are examples of traditional public fora.  *Id*. at 295.  A "designated public
forum," on the other hand, is a venue that is not a traditional public forum but that the
government has "intentionally opened up for use by the public as a place for expressive
activity."  *Id*. at 296; s*ee also Christ's Bride Ministries, Inc. v. SEPTA*, 148 F. 3d 242, 249-55
(3d Cir. 1998); *Hopper v. City of Pasco*, 241 F.3d 1067, 1074-81 (9th Cir. 2001); *United Food &
Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 355 (6th
Cir. 1998).  Finally, a "nonpublic forum" is a venue that is not open to speech by the broader
public.  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (discussing
definition of nonpublic forum).  Military bases, dedicated handicapped ramps, and state vanity
license plates are examples of nonpublic fora.  *See Greer v. Spock*, 424 U.S. 828, 836 (1976);
*McTernan v. City of York*, 577 F.3d 521, 527-28 (3d Cir. 2009); *Perry v. McDonald*, 280 F.3d
159, 163 (2d Cir. 2001).

      To classify the forum, the Court must examine the government's "policies ***and practices***
in using the space and also the nature of the property and its ***compatibility with expressive
activity***."  *Christ's Bride Ministries*, 148 F.3d at 249 (emphasis added).  The Court also must
examine the government's intent in establishing and maintaining the property.  *Cornelius*, 473
U.S. at 802.  Importantly, however the government's "own statement of its intent . . . does not
resolve the public forum question."  *Christ's Bride Ministries*, 148 F.3d at 251; *see Gregoire v.
Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("To allow . . . the government's
statements of intent to end rather than to begin the inquiry into the character of the forum would
effectively eviscerate the public forum doctrine; the scope of first amendment rights would be

determined by the government rather than by the Constitution"); *see also Airline Pilots Ass'n, Int'l,  v. Dep't of Aviation of the City of Chicago*, 45 F.3d 1144, 1152 (7th Cir. 1995) (intent gleaned from scrutiny of the "policy and practice of the government with respect to the underlying property" and "the nature of the property and its compatibility with expressive activity").  "[T]he fact that the government has reserved the right to control speech without any particular standards or goals, and without reference to the purpose of the forum, does not necessarily mean that it has not created a public forum.  If anything, we must scrutinize more closely the speech that the government bans under such a protean standard." *Christ's Bride Ministries*, 148 F.3d at 251.

The Public Areas of the Airport constitute a "designated public forum" because the City has opened those Public Areas to an enormous variety of expressive activity, both before and after the City promulgated the March 2012 policy.  *See* Facts ¶¶ 7-10, 14-15.  Moreover, the vast array of communications within the Public Areas, including the City's own ads on potentially controversial topics, like LGBT tolerance and beer drinking, show that such expressive activity is not inconsistent with the nature or function of the Airport.  *See Planned Parenthood Ass'n v. Chicago Trans. Auth.*, 767 F.2d 1225, 1232 (7th Cir. 1985) (where government already permits use of its facilities for public issue advertising, "it cannot argue that such use is incompatible with the primary use of the facilities").  Further proof that a wide range of expressive activity in the Public Areas of the Airport is fully compatible with the Airport's primary function as a transportation facility is the vast array of non-commercial artwork and television programming (such as news broadcasts in the Airport) and, prior to March 2012, the non-commercial public interest advertising that the City permitted to be displayed on the walls of the Airport.  *See* Facts ¶¶ 14-15.

In like circumstances, other courts have found that the government indeed created a "designated public forum." In *Christ's Bride*, for example, the Third Circuit found that a designated forum was created "based on SEPTA's written policies, which specifically provide for the exclusion of only a very narrow category of ads, based on SEPTA's goals of generating revenues through the sale of ad space, and based on SEPTA's practice of permitting virtually unlimited access to the forum." 148 F.3d at 252. SEPTA's written policy permitting it to reject material that it "deem[ed] objectionable for any reason" did not change the Third Circuit's analysis. [15] *Id*. at 251-52.

