# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 11-6533** |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

**RUFE, J.**                                                          **AUGUST 1, 2014**

Before the Court are cross-motions for Summary Judgment filed by Plaintiff, the National Association for the Advancement of Colored People ("NAACP") and Defendant, the City of Philadelphia ("City"). For the reasons that follow, the NAACP's motion will be granted, and the City's denied.

### INTRODUCTION

In January 2011, the NAACP submitted a proposed advertisement titled "Misplaced Priorities" to be displayed in the Philadelphia International Airport ("Airport"), which is governed by the City. The ad showed the Statue of Liberty silhouetted against a sunset to the right of a block of text that read, "Welcome to America, home to 5% of the world's people & 25% of the world's prisoners." Below that sentence, in smaller type was the text: "Let's build a better America together. NAACP.org/smartandsafe." The City rejected the ad, and the NAACP filed a complaint. At the time of the rejection, the City had no written policy regarding what advertisements could be run in the Airport. In March 2012, while the complaint was pending, the Airport comprehensively revised its Rules and Regulations; included in the revision are parameters that specify what ads may or may not run in the Airport. The NAACP and the City

entered into a settlement pursuant to which the ad ran in the Airport at two locations for three months, and the NAACP reserved its right to amend its complaint to challenge the post-March 2012 advertisement policies. The NAACP amended its complaint, the parties engaged in discovery, and they cross-moved for summary judgment. This Opinion resolves the motions.

The NAACP argues that there are two advertising policies, one written, the other unwritten, and it brings facial challenges to both, arguing that they run afoul of the First Amendment to the United States Constitution and the analogous provision of the Pennsylvania Constitution. Pursuant to the written policy, the Airport will reject "[a]dvertisements that **do not** propose a commercial transaction." Under the unwritten policy, according to the NAACP, the Airport will reject any advertisement that Airport executives deem "inappropriate."

The NAACP argues that the Airport has designated all public areas in its control as a forum for speech and thus its advertising policies may only restrict speech if the restrictions are narrowly tailored to a compelling government interest, a test these policies fail. In the alternative, the NAACP argues that the Airport may only restrict speech if the restrictions are reasonable in light of the purposes of the forum for speech the Airport created; these policies, according to the NAACP, are unreasonable.

The City argues that there is no unwritten policy and that, even if there were an unwritten policy, the NAACP would lack standing to challenge it. The City further argues that its written policy is reasonable and that because it has not designated a public forum for speech, it need not narrowly tailor its restrictions to a compelling government interest.

**I.**     **Standing**

2

Under Article III of the Constitution, Federal Courts have jurisdiction to hear only "cases or controversies," a limitation which has been read to require a plaintiff to demonstrate throughout the case that it has "standing," i.e., the right to sue. In order to have standing,

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[1]

The crucial question here is whether the NAACP has sufficiently alleged that it has suffered injury in fact.

> The Supreme Court has instructed that "the injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." However, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."[2]

Here, the NAACP's injury consists of an allegation that it wishes to display the Misplaced Priorities ad, and it is certain that the City would reject the ad under both its written and unwritten advertising policies.[3] The Court now turns to whether this injury is sufficient to maintain the suit under the various theories the NAACP has advanced in its briefs supporting its motion for summary judgment.

---

[1] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations in original; citations omitted).

[2] *Constitution Party of Pa. v. Aichele*, No. 13-1952, 2014 WL 3294855, at *10 (3d Cir. July 9, 2014).

[3] *Cf. Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1369–70 (3d Cir. 1990) ("On the ground that it would request use of the Centennial facilities again for religious purposes, Student Venture sought to have Centennial's facilities use policy enjoined and a permanent injunction issued prohibiting Centennial from preventing its access to school facilities based on the religious content of its message.")

### A.   *Unconstitutionality of Regulations in the Airport's Forum for Speech*

### 1.   The Written Policy

It is uncontroversial that the NAACP may sue under a theory that the written policy violates the First Amendment "forum analysis" line of cases. Although it has not taken the step of actually submitting the ad in order for it to be rejected, it is clear that the ad does not "propose a commercial transaction," and thus is ineligible for placement in the Airport under the advertising policy. In a First Amendment challenge, where an allegedly unconstitutional policy has chilled speech (here, the non-submission of the advertisement), the chill is sufficient injury.[4]

### 2.   The Unwritten Policy

The City challenges the NAACP's right to sue under the unwritten policy, arguing that because the NAACP's ad would be rejected under the written policy, it lacks standing to challenge the unwritten policy. The right to challenge a policy under the First Amendment is the same whether the policy is written or not.[5] And "courts have repeatedly shown solicitude for First Amendment claims because of concern that, even in the absence of a fully concrete dispute, unconstitutional statutes or ordinances tend to chill protected expression among those who forbear speaking because of the law's very existence."[6] Assuming for the moment that the unwritten policy exists, the NAACP has standing to attack the unwritten policy because it has

---

[4] *Constitution Party of Pa.*, 2014 WL 3294855, at *12–13.

[5] *See Virginia v. Hicks*, 539 U.S. 113, 118–19, 121–22 (2003).

[6] *Peachlum v. City of York,* 333 F.3d 429, 434–35 (3d Cir. 2003). Although *Peachlum* involved an overbreadth challenge, it discussed solicitude for First Amendment challenges generally, and has been cited for the proposition that there is a "relaxed standing requirement . . . in the First Amendment context." *Pennsylvania Prison Soc. v. Cortes*, 508 F.3d 156, 169 (3d Cir. 2007) (emphasis deleted); *accord CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 625 (3d Cir. 2013).

alleged (and, as discussed below, proven) that the unwritten policy is independent from the written one and thus would serve as an alternative basis for rejecting the proposed ad regardless of the written policy's existence and even if the written policy is struck down as unconstitutional.[7] Therefore, the NAACP has alleged sufficient injury to challenge the unwritten policy.

### B. Unconstitutional Vagueness of the Regulations

The NAACP has not moved for summary judgment on the grounds that the advertising regulations are overbroad; rather, it argues that they are unconstitutionally vague. In the overbreadth context, standing is a light burden. "When raising a claim of unconstitutional vagueness, however, the rule is otherwise. In the latter instance, the litigant must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of its potentially vague application to others."[8] Here, the NAACP has never contended that the advertising regulations, vague as they may be, do not clearly proscribe the NAACP's advertisement. Whatever "propose a commercial transaction" may mean, the NAACP's advertisement does not do so, and therefore, the NAACP lacks standing to challenge the advertising regulations as unconstitutionally vague.

## II.   Standard of Review

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the

---

[7] *Cf. Gregoire*, 907 F.2d at 1369–70.

[8] *Aiello v. City of Wilmington, Del.*, 623 F.2d 845, 850 (3d Cir. 1980).

[9] Fed. R. Civ. P. 56(a).

suit under the governing [substantive] law."[10] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[11]

Both parties have moved for Summary Judgment. The Court first considers the NAACP's motion and will thus resolve all genuinely disputed factual matters in favor of the City.

### III.   The Written Policy

#### A.   Forum Analysis

The parties agree that the NAACP's claim must be adjudicated under what has been called "forum analysis," whereby a court first identifies the forum the speaker seeks to access and then categorizes the forum. The category to which the forum belongs determines the level of scrutiny the Court must apply to the claimed restriction on speech.