The City's practices at the Airport are similar. *See* Tyrrell Dep. II at 11:19-14:6. Like SEPTA, the City allowed a wide variety of expressive activity at the Airport, including non-commercial advertisements, until the NAACP submitted its proposed ad. Tyrrell Dep. II at 14:7-16. The city continues to allow a plethora of expressive activity, including news broadcasts, artwork, and City advertising, while only policing private, non-commercial advertisements. Also like SEPTA, the City's purpose in allowing advertising in the Airport is to raise revenue. Tyrrell Dep. at 92:20-23. As the Court of Appeals said in *Christ's Bride Ministries*, 148 F.3d at 251, "[t]he goal of generating income by leasing ad space suggests that the forum may be open to those who pay the requisite fee," consistent with a "designated public forum."

In *Hopper*, the Ninth Circuit held that a city hall was a designated public forum because the government had opened the property to displays of artwork. 241 F.3d at 1078 ("It is undisputed that [the City] opened its display space to expressive activity by retaining the Arts Council to manage a gallery with exhibitions by local artists. This evinces an intent to create a designated public forum. . . . The city's so-called policy of non-controversy became no policy

---

[15] The Third Circuit did not address whether SEPTA's policy was unconstitutionally vague.

at all because it was not consistently enforced and because it lacked any definite standards.").   In so holding, the Ninth Circuit noted that "an abstract policy statement purporting to restrict access to a forum is not enough.  What matters is what the government actually does – specifically, whether it consistently enforces the restrictions on use of the forum that it adopted."  *Id*. at 1075. Likewise in this case, the City of Philadelphia currently opens the forum to artwork, advertisements, displays, and network television without a consistent restriction against non-commercial displays.  *See* Facts ¶¶ 7-10.  Further, if the City had a policy against non-commercial displays pre-2012, it did not consistently apply its policy prior to the submission of the NAACP advertisement, as evidenced by the City's pre-March 2012 display of admittedly noncommercial advertisements in open display spaces.  *See* Facts ¶¶ 14-15, Tyrrell Dep. II at 14:7-19.

Similarly, in *United Food & Commercial Workers*, the Sixth Circuit found that the SORTA transit agency had created a designated public forum even though SORTA stated, "[i]t is SORTA's policy that its buses, bus shelters and billboards are not public forums."  161 F.3d at 352.  The Court found that SORTA's "stated purpose for limiting advertising on buses only tenuously related, at best, to the greater forum's intended use."  *Id*. at 354.  Because SORTA could not show that the excluded speech "necessarily will frustrate SORTA's commercial interest" and because the agency had a history of accepting nearly all advertisements submitted since the advertising policy was adopted, the court found that the agency had created a designated public forum and that exclusion of the advertisements at issue was unconstitutional. *Id*. at 354-55 (subjecting policy to strict scrutiny and stating, "We think it self-evident that excluding the Union's advertisement based on aesthetics and the limited possibility of controversy fails this historically stringent test.").

For all these reasons, the Public Areas of the Airport constitute a designated public forum.

### C.       The Public Areas of the Airport Do Not Constitute a Nonpublic Forum

The Court should reject any City argument that the Public Areas of the Airport (or the advertising spaces on the walls) are a nonpublic forum.  The fora that courts have found to be nonpublic are strikingly different in kind.  In *Greer*, for example, the Supreme Court found that a military base was a nonpublic forum because "it is [] the business of a military installation . . . to train soldiers, not to provide a public forum," and because "[a] necessary concomitant of the basic function of a military installation has been the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the area of his command."  424 U.S. at 838 (quotation omitted).  In *McTernan*, the Third Circuit found that "[t]here is nothing in the record establishing that [a disabled access ramp] was constructed to facilitate expressive activity, daily commerce, or the life of the neighborhood.  To the contrary, the ramp's purpose was singular, to effectuate access of patrons, both able and disabled."  577 F.3d at 527.  In *McDonald*, the Second Circuit noted that vanity license plates were a non-public forum because "vanity plates are an unlikely means by which to engage in meaningful assembly and debate," and because "vanity plates are a highly limited and extremely constrained means of expression" due to their limited size and space and extensive regulation.  280 F.3d at 168.  The Restricted and Secured Areas of the Airport, *see* Fact ¶ 3, unlike the Public Areas, are paradigmatic non-public fora.