##### 1.   What is the Forum?

In *Christ's Bride Ministries v. SEPTA* ("*CBM*"), a case with significant factual similarities to this one, the Third Circuit held that a forum is to be defined by the "access sought" by the speaker.[12] This approach is precisely what the Supreme Court prescribed:

> [I]n defining the forum we have focused on the access sought by the speaker. When speakers seek general access to public property, the forum encompasses that property. In cases in which limited access is sought, our cases have taken a more tailored approach to ascertaining the perimeters of a forum within the confines of the government property.[13]

---

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11] *Id.*

[12] 148 F.3d 242, 248 (3d Cir. 1998).

[13] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985).

The NAACP's argument that the forum should be defined in terms of the expressive activity allowed by the government is unavailing in the face of directly contrary controlling cases.

In *CBM*, the plaintiff sought to place a poster in SEPTA's advertisement space that discouraged women from terminating pregnancies. The District Court defined the relevant forum as "the stations in a public transit system," a "public transportation system," and "SEPTA's subway and rail stations and their advertising space."[14] The Third Circuit reversed, holding that because CBM had only sought access to the advertising space, the advertising space was the relevant forum. Here, the NAACP has similarly only sought access to the Airport's advertising space. The fact that the advertising space is within the Airport's public spaces is of no moment to the forum analysis.[15] Third Circuit and Supreme Court precedent clearly command that the relevant forum is the Airport advertising space.

### 2.   Legal Uncertainties in Characterizing a Speech Forum

Having identified the forum, the Court must now characterize the forum. This is easier said than done. To reiterate, the level of scrutiny the Court will apply to the challenged restriction on the NAACP's access to the Airport advertising space is at stake. Governments may restrict access to certain kinds of fora only if the restriction is narrowly tailored to a compelling government purpose; they may restrict access to other kinds of fora if the restriction is viewpoint-neutral and "reasonable in light of the purpose served by the forum."[16] In deciding

---

[14] *CBM*, 148 F.3d at 248.

[15] *Cf. Cornelius*, 473 U.S. at 801 ("Although petitioner is correct that as an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns, forum analysis is not completed merely by identifying the government property at issue.").

[16] *CBM*, 148 F.3d at 247.

whether to subject restrictions on speech in a forum to strict scrutiny or reasonableness review, courts have delineated several kinds of forum. A space where speech activity may occur can be described as a public forum; a designated public forum; a limited public forum; a nonpublic forum; or a place that is simply not a forum for speech at all. Restrictions on speech in public and designated public fora are reviewed under strict scrutiny. The law is unsettled on how to treat the last two kinds of fora.

a. The Kinds of Speech Fora

There are four major problems with forum analysis that are relevant to this case. The first is that it is unclear what categories of fora even exist. In *Arkansas Educational Television Commission v. Forbes* ("*AETC*"), decided in 1998, the Supreme Court declared that "Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all."[17] However, more recently, in *Christian Legal Society v. Martinez* ("*CLS*"), the Supreme Court described as a closed set three categories of forum: public, designated, and limited public, eliminating the category of nonpublic forum.[18] The Court stated that a government creates a limited public forum when it restricts the access to the forum to certain speakers.[19] The Third Circuit formerly considered limited public fora as a subset of designated public fora, but it has recently acknowledged the possibility that its own cases may have been superseded by Supreme Court case law.[20]

---

[17] 523 U.S. 666, 678 (1998).

[18] 130 S. Ct. 2971, 2984 n.11 (2010).

[19] *Id.*

[20] *Galena v. Leone*, 638 F.3d 186, 197–98 nn.8 & 9 (3d Cir. 2011) ("There appears to be some inconsistency in federal courts' opinions, even those of the Supreme Court, as to whether a limited public forum is a

b.   Designated and Limited Public Fora

Second, the distinction between the designated public forum and the limited public forum (assuming, based on *CLS*, that the limited public forum has replaced the nonpublic forum) largely depends on how courts or parties frame the identity of a class to whom the forum has been opened. The *AETC* Court held that a government could create a designated public forum by making "property generally available to a class of speakers,"[21] while in *CLS*, when property was "'limited to use by certain groups'"[22] it would be considered not a designated public forum but a limited public forum. The challenge that this creates for lower courts is that the line between property that is generally available to a class of speakers and property that is limited to use by certain groups is gossamer: a class of speakers is often made up of certain groups. To put the puzzle more concretely, in *Widmar v. Vincent*,[23] the forum in question was a school's meeting facilities, which were available to student groups. We know from the Supreme Court's explicit holding in *AETC* that the forum of *Widmar* was a designated public forum (*Widmar* does not use that terminology),[24] but it is not obvious why the forum was considered "generally available to [the] class" of student groups (and thus a designated public forum) rather than "limited to use by" student groups, and therefore a limited public or nonpublic forum. By contrast, in *AETC*, the

---

separate category or a subset of a designated public forum with a third category of forums being 'nonpublic forums.' Recently the Court has used the term 'limited public forum' interchangeably with 'nonpublic forum,' thus suggesting that these categories of for[a] are the same. Because the continued existence *vel non* of a 'nonpublic forum' category has no bearing in this case, we need not dwell on the possible distinction between limited public forums and nonpublic forums. . . . We have stated that 'we have generally applied to limited public fora the constitutional requirements applicable to designated public fora.' In light of *Pleasant Grove,* this statement may no longer be good law." (citations omitted)).

[21] 523 U.S. at 678 (internal quotation marks and citation omitted).

[22] 130 S. Ct. at 2984 n.11, quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009).

[23] 454 U.S. 263 (1981).

[24] *AETC*, 523 U.S. at 678.

forum was limited to use by viable congressional candidates, and thus it was deemed nonpublic. But why was it not "generally available" to the class of viable candidates?[25]

### c. *Ex Ante* Forum Definitions

The third problem is that when the government defines a forum, there is very little guidance on the topic of how or whether to review the government's definitions before turning to the challenged exclusion. The Supreme Court has stated frequently that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."[26] The key word in that sentence for present purposes is "lawfully." What kind of dedication is "lawful," i.e., consistent with the First Amendment? Viewpoint discrimination is clearly forbidden; a government could not create a space for discussion and exclude all speakers who espouse a particular opinion. But when a government draws lines that affect the identity of speakers who will have access to a forum, do courts review

---

[25] *See id.* at 693 n.18 (1998) (Stevens, J., dissenting) ("Ironically, it is the standardless character of the decision to exclude Forbes that provides the basis for the Court's conclusion that the debates were a nonpublic forum rather than a limited public forum. The Court explains that '[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers.' If, as AETC claims, it did invite either the entire class of 'viable' candidates, or the entire class of 'newsworthy' candidates, under the Court's reasoning, it created a designated public forum." (citation omitted)).