The plurality opinion in *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992), is not precedent for the contrary proposition.  *Lee* addressed the question whether adherents of the Krishna Consciousness religion should be allowed to hand out literature and ask for donations in airport "terminals [that had] never been dedicated . . . to expression in

the form sought to be exercised." *Id*. at 682.  Here, in contrast, the City has permitted other

organizations to express their views in the same format sought by the NAACP.  Further, in *Lee*,

the plurality expressly found that "the record demonstrates that Port Authority management

considers the purpose of the terminals to be the facilitation of passenger air travel, not the

promotion of expression." *Id.*  The record in this case is far different.  The City's history of

permitting non-commercial advertisements prior to March 2012, and even displaying artwork in

the terminals, demonstrates that the City believes the purpose of the Airport is not only to

facilitate air travel but also to achieve expressive ends.  Because *Lee* considered a wholly distinct

factual scenario, it provides neither persuasive nor binding authority for the assertion that the

Public Areas of the Airport (or the wall spaces) constitute a non-public forum.

   The City may try to argue that the Public Areas of the Airport, or the Airport's wall

advertising spaces, *must* be deemed a non-public forum because the City has expressly excluded

a category of speech (non-commercial advertisements) from those spaces.  The Second Circuit

saw right through this kind of specious, boot-strap argument.  *See N.Y. Magazine v. Metro.*

*Transp. Auth*., 136 F.3d 123, 129-30 (2d Cir. 1998) ("This reasoning would allow every

designated public forum to be converted into a non-public forum the moment the government did

what is supposed to be impermissible in a designated public forum, which is to exclude speech

based on content" and would eliminate the concept of the designated forum).  Moreover, when

the government redefines the character of the forum with the result of outlawing certain speech,

it must identify a legitimate purpose for doing so; otherwise, forum redefinition would be the

government's response to every challenge.  *See, e.g., Christ's Bride Ministries, Inc.*, 148 F.3d at

253 (citing to *Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 801

(1996) (Kennedy, J. concurring in part and dissenting in part) ("[T]he power to limit or redefine

forums for a legitimate purpose does not allow the government to exclude certain speech or speakers from them for any reason at all.") (citation omitted); *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1287-88 (10th Cir. 1999) (noting that the only way the government may alter a traditional public forum is "by changing the physical nature of its property [to] alter it to such an extent that it no longer retains its public forum status").

### D. The Official Airport Advertising Policy Cannot Survive Strict Scrutiny.

Because the Public Areas of the Airport constitute a designated public forum, any content-based restriction on speech in the forum is subject to strict scrutiny, *see Widmar v. Vincent*, 454 U.S. 263, 270 (1981).[16]  The government must show that "[the] restrictions [are] narrowly tailored to serve a compelling governmental interest."  *Pittsburgh League of Young Voters Educ. Fund*, 653 F.3d at 295.  A policy is not narrowly tailored if it is (i) not necessary to achieve the government's claimed interest, *see Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 609-10 (1982), (ii) is over- or under-inclusive, *see First National Bank of Boston v. Bellotti*, 435 U.S. 765, 793-95 (1978), or (iii) is not the least restrictive means

---

[16] It is indisputable that the Airport Advertising Policy is content-based rather than content-neutral because the City must look to the content of each advertisement to determine its permissibility.  *See Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984) (plurality opinion). Examples of content-based regulations include a sales tax scheme taxing general interest magazines, but exempting newspapers and religious, professional, trade, and sports journals, *see Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987); a statute banning photographic reproductions of currency except for educational or newsworthy purposes, *see Regan*, 468 U.S. at 648-49; and a statute mandating that schools notify parents if their child declines to salute the flag, *see Circle Sch. v. Pappert*, 381 F.3d 172, 174 (3d Cir. 2004). Examples of content-neutral regulations include an ordinance limiting the size of billboards, *see Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 816 (6th Cir. 2005); an ordinance prohibiting portable signs from being located between the building setback line and a public road, *see Dills v. Cobb Cnty.*, 755 F.2d 1473 (11th Cir. 1985) (per curiam); and an ordinance prohibiting signs that display electronically changeable messages, *see Naser Jewelers, Inc. v. City Of Concord*, 513 F.3d 27, 30 (1st Cir. 2008).

of achieving this interest, *see Sable Communications v. FCC*, 492 U.S. 115, 126-31 (1989).  The Policy fails to be narrowly tailored in all three respects.