Several commentators conclude that the designated public forum cases can be reconciled with limited public forum cases by accepting the government's definition of the forum and inquiring whether the speaker who has been excluded is a member of the class or not. If the speaker is a class member, the forum is a designated public forum *with respect to that speaker*. Thus, the school facilities in *Widmar* were designated public fora with respect to school groups, but not with respect to outside groups, like, to take an example at random, the NAACP. G. Sidney Buchanan, *The Case of the Vanishing Public Forum*, 1991 U. Ill. L. Rev. 949, 960 & nn. 106 & 108 (1991); Matthew D. McGill, *Unleashing the Limited Public Forum: A Modest Revision to a Dysfunctional Doctrine*, 52 Stan. L. Rev. 929, 942 (2000); Marc Rohr, *The Ongoing Mystery of the Limited Public Forum*, 33 Nova L. Rev. 299, 312 (2009); Keith Werhan, *The Supreme Court's Public Forum Doctrine and the Return of Formalism*, 7 Cardozo L. Rev 335, 406 n.346 (1986). These commentators unanimously criticize such a rationalization as either putting too much power in the government's hands or not meaningfully guiding courts' discretion. And, more to the point for this Court's purposes, both the Supreme Court and the Third Circuit regularly state that they define the nature of the forum (as traditional public, designated public, etc.) only with respect to the forum itself and not taking into account the identity or characteristics of the plaintiff. Thus, even if the speaker-dependent characterization of forum analysis has explanatory power, this Court is loath to accept it as an accurate statement of the law when the Third Circuit and the Supreme Court have had ample opportunity to do so but have steadfastly held to the practice of defining the qualities of fora without reference to a plaintiff's membership in a class to whom the forum has been opened.

[26] *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (collecting cases).

the definition of the forum? As Justice Breyer put it, "Must a local government, for example, show a compelling state interest if it builds a band shell in the park and dedicates it solely to classical music (but not to jazz)? The answer is not obvious."[27]

### d.   Changing the Character of a Forum

The final problem is that there is little case law on the government's power to change the nature of a forum.[28] The Supreme Court has stated (in dicta) that in the case of a designated public forum, "Of course, the government is not required to indefinitely retain the open character of the facility."[29] But should courts review closures of or restrictions on fora, and, if so, under what standard? In *CBM*, the Third Circuit carefully scrutinized the definition of a forum to determine whether it was a designated public forum or a nonpublic forum, but the court did not indicate how it would review an unambiguous attempt by the government to de-publicize a previously public forum. Again, it seems uncontroversial to conclude that a viewpoint-based limitation on access to a forum would not be permitted, but, to follow Justice Breyer's hypothetical, if a government had a band shell in a park dedicated to classical music and jazz one summer, must the government show a compelling state interest if it decides only to schedule classical programming in a second summer? Here too, the answer is far from obvious.

### e.   The Law on Speech Fora

---

[27] *Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 750 (1996).

[28] *See* McGill, supra note 25 at 942 (criticizing the Supreme Court for failing "to address the central paradox of limited public forum regulation: How does one distinguish between a legitimate re-designation of a limited public forum and an impermissible content-based restriction?").

[29] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985) (internal quotation marks omitted).

Having considered the cases discussed above and the difficulties they raise, the Court views the state of the law as follows:[30] (1) "Limited public fora" and "nonpublic fora" are both subject to reasonableness review.[31] (2) A government's restrictions on access to a forum made in order to define a forum, regardless of whether the forum is eventually determined to be a designated or limited public forum, need only be reasonable in order to be constitutional, so long as the restrictions are viewpoint-neutral.[32] (3) Notwithstanding (2), the Court will carefully examine the forum in terms of its own characteristics, without reference to the identity of the aspiring speaker,[33] to determine what restrictions are in fact in place and whether those restrictions have in fact resulted in a limited public/nonpublic forum on the one hand or a designated public forum on the other.[34] Generally, a forum is more likely to be a limited public forum if a speaker requires permission to access the forum and the person who grants or denies permission exercises discretion in a way that the task of reviewing requests to speak is more than

---

[30] Because the lowest level of scrutiny applied to restrictions on speech in any forum requires the restrictions to be viewpoint neutral and reasonable, the Court could assume without deciding that such a review is appropriate in this case and conclude (as discussed below) that the policies here fail to satisfy this deferential standard. However, the parties have amassed and presented a sufficient record to resolve these challenging questions. It is therefore appropriate for the Court to determine as best it can what the law is.

[31] *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) ("The Court has also held that a government entity may create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects. In such a forum, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." (citation omitted); *accord CLS v. Martinez*, 130 S. Ct. 2971, 2984 n.11 (2010). So holding does not necessarily repudiate the outcome of Third Circuit cases that held that limited public fora get strict scrutiny; it may be that with the benefit of *CLS* and *Pleasant Grove*, the Third Circuit would now use a different label (designated public forum) to describe spaces that had previously been called "limited public fora." The outcome of those cases, i.e., the scrutiny ultimately applied, may well have been the same before and after *CLS* and *Pleasant Grove*.

[32] *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 280 (3d Cir. 2004).

[33] *See supra* note 25.

[34] *Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 247–55 (3d Cir. 1998).

ministerial.[35] (4) Even if a forum was at one point a designated public forum, a government may effectively redefine it as a limited public forum and restrict access to it under the same conditions as set forth above in (2) and (3).[36]

### B.  Characteristics of the Forum

In order to evaluate what kind of forum the Airport advertising space is, the Court must

> look to the authority's intent with regard to the forum in question and ask whether [the Airport] clearly and deliberately opened its advertising space to the public. To gauge [the Airport]'s intent, [the Court will] examine its policies and practices in using the space and also the nature of the property and its compatibility with expressive activity. Restrictions on the use of the forum, however, do not necessarily mean that [the Airport] has not created a public forum.[37]

The Airport may have created a designated public forum if the restrictions are straightforward and applied in a mechanistic, ministerial way; by contrast, the more difficult it is to gain access to the forum and the greater the care with which the Airport enforces its restrictions, the more likely it is that the Airport has created a limited public or nonpublic forum.

The parties agree that the advertisement space is a forum and that it is not a traditional public forum. It is also undisputed that before March, 2012, the Airport had a less restrictive

---

[35] *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679–80 (1998) ("[T]he government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it. For instance, the Federal Government did not create a designated public forum in *Cornelius* when it reserved eligibility for participation in the CFC drive to charitable agencies, and then made individual, non-ministerial judgments as to which of the eligible agencies would participate." (internal quotation marks and citation omitted)).

[36] *Cornelius*, 473 U.S. at 802; *accord Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 699–700 (1992) (Kennedy, J., concurring in the judgment) ("I recognize that when property has been designated for a particular expressive use, the government may choose to eliminate that designation. . . . The difference [between traditional and designated public fora] is that when property is a protected public forum the State may not by fiat assert broad control over speech or expressive activities; it must alter the objective physical character or uses of the property, and bear the attendant costs, to change the property's forum status.") The Third Circuit relied on this opinion in a public forum analysis in *United States v. Marcavage*, 609 F.3d 264, 275–78 (3d Cir. 2010).

[37] *CBM*, 148 F.3d at 248–49 (3d Cir. 1998) (citations omitted).

advertising policy than it does today.[38] Because the Court has determined that a change in a government-created forum from designated public to limited public/nonpublic is subject to reasonableness review (the lowest possible standard), the Court will review the forum as it is currently structured. If the forum is currently a designated public forum, the Court will review the exclusion of the NAACP's proposed ad under strict scrutiny; if it is a limited public or nonpublic forum, the exclusion will be reviewed for viewpoint neutrality and compatibility with the forum's purposes. The Airport's policies and practices before 2012 remain relevant to the nature of the property and its compatibility with expressive activity even if they do not bear on the Airport's contemporary policies and practices.