The Airport Advertising Policy is not narrowly tailored to serve a compelling government interest.  Over the course of this lawsuit, the City has posited a variety of interests to justify the official Airport Advertising Policy, *see* Tyrell Dep. at 51:20-52:3, 52:12-19; City's Motion to Dismiss at 9-10 (Doc. No. 41), but only one of these interests (raising revenue) is compelling, and the Airport Advertising Policy is not narrowly tailored to achieve any of them:

**Raise Revenue.**  The City may well have a "compelling interest" in generating more revenue, but banning a category of advertisements results in less revenue, not more.  The City's 30(b)(6) witness himself was unable to identify any way in which banning paid non-commercial advertisements could somehow help the City raise revenue.  *See* Tyrell Dep. at 144:16-145:21; *see also id.* at 141:10-16 ("[A]s a business person at the airport tasked with generating revenue, I would sell just about anything that wasn't totally offensive to the traveling public and put it anywhere at the airport.").

**Maintain a "Commercial" Environment; Create a "Family-Friendly" Environment; Promote the Airport's "Mission."**  These alleged purposes are so poorly defined that it is impossible to determine what they mean, let alone to deem them "compelling." Moreover, even if these alleged purposes were capable of clear definition, banning non-commercial ads does nothing to achieve them.  The distinction between commercial and non-commercial advertisements does not correlate with whether an ad is or is not "family friendly"; commercial advertisements can be just as offensive, obscene, or violent as non-commercial advertisements, whereas noncommercial advertisements can be encouraging, uplifting, educational, and family friendly.  *See, e.g.,* Tyrell Dep. at 156:9-20; 168:2-169:13; *see also Act*

27

*Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 905 F. Supp. 2d 317, 329 & 335 (D.D.C. 2012) (restriction on speech must actually advance the purpose asserted).  Moreover, the Court ought not to allow the City to claim that it has a "compelling interest" to create a family friendly environment or the like when the City permits arguably non-family friendly content to be displayed throughout the Airport.  *See, e.g.*, G-09 (gin advertisement), G-63 (provocative perfume advertisement).

**Minimize Chances of Abuse, the Appearance of Favoritism, and the Risk of Imposing on a Captive Audience.**  The City argued in its Rule 12(b)(6) motion that these were the true purposes of the Policy.  The City's lawyers invented these purposes out of whole cloth, however, solely for the purposes of defending this lawsuit.  The City's own designated 30(b)(6) witness, testifying on behalf of the City, flatly denied that these were the City's purposes, *see* Tyrrell Dep. at 128:3-130:1; 136:7-14, and the Airport CEO, Mark Gale, never identified these purposes, either.  Gale Dep. at 23:11-22.  Moreover, even if the City could demonstrate that these purposes were "compelling," they are completely unrelated to the City's ban on noncommercial advertisements.

Not only are the City's purported interests (other than raising revenue) **un**compelling and unrelated to the ban on noncommercial ads, but that ban is both under-inclusive and over-inclusive.  If the Policy is motivated by a desire to raise revenue, the ban on noncommercial advertisements is over-inclusive, since it bans **paid** non-commercial advertisements that would generate the same revenue as commercial ads.  On the other hand, if the Policy's purpose is to promote a "family friendly environment," the policy is under-inclusive, since, as discussed above, the commercial/non-commercial distinction does not correlate with family friendly/not family friendly.

28

Moreover, even assuming the ban on non-commercial advertisements actually promoted a compelling City interest, a blanket ban on a wide cross-section of advertisements manifestly is not the least restrictive means of achieving that interest.  If the City is concerned that it might appear to be favoring speech that it dislikes, it can simply place disclaimers next to such advertisements stating that the views or opinions expressed by the advertisements do not represent the views of the City.  *See Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 898 F. Supp. 2d 73, 82-83 (D.D.C. 2012) (holding that refusal to display advertisement was not narrowly tailored to achieve compelling interest in protecting public transit system because "WMATA could have decided to distance itself from Plaintiffs' sentiments with accompanying statements and/or advertisements which conveyed its disagreement and explained its constitutional obligations").

### E. The City's Unwritten No-Inappropriate-Ads Policy Cannot Survive Strict Scrutiny.

As much as the official Airport Advertising Policy violates the First Amendment, the unwritten No-Inappropriate-Ads policy may be even worse.  The desire to display only advertisements that the City deems "appropriate" or "inoffensive" is not a legitimate government purpose, let alone a "compelling interest," and is wholly inconsistent with the First Amendment. *See Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991)  ("[T]he [g]overnment may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (quoting *United States v. Eichman*, 496 U.S. 310, 319 (1990)); *see also United States v. Marcavage*, 609 F.3d 264, 282 (3d Cir. 2010) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (quotation omitted).