### 1.  Policies

Since 2013, entities wishing to advertise at the Airport must submit proposed advertisements to Clear Channel, the company that sells advertising space on behalf of the Airport. Clear Channel reviews advertisements for compliance with the Airport Regulations. If Clear Channel approves the advertisement, it is submitted to the City of Philadelphia Law Department for further review. Following approval from the Law Department, an advertisement is submitted to Deirdre McDermott-O'Neill,[39] a member of the staff of James Tyrrell, Deputy Director of Development Property, Property/Business Development at the Airport.[40] McDermott-O'Neill reviews the advertisement "in terms of location, format, the terms of the contract [i.e.,

---

[38] Before the written policies, the Airport allowed issue advertisements to run. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. H, ECF No. 91-6.

[39] Tyrrell Dep. 36:13–24, Mar. 22, 2013, ECF No. 91-1 at 55.

[40] *Id.* at 8:3–6, ECF No. 91-1 at 27.

the fee for the ad and duration of its display], to make sure there are no inconsistencies, and then she submits it to" Tyrrell.[41]

Tyrrell testified at his deposition that he reviewed ads approved by Clear Channel to determine whether they were "appropriate."[42] Tyrrell testified that he and other executives would review advertisements not only for compliance with the Airport's written advertising policy, but to make certain that the advertisements are consistent with the Airport's "mission,"[43] which Tyrrell described as "to create an attractive environment to . . . promote tourism. It's to create a family oriented environment. It is to promote the region, to attract customers to the region. It's really to generate business for the area."[44]

Following Tyrrell's review, proposals are submitted to the Airport's CEO, Mark Gale, for final approval.[45] The Regulations provide that the Airport CEO's consent is required before an advertisement will be approved. The CEO is prohibited from approving four kinds of advertisements, namely those: "that **do not** propose a commercial transaction;" "relating to the sale or use of alcohol or tobacco products;" "that contain sexually explicit representations and/or

---

[41] *Id.* at 37:15–24, ECF No. 91-1 at 56.

[42] *Id.* at 32:17, ECF No. 91-1a t 51.

[43] *E.g.*, *id. at* 169:3, ECF No. 91-1 at 188; *id.* at 173:9–174:10, ECF No. 91-1 at 55..

[44] *Id.* at 52:12–19, ECF No. 91-1 at 71.

[45] When asked whether he personally could reject the NAACP's proposed advertisement, Tyrrell stated that he believed he had "the contractual ability to do so, but I'm not sure I have the right." *Id.* at 123:24–124:2, ECF No. 91-1 at 142–43. In context, it appears that the distinction between "contractual ability" and "right" means that the Airport's agreement with Clear Channel gave Tyrrell unfettered discretion to reject an advertisement that Clear Channel approved, but that exercising that discretion without consulting with the Law Department and Tyrrell's superiors would have been inconsistent with Tyrrell's job responsibilities. Tyrrell testified at one point, "Recall *my* ability to disapprove any ad in *our* sole discretion," *id.* at 101:4–5 (emphasis added), suggesting, albeit ambiguously because of the different numbers used in his pronouns, that Tyrrell himself had the ability to reject ads; at another point, however, he stated, "My implementation of the policy is not done in a vacuum. It's not done simply by me. It's done as a group. It's done as a decision-making process." *Id.* at 160:18–21.

relate to sexually oriented businesses or products;" and "relating to political campaigns."[46] At the same time, the City of Philadelphia may post its own advertisements to promote air service; the Airport; Philadelphia; the greater Philadelphia area; and "[o]ther City initiatives or purposes."[47]

The purpose of the Airport's policies, according to the City's brief in opposition to the NAACP's motion for summary judgment, is "to earn money for the Airport from the sale of its advertising spaces, to avoid controversy, and to cater to the travelers going through the Airport."[48] These purposes are not described in the written advertising policies, and a review of the deposition testimony of the Airport officials with knowledge of the advertising policies paints a more nuanced picture of the City's policies and gives some meaning to the City's agenda of "avoid[ing] controversy."

Tyrrell testified that the purposes of the advertising policies were to raise money, in part to comply with a condition on receiving federal funds that the Airport be operated "in as businesslike [a] fashion as possible"[49] and that in general, the policy promotes efficiency and the efficient use of Airport facilities; in some limited cases, the policy could promote safety in operating the Airport.[50] He also testified that Airport executives "make a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing"[51] and that the distinction between ads that propose a commercial transaction and those that do not was adopted possibly in order to lessen the

---

[46] Joint Statement of Stipulated & Undisputed Material Facts at ¶ 8, ECF No. 91-6.

[47] *Id.*

[48] Def.'s Br. in Supp. of its Mot. for Summ. J. & Resp. to Pl.'s Mot. for Summ. J. at 2, ECF No. 90.

[49] Tyrrell Dep, 82:23–24, ECF No. 91-1 at 101.

[50] *Id.* at 107:12–110:6, ECF No. 91-1 at 126–29.

[51] *Id.* at 123:11–16, ECF No. 91-1 at 142.

likelihood that travelers in the Airport would be offended.[52] He offered no other reason why the

distinction was included in the policies, though he did allude to the possibility that if the Airport

allowed offensive advertisements, some advertisers may be less inclined to use Airport

advertising space.[53] Finally, in discussing how Airport employees would review hypothetical

advertisements, Tyrrell testified that in implementing the Airport's policies, he would be

furthering the Airport's mission, previously described as to promote tourism, to create a family

oriented environment, and to generate business for the area.[54]

      Gale testified that the purpose of the Airport's rules and regulations generally is to

"promote the operation of the Airport."[55] More specifically, his responsibility is in part:

> to look out for how the Airport looks and feels to the general traveling public in
> terms of an aesthetic value. I try to insure that we're not plastering advertising in
> too many different locations, and that the advertising we are putting up is done
> tastefully in terms of not plastering every single wall with an electronic panel or a
> vinyl wall wrap or a static display, making it look like Broadway as opposed to
> what we're trying to achieve, which is a very nice and comfortable atmosphere for
> our passengers to travel through.[56]

He further testified:

> The purpose of the advertising at the Airport for us is we raise revenue for the
> operation of the Airport through the sale of that advertising. But at the same time
> the Airport is a gateway to our region. Part of our responsibility, we believe, at the
> Airport is to promote a facility that is looking to attract business and hospitality
> issues and tourism. And I think we use these guidelines here, these Rules and
> Regulations as laid out to actually identify what should be displayed at the Airport
> and what shouldn't be displayed.[57]

---

[52] *Id.* at 145:5–146:23, ECF No. 91-1 at 164–65.

[53] *Id.* at 114:15 – 115:2, ECF No. 91-1 at 133–34.

[54] *Id.* at 52:12–19, ECF No. 91-1 at 71.

[55] Gale Dep. 44:6–44:7, Sept. 18, 2013, ECF No. 92-6 at 12.

[56] *Id.* at 14:5–14:17, ECF No. 92-6 at 5.

[57] *Id.* at 23:14–24:3, ECF No. 92-6 at 7.