II.  **BOTH THE OFFICIAL AIRPORT ADVERTISING POLICY AND THE UNWRITTEN NO-INAPPROPRIATE-ADS POLICY ARE UNCONSTITUTIONAL BECAUSE THEY ARE SO VAGUE AND SUBJECTIVE THAT CITY OFFICIALS CAN USE THEM TO ARBITRARILY REJECT ADVERTISEMENTS.**

A restriction of speech violates the First Amendment if it is so vague that government officials can enforce it in an arbitrary and discriminatory way.  *Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.*, 233 F. Supp. 2d 647, 666 (D.N.J. 2002), *aff'd*, 386 F.3d 514 (3d Cir. 2004); *see also City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 758 (1988) (ambiguous and indefinite standards allow governmental officials to use "*post hoc* rationalizations" and "shifting or illegitimate criteria" to justify their behavior, "making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression.").  "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food & Commercial Workers Union*, 163 F.3d at 359 (citation omitted).  In essence, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).  "Thus, a statute or ordinance offends the First Amendment when it grants a public official 'unbridled discretion' such that the official's decision to limit speech is not constrained by objective criteria, but may rest on 'ambiguous and subjective reasons.'" *United Food & Commercial Workers Union*, 163 F.3d at 359 (quoting *Desert Outdoor Adver., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996)).

In *United Food & Commercial Workers Union*, the Southwest Ohio Regional Transit Authority ("SORTA") implemented an advertising policy for its buses and bus shelters prohibiting "[a]dvertising of controversial public issues that may adversely affect SORTA's

ability to attract and maintain ridership," and requiring that all ads "be aesthetically pleasing and enhance the environment for SORTA's riders and customers and SORTA's standing in the community."  *Id.* at 346.  The Sixth Circuit struck down the policy, holding that "[w]e have no doubt that standing alone, the term 'controversial' vests the decision-maker with an impermissible degree of discretion."  *Id.* at 359.  Furthermore, the court stated, "[i]n the absence of requiring a demonstrable causality between an advertisement's controversial nature and SORTA's interests, the Policy invites 'subjective or discriminatory enforcement' by permitting the decisionmaker to speculate as to the potential impact of the controversial advertisement on SORTA's interests."  *Id.* at 360.  Finally, the court determined that "[s]ince it is not susceptible to objective definition, the 'aesthetically pleasing' requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing."  *Id.*

So it is in this case.  Both the official written Airport Advertising Policy and the City's unwritten policy suffer from the same infirmities as that the Sixth Circuit identified in *United Food & Commercial Workers Union*.  First, as to the official Airport Advertising Policy, neither the phrase "propose a commercial transaction" nor the term "commercial" is defined by the Airport Advertising Policy or any other document published by or available from the City, and James Tyrrell, the City's 30(b)(6) witness and the man in charge of administering the Policy, was unable to define the phrase.  *See* Tyrrell Dep. at 149:24-150:18.  When shown a series of advertisements, Tyrrell was unable to say whether they did or did not "propose a commercial transaction."  *See, e.g.*, Tyrrell Dep. at 180:3-181:8, 181:16-182:4, 182:11-183:21.  Tyrrell could not even say whether adding the words "buy a t-shirt" to the NAACP ad would transform the advertisement into one that "proposes a commercial transaction."  Tyrrell Dep. at 188:24-189:13.

31

When asked whether an ad has "to actually propose that the viewer, the customer buy a product or a service" to be allowed, Tyrrell responded, "I'm sure that's part of it." *Id*. at 58:3-7. When asked if there was another part of the test, Tyrrell stated, "I don't know." *Id.* at 58:8-9.

The City might try to argue that the line between commercial and non-commercial is clear, and at the extremes, it may be: an ad that says "Buy a Coke today" clearly proposes a commercial transaction and an ad that says "Hug your child today" clearly does not. But clarity at the extremes does not help the City here. Even a regulation that is clear at the extremes can be void for vagueness if the "gray area" between the extremes is obscured. *See, e.g.*, *U.S. Sw. Africa/Namibia Trade & Cultural Council*, 708 F.2d at 769-70 (noting that commercial speech can simultaneously communicate political and social messages and that the gray area in the middle can lead to an impermissible preference for more benign commercial speech); *N.Y. Magazine v. Metro. Transp. Auth.,* 136 F.3d 123, 131 (2d Cir. 1998) ("This case aptly demonstrates that where there are both commercial and political elements present in speech, even the determination whether speech is commercial or not may be fraught with ambiguity and should not be vested in an agency such as MTA."). And Tyrrell himself – the official charged with administering the Policy and designated by the City to testify about it – was utterly unable to articulate a precise definition for this standard and, as discussed above, repeatedly testified that he had no idea whether various advertisements put before him did or did not propose commercial transactions. Finally, the City's actual practice further shows that the "commercial/non-commercial" distinction is nowhere near as clear-cut as the City claims. The City has permitted wall advertisements that invite people to go to a website to "download a *free* app" – apparently deeming such advertisements to "propose a commercial transaction" – but an advertisement like the NAACP's would be rejected as noncommercial, even though it asks