When asked why the Airport does not display issue ads, Gale responded:

> The Airport is not interested in posting issue ads that might promote or—what's the word I'm looking for—not to promote but to project a negative image of the city or the region. We're working very hard at the Airport to promote a positive image for the city and the region to attract businesses and tourism to our area. We are a gateway to the nation and to the world, and we're trying to do everything we can to promote the positive image of the city and the region.[58]

From the foregoing, the Court can conclude for the purposes of resolving this motion that the purposes of the advertising policies are to raise revenue for the airport, to create a positive, family-friendly atmosphere for travelers, and to cast a positive light on the region that the Airport serves in order to convince travelers to return.

## 2. Practices

The record does not give a comprehensive account of the Airport's practices in administering its advertising policies, either in the time period before March 2012, when the written policy was adopted, or afterward. Before 2012, the NAACP's advertisement was rejected, though it was later displayed as part of a settlement agreement between the NAACP and the Airport over the rejection. The ad was rejected after Tyrrell consulted with Clear Channel to ask if the ad had been accepted for display at any other airport; Tyrrell learned that the ad had been submitted to about ten of the top twenty-five airports nationwide, and that none of the airports had chosen to run the ad.[59] Other rejected ads that Tyrrell recalled were a hotel advertisement of a format and size inconsistent with typical ads in the Airport,[60] an ad for Penthouse Magazine, and an ad by an organization opposed to the Transportation Security

---

[58] *Id.* at 26:15–27:1, ECF No. 92-6 at 8.

[59] Tyrrell Dep. 45:20–46:20, Mar. 22, 2013, ECF No. 91-1 at 64–65.

[60] *Id.* at 41:18–42:4, No 91-1 at 60–61.

Administration.[61] Gale recalled an advertisement for a museum exhibition "that may have shown the human body in different layers of skin and flesh and bone and may have been a little scary looking"[62] that was rejected because it was felt that that the ad "would have been inappropriate to display that in the Airport for fear that it may upset a particular audience."[63]

Between the time of the adoption of the written policies in March 2012 and Tyrrell's deposition of March 2013, the Airport rejected at least two advertisements, one from the Pennsylvania State Troopers and one possibly by the United States Army.[64] The record does not reveal exactly what those advertisements contained, but they were rejected as not having proposed a commercial transaction. The record does not reflect the results of Clear Channel's initial review of proposed advertisements either before or after March 2012; although all advertisements must be approved by the CEO, the CEO does not recall ever personally having rejected an advertisement that made it through the layers of review below him.[65]

The NAACP does not point to any particular advertisement that has run in the Airport since the written policy was adopted that suggests that the Airport applies the policy selectively. Furthermore, the record evidence suggests that application of the policy is a lengthy process with many levels of thorough review, both for style and substance. Unlike SEPTA's practices in *CBM*, the record does not demonstrate that the Airport has a "practice of permitting virtually unlimited access to the" advertising space.[66]

---

[61] Tyrell Dep. 12:3–12, July 25, 2013, ECF No. 91-1 at 227.

[62] Gale Dep. 35:14–17, ECF No. 92-6 at 10.

[63] *Id.* at 36:14–17, ECF No. 92-6 at 10.

[64] Tyrrell Dep, 35:15–36:4, Mar. 22, 2013, ECF No. 91-1 at 55.

[65] Gale Dep. 13:11–13, ECF No. 92-6 at 5.

[66] *Christ's Bride Ministries, Inc. v. Se. Pennsylvania Transp. Auth.*, 148 F.3d 242, 252 (3d Cir. 1998)

3.   Nature of Property

The physical nature of the forum here, wall spaces where advertisements may be displayed, is straightforward. Advertisements are static and segregated from the places where people pass through the Airport by simple devices that mount images on a wall. But the nature of the forum is defined by more than its physical attributes; the forum's own context necessarily defines the role the forum plays within the environment of the Airport.

The forum here—advertising space—is within the Philadelphia International Airport, described by Gale as a "gateway to the nation and to the world."[67] Over 30,000,000 travelers passed through the Airport in 2012, and in the Airport they may have encountered restaurants, bars, boutiques, televisions broadcasting breaking news on the CNN Airport Network, art displays, advertisements promoting the City and the greater Philadelphia area, as well as the predictable accoutrements of air travel: security points, gates, Airport personnel, and travelers. The property that contains the forum is a hive of activity, commercial, expressive, and transportation-related. Notable expressive activity in the Airport includes televisions that broadcast breaking news and televised advertisements; store displays that encourage shoppers to buy all manner of wares, including news magazines, luxury goods, spirits, cigarettes, pornographic magazines (partially concealed behind a black plastic bar),[68] toys, and souvenirs; commercial advertisements; advertisements promoting the City and the region; and televisions in bars and restaurants that are not necessarily tuned to the CNN Airport network.

---

[67] Gale Dep. at 26:22–23, ECF No. 92-6 at 8.

[68] Pl's Resp. to Def.'s Mot. for Summ. J. Ex. G-07, ECF No. 91-2.

The nature of the property is also, as Tyrrell testified, "very stressful."[69] This fact is undisputed, and the Court understands that travelers are found in the Airport because they have a plane to catch or have just disembarked from a journey that may have been quite harrowing. Passengers may be nervous about boarding or disembarking from a tightly packed tube that hurtles 30,000 feet above the Earth near the speed of sound. Security personnel pervade the terminals.

In short, the Airport is a large, varied environment, with much to see, do, and buy, that has a primary purpose of conducting travelers safely to their destinations; the forum is a part of that environment and caters to Airport customers.

4.  Compatibility with Expressive Activity

Given the whole context of the Airport, the forum is quite compatible with many kinds of expressive activity. Of course, not all expression is necessarily compatible with the unique security concerns of the Airport, the stressfulness of the environment, the necessity to maintain its function as an efficient conduit for travelers, and the wide variety of passengers of all ages, tastes, and backgrounds. Notably for the purposes of this lawsuit, the advertisement that the NAACP seeks to place in the Airport has in fact run there as part of a settlement of previous litigation; the City has pointed to no evidence to suggest any adverse consequences from running the advertisement. Additionally, CNN broadcasts, with sound, throughout the Airport breaking news from around the globe; as any reasonably well informed person knows, a given newscast covering contemporary events can be as controversial, shocking, and upsetting as it is informative.

---

[69] Tyrrell Dep. 109:5, Mar. 22, 2013, ECF No. 91-1 at 128.

Nor is the forum incompatible with "issue" advertisements. In May of 2011, Witold Walczak, the legal director of the NAACP, strolled through the Airport and photographed advertisements promoting cancer research; a disabled surfer's positive example of perseverance; safe driving; Jackie Robinson's positive character attributes; the World Wildlife Foundation; the example of Liz Murray, a formerly homeless woman, who overcame adversity and graduated from Harvard College; the National PTA's encouragement to "know about your kid's school;" and more.[70] These advertisements all predated the written policy, but there is nothing in the record to suggest that they were incompatible in any way with the forum other than by virtue of the policymakers' decision to exclude this kind of advertising except when promoted by the City.