viewers to go to the NAACP's website to help "build a better America together" and links them to a website through which they can donate to the NAACP.

The commercial/non-commercial distinction contains enough "gray area" to allow City officials to reject ads that offend the officials' subjective beliefs and values. This lack of standards provides Tyrrell and other City officials unlimited discretion to reject advertisements they do not like, for whatever reason, *i.e.*, to engage in viewpoint discrimination. *Cf. Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1374 (3d Cir. 1990) ("The definition of the groups falling within the 'educational mission of the school' is so vague that Centennial has virtually unlimited discretion in deciding which groups qualify and which do not.").

Finally, it hardly needs arguing that the City's unwritten No-Inappropriate-Ads policy is completely illegal. An "appropriate/inappropriate" or "offensive/non-offensive" standard invites "subjective or discriminatory enforcement." *See United Food & Commercial Workers Union*, 163 F.3d at 360.

## III.   EVEN IF THE FORUM WERE NONPUBLIC, THE AIRPORT ADVERTISING POLICY WOULD FAIL BECAUSE IT IS UNREASONABLE.

The City argued in its 12(b)(6) motion that the forum is nonpublic, and therefore, that the Airport Advertising Policy is not subject to strict scrutiny. In light of all the expressive activity that the City allows in the Airport's Public Areas, it seems preposterous to call the Public Areas a nonpublic forum, but if the City persists in this argument, the NAACP will show in its responsive brief (due January 7, 2014) that neither the official Airport Advertising Policy nor the unwritten No-Inappropriate-Ads policy would be permissible even in a non-public forum. Even in a non-public forum, a restriction on speech must be both reasonable and viewpoint neutral, and the City's polices are neither.

IV.     **THE AIRPORT ADVERTISING POLICY ALSO VIOLATES THE PENNSYLVANIA CONSTITUTION.**

Article I, Section 7 of the Pennsylvania Constitution provides in pertinent part: "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pennsylvania courts have made clear that the Pennsylvania constitution provides a "more expansive protection than the First Amendment." *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1338 (Pa. 1986); *see also id.* at 1333 ("In our federal system, the Constitution of United States provides a minimum level of protection for individual rights. A state constitution may [ ] provide greater protection for those rights."); *Pap's A.M. v. City of Erie*, 812 A.2d 591, 603 (Pa. 2002) ("Article I, §7 is broader than the First Amendment"). Accordingly, for all of the reasons discussed above, the Airport Advertising Policy also violates the Pennsylvania Constitution.

## CONCLUSION

The NAACP requests that the Court enter summary judgment in its favor and against the City, and that the Court deny the City's cross-motion for summary judgment. Alternatively, the court should schedule the case for a non-jury trial on the merits.

December 13, 2013

s/ Fred. T. Magaziner

Fred T. Magaziner
Alexander R. Bilus
Catherine V. Wigglesworth
Laura M. Kessler
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Phone:  (215) 994-4000
Fax:  (215) 994-2222

Mary Catherine Roper
AMERICAN CIVIL
   LIBERTIES FOUNDATION
   OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA  19106
Phone:  (215) 592-1513
ext. 116
Fax:  (215) 592-1343

Seth F. Kreimer
3400 Chestnut St.
Philadelphia, PA  19104
Phone:  (215) 898-7447
Fax:  (215) 573-2025

*Attorneys for Plaintiff National Association for the Advancement of Colored People*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 13, 2013 I electronically filed this document via the Court's

CM/ECF system and electronically served it upon all counsel of record.

<u>s/ *Catherine Wigglesworth*</u>
Catherine Wigglesworth
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Phone:  (215) 994-4000
Fax:  (215) 994-2222