5.  Summary of Forum Analysis

Considering all the evidence above, and mindful of the procedural posture of this case, which requires the Court to construe disputed factual matters in the light most favorable to the City when considering the NAACP's motion, the Court holds that the advertising space is a limited public forum—as the Supreme Court used that phrase in *CLS* and *Pleasant Grove*—or, to use terminology from less recent cases, a nonpublic forum. Whatever terminology is appropriate in this somewhat unsettled area of law, the result is this: the City need only prove that the restrictions on speech are reasonable in light of the purposes of the forum.

The Court reaches this conclusion largely because the thorough process of obtaining permission to access the advertising space evinces an intent on the part of the City to control access to the forum carefully. The parties have amassed evidence that the City has rejected proposed advertisements as inconsistent with the City's purposes in opening the advertising space to speakers, and there is no evidence to suggest that granting or denying permission to

---

[70] Pl.'s Response to Mot. for Summ. J. Ex. H, ECF No. 91-2.

speak in the ad space is a mechanistic or ministerial matter, distinguishing this case from *CBM*. This conclusion is supported by the decision in *International Society for Krishna Consciousness v. Lee* ("*ISKCON*"),[71] which held that restrictions on speech in airport terminals are subject to reasonableness review, and *Lehman v. City of Shaker Heights*,[72] which held that advertising space inside buses where there was a categorical prohibition on political messaging was also subject to reasonableness review.

### C. Viewpoint-Neutrality

Any restriction on speech, even in a nonpublic forum, must be viewpoint-neutral, that is to say, "not an effort to suppress the speaker's activity due to disagreement with the speaker's view."[73] The NAACP has amassed considerable evidence that tends to support the inference that the purpose of the written policy is to exclude speech that may cast a negative light on Philadelphia and the region. The timing of adoption of the written policy, shortly after the NAACP submitted its advertisement that criticizes American criminal justice policies, is highly suggestive. Additionally, Gale testified that "We're working very hard at the Airport to promote a positive image for the city and the region to attract businesses and tourism to our area."[74] Similarly, according to Tyrrell, the purposes of the policies are "to promote the region, to attract customers to the region."[75] These comments suggest that Airport executives believe that commercial advertisements, in addition to being less likely to offend Airport customers,[76] would

---

[71] 505 U.S. 672, 679 (1992).

[72] *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974).

[73] *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 687 (1992) (O'Connor, J., concurring in the judgment).

[74] Gale Dep. at 26:15–22, ECF No. 92-6 8.

[75] Tyrell Dep. 52:16–18, Mar. 22, 2013, ECF No. 91-1 at 71.

be less likely be critical of Philadelphia and the region or to cast a negative light on the region by criticizing the nation generally.

At the same time, however, the policies themselves are silent on the topic of a speaker's viewpoint. And Tyrrell and Gale may have sincerely believed that commercial advertisements in general are more likely to maintain the Airport's overall family friendly atmosphere than issue ads, which might raise difficult questions that Airport travelers would rather not face. Although it is a close question, the Court cannot at this stage conclusively resolve whether the restrictions manifested by the written policy are viewpoint-neutral. Since the Court must draw all reasonable inferences in the nonmoving party's favor and there are competing inferences to be drawn from the evidence that sheds light on whether the policies are viewpoint-neutral, the Court will not award summary judgment on this basis to the NAACP.

### D.  Reasonableness in Light of Purposes of the Forum

As Justice O'Connor wrote:

> The determination that [these] are not public fora . . . only begins our inquiry. . . . [A] restriction on speech in a nonpublic forum is reasonable when it is consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated. Ordinarily, this inquiry is relatively straightforward, because we have almost always been confronted with cases where the fora at issue were discrete, single-purpose facilities. . . . But the wide range of activities promoted by the [Airport] is no more directly related to facilitating air travel than are the types of activities in which the [NAACP], wishes to engage. . . . The reasonableness inquiry, therefore, is not whether the restrictions on speech are consistent with . . . preserving the property for air travel, but whether they are reasonably related to maintaining the multipurpose environment that the [Airport] has deliberately created.[77]

---

[76] *Id.* 145:5–146:23, ECF No. 91-1 at 164–65.

[77] *ISKCON*, 505 U.S. at 687-89 (O'Connor, J. concurring in the judgment) (fifth, sixth, seventh, and last alterations in original) (citations omitted) (internal quotation marks omitted).

The purposes of the forum identified by Tyrrell and Gale are to raise revenue for the Airport and to cater to Airport customers by maintaining the Airport as a family-friendly environment that casts a positive light on the City and the region. The restriction at issue here is the prohibition on non-commercial advertisements. The restriction is unreasonable because it is only tenuously connected to the purposes the Airport has identified or "to maintaining the multipurpose environment that the [Airport] has deliberately created."[78]

Tyrrell, the corporate designee named to testify about the advertising policy, demonstrated that the policy fails to support the goal of raising revenue. Tyrrell acknowledged that the "distinction that the policy draws between what kind of ad and the other, that has nothing to do with revenue."[79] When asked about the role played by the relationship between supply, demand, and Airport revenue, Tyrrell responded, "I'm not sure we have ever had a shortage of advertising capability."[80] Considering the abundant supply of ad space, opening up the space to more advertisers would tend to increase ad revenue.

The policy cannot plausibly be connected with creating a family-friendly environment. Advertisements that propose a commercial transaction may propose a family-friendly commercial transaction, or they may not.[81]

As far as promoting the City and region are concerned, to the extent such a goal does not amount to viewpoint discrimination, it is equally difficult to understand why commercial advertisements are more likely than non-commercial ones to further this governmental goal.

---

[78] *Id.* at 689

[79] Tyrrell Dep. 145:5–9, Mar. 22, 2013, ECF No. 91-1 at 164.

[80] *Id.* at 122:4–6, ECF No. 91-1 at 141.

[81] Tyrrell Dep. Exs. P-21, 31, 32 & 33, ECF No. 9101 at 219–23.

Commercial advertisements encourage the public to purchase goods or services which may or may not have anything to do with the greater Philadelphia area. Issue advertisements equally may support awareness of local or foreign matters, as well as affairs not tied to any particular location.

Similarly to the leafleting at issue in *ISKCON*, "it is difficult to point to any problems intrinsic to the act of [placing a passive advertisement on a wall] that would make it naturally incompatible with a large, multipurpose forum such as those at issue here."[82] As stated above, in order to be constitutional, the advertising policy must be reasonable *in light of the purposes of the forum*. The forum here is advertising space at the Airport. The proposed advertisement is in no way physically incompatible with the spaces where it is designed to hang. And its content is also compatible with the large, multipurpose venue for traveling and shopping that is the Airport, especially considering all the expressive media that the Airport supports, including televisions tuned to the CNN Airport Network, televisions in bars and restaurants tuned to other channels, advertisements within various boutiques at the Airport easily visible from outside the stores, and all manner of publications for sale throughout the terminal. The Airport has pointed to no reason to conclude that the proposed advertisement is incompatible with this environment, and the Court can conceive of none.

By contrast, restrictions on speech that have been upheld include face-to-face solicitation in an Airport because it was "incompatible with [an] airport's functioning;"[83] political advertising that could have resulted in diminished total advertising revenue and that was restricted "in order to minimize chances of abuse, the appearance of favoritism, and the risk of

---

[82] *ISKCON*, 505 U.S. at 689 (opinion of O'Connor, J.).

[83] *Id.*

26

imposing upon a captive audience;"[84] restrictions on the kinds of organizations permitted to

participate in a federal charity drive where "the President could reasonably conclude that a dollar

directly spent on providing food or shelter to the needy is more beneficial than a dollar spent on

litigation that might or might not result in aid to the needy" and in order to avoid "the appearance

of political favoritism."[85] All of these cases differ from the present matter in that the restriction is

reasonably related to a legitimate government goal.

The NAACP has pointed to considerable evidence that supports the conclusion that to

display non-commercial ads, like the NAACP's, would be perfectly compatible with a

multipurpose terminal containing many adult-oriented potentially controversial media. By

contrast, the City has failed to demonstrate why allowing non-commercial advertisements would

diminish advertising revenue, diminish the Airport's efficacy, or make the Airport a

meaningfully less positive, family oriented place than permitting commercial and City-sponsored

advertisements only. Therefore the NAACP is entitled to summary judgment on its First

Amendment claim with respect to the written policy.

### IV.   The Unwritten Policy

#### A.   Is There an Unwritten Policy?

The NAACP posits that there is an unwritten policy that prohibits the display of

advertisements deemed inconsistent with the airport's mission. In support of this argument, the

NAACP points to the deposition of James Tyrrell, who was asked whether several possible

advertisements would be approved. Regrettably, the parties have not submitted with their moving

papers copies of all the exhibits referenced in the deposition, so it is not always possible to know

---

[84] *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974).

[85] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985).

the full contents of advertisements being discussed at certain points of the deposition, but the following exchange does illustrate the process for approving an ad. From context, the advertisement discussed was likely one for a toy gun. After Tyrrell was asked whether the ad would be approved, the following dialogue occurred:

> A [By Tyrrell]. Probably not.
> Q [by counsel for the NAACP]. And the basis for not displaying it?
> A. It's inconsistent with the airport's mission and policies.
> Q. Who is it that interprets what the airport's policies and missions are and decides whether something is or is not consistent?
> A. It would be probably a collection of people.
> Q. And would that be the same collection you mentioned before?
> A. Yes.
> Q. And that would include the lawyers?
> A. Sure.
> Q. And who else?
> A. The senior management team.
> Q. Mr. Gale?
> A. Yes.
> Q. Ms. Lopez?
> A. The other deputies and chief of staff.
> Q. Okay.[86]

Tyrrell's reference to "policies" leaves this exchange ambiguous about whether he is describing an unwritten policy to reject ads inconsistent with the Airport's mission, but the following discussion eliminates any possible ambiguity. Tyrrell is asked to discuss what would happen if Bentley, the luxury automobile company, had submitted a particular advertisement to the Airport. This time the ad has been made part of the Court record. The ad is a rectangular photographic portrait, oriented vertically, of a well-preserved man approximately fifty years old dressed in a dark suit, necktie, and sitting on leather couch of the sort one might find at an exclusive club. His right arm lies on the couch's armrest, but the man has elevated his right wrist, palm up, and has clenched all of his fingers but the middle one. Because his arm is much closer

---

[86] Tyrrell Dep. 156:16–157:15, Mar. 22, 2013, ECF No. 91-1 at 175.

to the camera than the rest of his body, a foreshortening effect has made the man's gesture

appear larger than life. Near the bottom of the picture in the center is the Bentley logo, and

underneath that, the word "BENTLEY." Here is the conversation about the ad:

> Q. [Exhibit] P-21 that you now have in front of you is an ad for Bentley
> automobiles. You would understand that to be a commercial ad, that is an ad that
> proposes a commercial transaction; correct?
> A. Yes.
> Q. Do you believe that ad would be accepted or rejected?
> A. I believe it would be rejected.
> Q. And the basis?
> A. It would probably be deemed offensive.
> Q. And it would be deemed offensive by the group that you identified of senior
> managers and lawyers; is that right?
> A. Yes.
> Q. And that group somehow has the responsibility, as you understand it, to
> determine which ads are offensive and which are not and to apply that
> determination in either allowing or disallowing ads; correct?
> MS. SHOFFEL [counsel for Tyrrell]: Objection. He didn't say offensive. He said
> if the policy was up to him, it would be offensive. That's where it came from.
> That's not what the policy is and it's not their role. I just want to be clear about
> that.
> MR. MAGAZINER [counsel for NAACP]: Well, I appreciate your testimony, but
> I was actually asking Mr. Tyrrell.
> A. The group would determine which ads are—would be permitted to be
> displayed in the airport.
> Q. And you said you believe the group would reject this ad on the ground that it
> was offensive?
> A. I believe it would reject it because it did not comply with the airport's mission,
> and they would find it objectionable.
> Q. And despite what your lawyer has just said, you believe that that group's
> responsibility, among other things, is to determine which ads are objectionable
> and comply with the airport's mission and which do not have to reject those
> which are objectionable and do comply with the mission; correct?
> A. Correct.
> Q. Is it your belief that that group has its responsibility and authority to reject ads
> that it finds offensive?
> A. Offensive is my word. If that's not the appropriate word, then—
> Q. Well, you don't have to listen to what your lawyer said.
> A. I believe the group would reject this because it's not appropriate to display in
> the airport.
> Q. What about that ad makes you understand that it proposes a commercial
> transaction which you said it does?

A. The only thing about this ad that is commercially anything is the name
Bentley. I don't believe it would promote a commercial transaction.
Q. Well, there are lots of advertisements that just mention a product and they
don't say please buy it; right?
A. I'm not sure.
Q. Okay.[87]

The parties disagree about the significance of this exchange. The NAACP argues that it

conclusively illustrates that there is an unwritten policy of rejecting "offensive" advertisements.

The City argues that it illustrates nothing because Bentley never actually submitted this

advertisement, so the NAACP is inventing an unwritten policy out of thin air. The City also

points to another section of the deposition where Tyrrell discussed what he wanted the policy to

be and argues that Tyrrell's testimony that certain ads would be rejected as offensive referred

only to the policy he wanted, not the actual policy.[88] Furthermore, the City argues that Tyrrell's

testimony amounted to speculation about what other people would do, and therefore it does not

create a fact issue. Finally, the City argues that "we doubt that an obscene gesture is protected

speech in a nonpublic forum, so the Airport's hypothetical rejection of such an advertisement

does not imply unfettered discretion." [89]

The City does not rely on Tyrrell's assertion that this advertisement for a company that

makes consumer goods does not "propose a commercial transaction,"[90] and the arguments the

---

[87] *Id.* at 167:6–170:13, ECF No. 91-1 at 186–89.

[88] *E.g.*, *id.* at 141:10–16, ECF No. 91-1 at 160 ("Well, I can tell you as a business person at the airport tasked with generating non-airline revenue, I would sell just about anything that wasn't totally offensive to the traveling public and put it anywhere at the airport.").

[89] Def.'s Reply Br. in Supp. of Renewed Mot. for Summ. J. at 7, ECF No. 108 at 7.

[90] Any reliance this statement (which contradicts Tyrrell's own earlier testimony that the ad would be rejected because it was offensive) would be misplaced. The ad's message is hardly esoteric: Bentley owners don't care or need to care what other people think of them; wouldn't you like to sit in an expensive suit on a comfy couch and offend everyone who passes by without suffering any consequences? If so, you should buy a Bentley. To the extent Tyrrell's assertion reflects a dispute about the material fact of whether the unwritten policy exists, the Court

City does make miss the mark. The NAACP sued the City over the advertising policies. The City designated Tyrrell pursuant to Rule 30(b)(6) as the representative who was in the best position to describe the Airport policy. Tyrrell testified that the Airport prohibits advertisements that satisfy the written terms of the advertising policy from being displayed if they do not meet other, unwritten criteria. The City points to no evidence that refutes this testimony. The City's arguments—that the Bentley ad never went through the Airport's advertisement review process, that Tyrrell was speculating about conclusions other employees would reach, and that obscene speech may be restricted—are all completely beside the point. This is a suit about the constitutionality of the Airport's *policies themselves*. According to Tyrrell, who is plainly competent to testify to the content of the City's policies, ads are reviewed to determine whether they are consistent with the Airport's mission, a process that is missing from the City's written policies. The City nowhere points to evidence that suggests the review Tyrrell describes is not a part of the City's actual process in deciding whether to accept or reject proposed advertisements.

In addition to Tyrrell's deposition, Gale, the Airport CEO, testified that:

> The Airport is not interested in posting issue ads that might promote or—what's the word I'm looking for—not to promote but to project a negative image of the city or the region. We're working very hard at the Airport to promote a positive image for the city and the region to attract businesses and tourism to our area. We are a gateway to the nation and to the world, and we're trying to do everything we can to promote the positive image of the city and the region.[91]

When probed about the existence of an unwritten policy, Gale engaged in the following exchange with counsel for the NAACP:

> Q. And if it met all the— I don't see anything in Section 2 that excludes ads that propose a commercial transaction but do not promote the city or region.

---

holds that the dispute is not "genuine." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No reasonable factfinder could conclude that this ad does not propose a commercial transaction.

[91] Gale Dep. 26:15–27:1, ECF No. 92-6 at 8.

A. Right.

Q. Does that suggest that such an ad would be posted at the Airport?

A. Does it meet all the other criteria that are listed here?

Q. Let's assume it does.

A. Then I believe if there was additional concern, it would again be run through our process. If it's been approved by my designee and it's been approved by the Law Department and it comes onto my desk, I don't think that I would automatically reject it because I don't like the content or the ad. If I had questions as to whether or not it was in keeping with our initiatives of trying to positively promote the city or the region, or the Airport, then I would raise additional questions. But if I found that we weren't going to be afoul of the law, then I believe I would probably approve the ad and move forward.[92]

By itself, this exchange does not conclusively establish that there is an unwritten policy of rejecting advertisements that do not promote a positive image of the City and the Airport, but Gale nowhere contradicts Tyrrell's description of the approval process before an ad reaches Gale's desk, and he confirms that commercial advertisements that could be viewed as "offensive" receive extra scrutiny before they are approved. Therefore, Gale's testimony, if anything, tends to support the NAACP's contention that an unwritten, no-inappropriate-ads policy exists.

By contrast, the City does not point to evidence tending to negate the existence of an unwritten policy. Therefore, even though the City is entitled to have all reasonable inferences drawn in its favor, at summary judgment, the Court is able to conclude that an unwritten policy exists that prohibits advertisements deemed inconsistent with the Airport's mission from being displayed.

### B.   NAACP's Right to Challenge Unwritten Policy

The City argues that even if an unwritten policy exists, the NAACP cannot make out a challenge to the policy. First, the City asserts that the NAACP lacks standing to assert such a challenge because it has suffered no legal injury from an unwritten policy. This contention is

---

[92] *Id.* at 30:4–31:4, ECF No. 92-6 at 9.

disposed of above in the Court's discussion of standing. Second, the City argues that because the written policy is constitutional and the NAACP's ad was rejected under the constitutional policy, the NAACP cannot challenge the unwritten policy. The Court need not determine whether the City's position is accurate in the context of this facial challenge,[93] because as discussed above, the written policy is unconstitutional. Finally, the City points to a Ninth Circuit case, *Tipton v. University of Hawaii*, arguing that it stands for the proposition that in order to make out a challenge to an unwritten policy, a Plaintiff *must* show inconsistent application of a written policy.[94]

The City grossly over-reads *Tipton.* It does not stand to reason that inconsistent application of a written policy is always and in all cases a prerequisite to suing on an unwritten policy. If a plaintiff can show the existence of an unconstitutional unwritten policy, a court will invalidate the policy as unconstitutional. Indeed *Tipton* does not support the City's position. The court in *Tipton* stated, "Without some form of unwritten policy arising from the application of a written policy, there can be no challenge *that focuses on the systematically unconstitutional operation of the written policy*."[95] The NAACP, unlike the Plaintiff in *Tipton*, does not argue that the Airport engages in systematically unconstitutional operation of the written policy; the NAACP argues that there is a separate, additional, unwritten policy, regularly adhered to, that is unconstitutional. In *Tipton*, the plaintiff argued that the university applied its written policy in such a way as to give rise to the inference that there was an unwritten policy. Here, the NAACP

---

[93] The City relies on *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977), which was an as-applied challenge to a school board's decision, not to the board's policies.

[94] 15 F.3d 922 (9th Cir. 1994).

[95] *Id.* at 927 (internal quotation marks omitted).

points to other evidence, specifically testimony from Tyrrell and the CEO of the Airport, stating that there is an unwritten policy. The cases are not analogous.

### C.  The Unwritten Policy is Unconstitutional

As discussed above, the Airport has an unwritten policy of rejecting ads that do not support the Airport's "mission," described by Tyrrell as "to create an attractive environment to kind of promote tourism. It's to create a family oriented environment. It is to promote the region, to attract customers to the region. It's really to generate business for the area."[96] As the Airport CEO put it, "Well, we clearly want the visitors to Philadelphia and the greater Philadelphia region to have a positive image. We want them to come and visit our attractions, both our historic attractions, art museums, restaurants, all the different features that our city and our region have to offer, to do so and promote the Airport as the gateway in a very positive fashion, so that their experience is good and they return here, so that our economy can thrive."[97]

This is viewpoint discrimination. Of course, the City and the Airport may advocate for Philadelphia, exercising full-throatedly their right to government speech. But they cannot create a forum for private speech and then exclude speakers they do not agree with. The City allows non-government actors to speak in the Airport so long as they toe the government's line. By stifling speech that the City dislikes, the City risks creating an environment where non-government speakers whistle in unison a happy, secretly government sanctioned tune. The First Amendment furthers our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even when speech "include[s] vehement,

---

[96] Tyrrell Dep. 52:13–19, Mar. 22, 2013, ECF No. 91-1 at 71

[97] Gale Dep. 40:9–20, ECF No. 92-6 at 11.

caustic, and sometimes unpleasantly sharp attacks on government and public officials."[98] The

City's unwritten advertising policy falls far short of that lofty goal.

## CONCLUSION

The NAACP has standing to contest both the written and unwritten policies. Both

policies exist, and both are unconstitutional. The parties agree that the Pennsylvania

Constitution's protections of free expression are at least coextensive with those of the United

States Constitution. Summary judgment will be entered in favor of the NAACP. Because the

NAACP is entitled to summary judgment, it follows that the City is not, and the City's motions

will be denied. An appropriate Order follows.

---

[98] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).